# EXHIBIT 10 - PART C

 **Minnesota Session Laws**

## Minnesota Session Laws - 1995

Key: ~~language to be deleted~~...new language <u>Change language enhancement display.</u>

<u>Legislative history and Authors</u>

                    CHAPTER 53-S.F.No. 574
            An act relating to Indians; requiring the commissioner
        of natural resources to change certain names of
        geographic features of the state.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MINNESOTA:
    Section 1.    [COMMISSIONER OF NATURAL RESOURCES TO CHANGE
CERTAIN NAMES.]
    <u>On or before July 31, 1996, the commissioner of natural</u>
<u>resources shall change each name of a geographic feature in the</u>
<u>state that contains the word "squaw" to another name that does</u>
<u>not contain this word.  The commissioner shall select the new</u>
<u>names in cooperation with the county boards of the counties in</u>
<u>which the feature is located and with their approval.</u>
    Sec. 2.    [EFFECTIVE DATE.]
    <u>Section 1 is effective the day following final enactment.</u>
    Presented to the governor April 17, 1995
    Signed by the governor April 18, 1995, 12:14 p.m.

Encyclopædia Britannica                         Page 1 of 2



Home    Browse    Store    Subscribe    My Account

Search Results You Can *Trust*  [          ] 🔍

Log In or Subscribe Now          Dictionary

Log-in
[          ]

Password
[          ] 🔍

☐ Remember me
Forgot your password?

Not a subscriber yet?
Learn about the service.



Account Management
Shopping



Britannica's Early
Learners Suite
Price: USD $317
A complete learning
environment for the
young mind.



Art of India: Prehistory to
the Present
Price: USD $79.00
A beautiful tour through
the art history of India.



Merriam-Webster's
Flappers to Rappers:

## Merriam-Webster's Online Dictionary

(Merriam-Webster)  **Search**
[                    ] 🔍

3 words found.
To view an entry in the list, highlight it and click on GO TO.

  Thesaurus

Go To
| squaw |
| old-squaw |
| squaw man |

Main Entry: **squaw**
Pronunciation: ˈskwȯ
Function: *noun*
Etymology: Massachuset *squa, ussqua* woman
Date: 1634
1 *often offensive* : an American Indian woman
2 *usually disparaging* : WOMAN, WIFE

### Dictionary Pronunciation Key

\ə\ as **a** and **u** in abut
\ˈ°ə\ as **e** in kitten
\ər\ as **ur** and **er** in further
\a\ as **a** in ash
\ā\ as **a** in ace
\ä\ as **o** in mop
\au\ as **ou** in out
\ch\ as **ch** in chin

\e\ as **e** in bet
\E\ as **ea** in easy
\g\ as **g** in go
\i\ as **i** in hit
\I\ as **i** in ice
\j\ as **j** in job
\[ng]\ as **ng** in sing
\O\ as **o** in go

\o\ as **aw** in law
\oi\ as **oy** in boy
\th\ as **th** in thin
\[th_]\ as **th** in the
\ü\ as **oo** in loot
\u\ as **oo** in foot
\y\ as **y** in yet
\zh\ as **si** in vision

**Please see on Upper Right Corner**
**of Response to Office Action ONLY**

Examining Attorney: DE JONGE, KATHY
Serial Number: 76/511144

# UNITED STATES PATENT AN



**SERIAL NO**: 76/511144

**APPLICANT**: Squaw Valley Development Company

**CORRESPONDENT ADDRESS**:
VIRGINIA R. RICHARD
WINSTON & STRAWN
200 PARK AVENUE
NEW YORK NEW YORK 10166

**RETURN ADDRESS**:
Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3514

**MARK**:    SQUAW

**CORRESPONDENT'S REFERENCE/DOCKET NO**:  N/A

**CORRESPONDENT EMAIL ADDRESS**:

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and e-mail address.

# OFFICE ACTION

**TO AVOID ABANDONMENT, WE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF OUR MAILING OR E-MAILING DATE.**

RE: Serial Number  76/511144

This is in response to the applicant's response filed on May 20, 2004.

**Identification of Goods and Services**
The amended identification of goods and services is acceptable.

**Claim of Ownership**
The amended claim of ownership is acceptable.

**Specimen for Class 35 Services**
The requirement for a substitute specimen for the Class 35 services is withdrawn.

**Final Refusal – Disparaging Mark**
The refusal to register the mark **SQUAW** under Section 2(a) of the Trademark Act, on grounds that the mark consists of or comprises matter which may disparage American Indians or bring them into contempt or disrepute, is <u>maintained and made final</u>. This is a final action. 37 C.F.R. Section 2.64. Trademark Act Section 2(a), 15 U.S.C. §1052(a);  *See Greyhound Corp. v. Both Worlds Inc.*,

6 USPQ2d 1635 (TTAB 1988); *In re Anti-Communist World Freedom Congress, Inc.*, 161 USPQ 304 (TTAB 1969); TMEP §§1203.03, 1203.03(c) and 1203.03(d).

The applicant's mark is **SQUAW**. "SQUAW" is an offensive or disparaging term for an American Indian woman. The term "SQUAW" is defined as follows:

## squaw

squaw (skwô) *noun*
**Offensive.**
1.  A Native American woman, especially a wife.
2.  A woman or wife.
[Massachusett *squa*, younger woman.][1]

The Online *Merriam-Webster Dictionary* defines "SQUAW" as follows (see attachments):

1 *often offensive*: an American Indian woman
2 *usually disparaging*: WOMAN, WIFE

The *Encyclopedia of North American Indians* states that "[b]y the twentieth century the word squaw had developed multiple **derogatory** associations that had no connection with the word's original meaning."[2] (see attachments to first office action).

The examining attorney has attached excerpts from a representative sampling of stories in the LEXIS/NEXIS research database about the offensiveness of the term "SQUAW." This evidence establishes that legislation banning the term "SQUAW" from place names and landmarks has been enacted in at least five states (Minnesota, Maine, Wisconsin, South Dakota and Montana) and proposed in Oregon and several localities. Most recently, Phoenix's "Squaw Peak" was renamed "Piestewa Peak"; "Squaw Creek" in Nebraska is to be renamed. The Oklahoma legislature has enacted a resolution asking state officials to remove "squaw" from all geographic place names. The director of the Washington State Board of Place Names has said that "the name is so universally offensive that all 'squaw' names will eventually be replaced, I believe." (See attachments). Clearly, the term "SQUAW" is now regarded as offensive.

The applicant's registrations for the marks **SQUAW VALLEY** and **SQUAW VALLEY USA** differ from the proposed mark **SQUAW** in that they are geographic designations. The primary significance of "SQUAW" alone is that of an offensive or disparaging term for an American Indian woman, rather than a geographic designation. Therefore, the refusal to register is made final.

**Final Refusal – Likelihood of Confusion**
The refusal to register under section 2(d) of the Trademark Act, 15 U.S.C. §1052(d), due to a likelihood of confusion with the mark in U.S. Registration No. 2313003, is <u>maintained and made final</u>. This is a final action. 37 C.F.R. Section 2.64. The applicant's mark, when used on or in connection with the identified goods, so resembles the mark in the cited registration as to be likely

---

[1] *The American Heritage® Dictionary of the English Language*, Third Edition copyright © 1992 by Houghton Mifflin Company. Electronic version licensed from INSO Corporation; further reproduction and distribution restricted in accordance with the Copyright Law of the United States. All rights reserved.
[2] http://college.hmco.com/history/readerscomp/naind/html/na_037100_squaw.htm

to cause confusion, to cause mistake, or to deceive. TMEP §§1207.01 *et seq*. The examining attorney has considered the applicant's response carefully, but is not persuaded by the applicant's arguments for the following reasons.

The applicant's mark is SQUAW for "men's, women's and children's clothing and accessories, namely, jackets, sweatshirts, sweaters, shirts, pants, bathrobes, t-shirts, gloves, head bands, vests, hats" (among other goods and services not at issue). The cited registration is for the mark **SQUAW CREEK** for "clothing, namely, socks, leotards, tights, thigh highs, over the knee hosiery."

### Similarities Between the Marks
The examining attorney must compare the marks for similarities in sound, appearance, meaning or connotation. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973). Similarity in any one of these elements is sufficient to find a likelihood of confusion. *In re Mack*, 197 USPQ 755 (TTAB 1977). TMEP §§1207.01(b) *et seq*. The test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison. The issue is whether the marks create the same overall impression. *Visual Information Institute, Inc. v. Vicon Industries Inc.*, 209 USPQ 179 (TTAB 1980). The focus is on the recollection of the average purchaser, who normally retains a general rather than specific impression of trademarks. *Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b).

Both marks share the term "SQUAW." The deletion of the term "CREEK" from the registrant's mark does not obviate the likelihood of confusion. Marks may be confusingly similar in appearance notwithstanding the addition, deletion or substitution of letters or words. *See, e.g., Weiss Assoc. Inc. v. HRL Assoc.*, 14 USPQ2d 1840 (Fed. Cir. 1990) (TMM held confusingly similar to TMS); *Gillette Canada Inc. v. Ranir Corp.*, 23 USPQ2d 1768 (TTAB 1992) (ORAL-ANGLE held likely to be confused with ORAL-B); *Jockey Int'l, Inc. v. Mallory & Church Corp.*, 25 USPQ2d 1233 (TTAB 1992) (ELAAN in stylized form held likely to be confused with ELANCE); *Crocker Nat'l Bank v. Canadian Imperial Bank of Commerce*, 228 USPQ 689 (TTAB 1986) (COMMCASH likely to be confused with COMMUNICASH); *In re Pellerin Milnor Corp.*, 221 USPQ 558 (TTAB 1983) (MILTRON likely to be confused with MILLTRONICS in stylized form); TMEP §1207(01)(b)(iii). The marks **SQUAW** and **SQUAW CREEK** confusingly similar in appearance, sound, connotation and commercial impression.

### Relationship Between the Goods
The goods of the parties need not be identical or directly competitive to find a likelihood of confusion. They need only be related in some manner, or the conditions surrounding their marketing be such, that they could be encountered by the same purchasers under circumstances that could give rise to the mistaken belief that the goods come from a common source. *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); *In re Corning Glass Works*, 229 USPQ 65 (TTAB 1985); *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984); *Guardian Products Co., Inc. v. Scott Paper Co.*, 200 USPQ 738 (TTAB 1978); *In re International Telephone & Telegraph Corp.*, 197 USPQ 910 (TTAB 1978). TMEP §1207.01(a)(i).

The applicant's and registrant's goods are related in that they are items of clothing. The decisions in this field have held many different types of apparel related under Section 2(d). *Cambridge*

*Rubber Co. v. Cluett, Peabody & Co., Inc.*, 286 F.2d 623, 128 USPQ 549 (C.C.P.A. 1961) ("WINTER CARNIVAL" for women's boots v. men's and boys' underwear); *Jockey International, Inc. v. Mallory & Church Corp.*, 25 USPQ2d 1233 (TTAB 1992) ("ELANCE" for underwear v. "ELAAN" for neckties); *In re Melville Corp.* 18 USPQ2d 1386 (TTAB 1991) ("ESSENTIALS" for women's pants, blouses, shorts and jackets v. women's shoes); *In re Pix of America, Inc.*, 225 USPQ 691 (TTAB 1985) ("NEWPORTS" for women's shoes v. "NEWPORT" for outer shirts); *In re Mercedes Slacks, Ltd.*, 213 USPQ 397 (TTAB 1982) ("OMEGA" for hosiery v. trousers); *In re Cook United, Inc.*, 185 USPQ 444 (TTAB 1985) ("GRANADA" for men's suits, coats, and trousers v. ladies' pantyhose and hosiery); *Esquire Sportswear Mfg. Co. v. Genesco Inc.*, 141 USPQ 400 (TTAB 1964) ("SLEEX" for brassieres and girdles v. slacks for men and young men).

As evidence that the applicant's and registrant's items of clothing may emanate from a single source, see the third-party registrations attached to the first Office action. The Trademark Trial and Appeal Board has held that third-party registrations, while not evidence of use of the marks shown therein in commerce, are adequate to suggest that the various items listed therein are of a type that may emanate from a single source. *See In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783 (TTAB 1993); *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467 (TTAB 1988).

The examining attorney must resolve any doubt regarding a likelihood of confusion in favor of the prior registrant. *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 6 USPQ2d 1025 (Fed. Cir., 1988). TMEP §§1207.01(d)(i). Given the similarities between the marks and the relationship between the applicant's Class 25 goods and the registrant's goods, there is a likelihood of confusion as to the source of the goods. Therefore, the refusal to register is made final. As noted in the first office action, this refusal pertains to the applicant's Class 25 goods only and does not bar registration in the other classes.

**Response Guidelines for Final Refusals**
If the applicant fails to respond to this final action within six months of the mailing date, the application will be abandoned. 15 U.S.C. §1062(b); 37 C.F.R. §2.65(a). The applicant may respond to this final action by:

   (1) submitting a response that fully satisfies all outstanding requirements, if feasible (37 C.F.R. §2.64(a)); or
   (2) filing an appeal to the Trademark Trial and Appeal Board, with an appeal fee of $100 per class (37 C.F.R. §§2.6(a)(18) and 2.64(a); TMEP §§715.01 and 1501 *et seq.*; TBMP Chapter 1200).

In certain circumstances, a petition to the Director may be filed to review a final action that is limited to procedural issues, pursuant to 37 C.F.R. §2.63(b)(2). 37 C.F.R. §2.64(a). *See* 37 C.F.R. §2.146(b), TMEP §1704, and TBMP Chapter 1201.05 for an explanation of petitionable matter. The petition fee is $100. 37 C.F.R. §2.6(a)(15).

/Kathleen de Jonge/
Examining Attorney, Law Office 116
(703) 306-7916
(703) 746-8116 (fax)

**How to respond to this Office Action:**

To respond formally using the Office's Trademark Electronic Application System (TEAS), visit **http://www.uspto.gov/teas/index.html** and follow the instructions.

To respond formally via regular mail, your response should be sent to the mailing Return Address listed above and include the serial number, law office and examining attorney's name on the upper right corner of each page of your response.

To check the status of your application at any time, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at **http://tarr.uspto.gov/**

For general and other useful information about trademarks, you are encouraged to visit the Office's web site at **http://www.uspto.gov/main/trademarks.htm**

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINING ATTORNEY.**

****************************087828****************************

SEND TO: DEJONGE, KATHLEEN
        TRADEMARK LAW LIBRARY
        2101 CRYSTAL PLAZA ARC
        MAILBOX 314
        ARLINGTON, VIRGINIA 22202-4600

MAIL-IT REQUESTED: JUNE 17, 2004          10083K

        CLIENT:
        LIBRARY: NEWS
        FILE: MAJPAP

YOUR SEARCH REQUEST AT THE TIME THIS MAIL-IT WAS REQUESTED:
    SQUAW W/S OFFENSIVE

NUMBER OF STORIES FOUND WITH YOUR REQUEST THROUGH:
    LEVEL  1...   121

LEVEL  1 PRINTED

THE SELECTED  STORY NUMBERS:
1,2,4,13,16,21,24,27,29,31,37,38,40,42,45,52,53,58,70,73,79,84,85,87,90,107,112,
117

DISPLAY FORMAT: 75 VAR KWIC

RECEIVED
JUL 1 6 2004
By_____

DOCKETED
Dated 7/16/04

MULTIPLE DOCUMENTS ON A PAGE

SEND TO: DEJONGE, KATHLEEN
      TRADEMARK LAW LIBRARY
      2101 CRYSTAL PLAZA ARC
      MAILBOX 314
      ARLINGTON VIRGINIA 22202-4600

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*05292\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Copyright 2004 Denver Publishing Company
Rocky Mountain News (Denver, CO)

June 1, 2004 Tuesday Final Edition

SECTION: WIRE/NATIONAL/INTERNATIONAL; Pg. 6A

LENGTH: 1380 words

HEADLINE: SERVING WITH HONOR;
WHEN NATION HAS GONE TO WAR, AMERICAN INDIANS HAVE ANSWERED THE CALL

BYLINE: Gwen Florio, Rocky Mountain News

DATELINE: FORT WASHAKIE, Wyo.

BODY:

... German soldiers in France in World War I and was awarded the Croix de Guerre and the Silver Star.

Army Cpl. Mitchell Red Cloud Jr., a Ho-Chunk from Wisconsin, was posthumously awarded the Congressional Medal of Honor for single-handedly delaying an enemy charge during the Korean War. The Navy named a transport ship for him in 1999.

Army Spc. Lori Piestewa, a Hopi from Arizona, was the first U.S. servicewoman killed in the Iraq war. Piestewa died in the ambush in which Pfc. Jessica Lynch, Piestewa's roommate, was captured. An Arizona mountain, **Squaw Peak** - a name **offensive** to Indian people - was renamed in her honor.

Copyright 2004 The Tribune Co. Publishes The Tampa Tribune
Tampa Tribune (Florida)

May 19, 2004 Wednesday
FINAL EDITION

But two other San Antonio-area school districts, Harlandale and Jourdanton, do not intend to change mascots that Indians consider offensive.

Most **offensive** to Indians is the use of the term " **squaw** " in mascot or place names, Hook said. Most modern American Indian groups now consider "squaw" an obscene reference to a woman's body part, Hook said.

"It has always been a term of derision for Indian women," he said.

In the past few years there has been a national movement among Indian leaders to have "squaw" purged from place names. The National Congress of American Indians asked the U.S. Board on Geographical Names to have that term forbidden in use for place names across the country.

That board, part of the Interior Department's U.S. Geological Survey, decides what names for ...

Copyright 2001 The Oregonian
The Oregonian

March 23, 2001 Friday SUNRISE EDITION

SECTION: EDITORIAL; Pg. C12

LENGTH: 141 words

HEADLINE: LET GO OF OFFENSIVE WORD

BODY:
Let me update Jack C. Sullivan's citation of " **squaw** " from Webster's Ninth New Collegiate Dictionary ["Dictionary backs using ' **squaw',** " Letters, March 16]: The 10th edition adds "often taken to be **offensive** " after the definition "an American Indian woman." Other mainstream dictionaries say that " **squaw** " is   "**offensive** " or "now freq. considered **offensive."**

Copyright 2001 The Omaha World-Herald Company
Omaha World Herald (Nebraska)

March 13, 2001, Tuesday SUNRISE EDITION

SECTION: NEWS; Pg. 11;

LENGTH: 303 words

HEADLINE: Squaw Creek will Be Renamed After All

BYLINE: NICHOLE AKSAMIT

SOURCE: WORLD-HERALD STAFF WRITER

BODY:

Less than a month after informally deciding the word isn't **offensive,** Bellevue City Council members agreed Monday to remove " **squaw** " from the name of a creek that runs through northwest Bellevue.

"To reflect the proud Indian heritage, I would like to ask the council to change the **offensive** name of **Squaw** Creek to Big Elk Creek," Council President Larry Cascio said Monday.

Although some council members argued at a Feb. 17 meeting that " **squaw** " is not **offensive** and the name should not be changed, Cascio said several American Indians have since explained the word's negative connotations.

"We didn't have the right information on this derogatory offense," Cascio said of the council's previous action.

Of the 10 council members, only John Stacey on Monday maintained his earlier stance.

"The name isn't derogatory," he said. "I've stated it once. I'll state it again. I cannot support (the name change)."

Although Webster defines "squaw" as "a North American Indian woman or wife," many feel the word also has negative and vulgar meanings. At the urging of American Indian groups, Gov. Mike ...

Copyright 2001 The New York Times Company
The New York Times

March 4, 2001 Sunday
Late Edition - Final

SECTION: Section 4; Column 5; Week in Review Desk; Pg. 2

LENGTH: 880 words

HEADLINE: What Is, And Isn't, In a Word

BYLINE: By JESSE SHEIDLOWER; Jesse Sheidlower, who runs the American office of the Oxford English Dictionary, is the editor of "The F-Word" (Random House, 1999).

BODY:

LAST week, lawmakers in Idaho rejected a proposal to change place names that include the word "squaw," which some Native Americans believe to be an insult deriving from a vulgarism for female genitalia. Other states have faced similar challenges; in 1998, for example, Arizona rejected a proposal to rename that state's Squaw Peak, while Gov. Angus King of Maine signed a bill last year to ban the word from two dozen place names.

Some dictionaries do label **squaw as offensive,** but that reflects its derogatory usage, not its derivation. In fact, linguists agree that the etymological meaning of the word, a borrowing from the Massachusett language, is simply

"woman," with no insulting implications. The link to genitalia was promulgated, with no evidence, in a 1973 polemic, and circulated broadly after being mentioned in a 1992 episode of "Oprah."

Copyright 2001 The Times Mirror Company; Los Angeles Times
All Rights Reserved
Los Angeles Times

March 2, 2001 Friday
Home Edition

SECTION: PART A; Part 1; National Desk; Pg. 22

LENGTH: 95 words

HEADLINE: NATION IN BRIEF / SOUTH DAKOTA;
OFFENSIVE TOWN NAMES TO BE CHANGED

BYLINE: From Times Wire Reports

 BODY:

   Under a new state law, more than three dozen South Dakota towns will be renamed to remove the words " **Squaw** " or "Negro" because the words are   **offensive.**

   Among the place names deemed by the bill to be " **offensive**  and insulting to all of South Dakota's people, history, and heritage," were **Squaw** Lake, to be renamed Serenity Lake, and Negro Gulch, to be renamed Last Chance Gulch.

   Among the examples listed by the bill, the town of Squaw Teat Creek will be renamed East Rattlesnake Creek, and Negro Creek will become Medicine Mountain Creek. A total of 39 towns will be renamed.

Copyright 2001 The Omaha World-Herald Company
Omaha World Herald (Nebraska)

January 28, 2001, Sunday SUNRISE EDITION

SECTION: NEWS; Pg. 1A;

LENGTH: 1185 words

HEADLINE: Nebraska Moves to Purge 'Squaw' From the Map In the Midlands

BYLINE: TODD VON KAMPEN

SOURCE: WORLD-HERALD BUREAU

DATELINE: Lincoln

BODY:

... who either died while giving birth or after eating tainted meat, said Commissioner Ed Sowders.

"I'm here to tell you that the local people in that area never looked at (the name) as offensive," he said.

That position ignores Indians' feelings about the word, said Leonard Bruguier, a Yankton Sioux and the director of the Institute of American Indian Studies at the University of South Dakota in Vermillion.

As he grew up in Yankton, S.D., "the people I knew were seasonal workers, hard workers," Bruguier said. "They'd get drunk and you'd hear this, and it has a very negative connotation."

Linguists dispute the origin of " squaw, " although it clearly is   offensive  today, said Bruguier and colleague Tom Gasque, an English professor.

Some of those urging the abolition of "squaw" link it to a Mohawk word for a woman's private parts, retired UCLA linguistics professor William Bright wrote last fall in Names, a journal formerly edited by Gasque.

But he wrote that many linguists trace the word to 1624, four years after the Pilgrims reached America, when it was borrowed from the Massachusett Indian nation's word for "young woman." The language is unrelated to Mohawk, Bright wrote.

In any event, whites later applied "squaw" to Indian ...

Copyright 2000 Detroit Free Press
All Rights Reserved
Detroit Free Press

JUNE 6, 2000 Tuesday METRO FINAL EDITION

SECTION: NWS; Pg. 8A

LENGTH: 228 words

HEADLINE: OKLAHOMA URGES 'SQUAW' BE AVOIDED

BYLINE: FREE PRESS NEWS SERVICES

DATELINE: OKLAHOMA CITY

BODY:

... term that dates to the days of white trappers and pioneers, is defined in many dictionaries as an American-Indian woman. But critics say it actually is a slur meaning a prostitute or a woman's genitalia.

Most people "think squaw means American-Indian woman," said Leda Green, a member of the Apache and Otoe-Missouria tribes in Oklahoma. "But in true meaning, it's her body parts."

The Oklahoma legislature agreed. The resolution, passed unanimously in May, does not carry the force of law but asks state officials to work with local authorities to remedy the problem.

"The word ' **squaw' is offensive** to Native Americans, and a national movement exists to remove this word from all geographic place names," the resolution stated.

Copyright 2000 CanWest Interactive, a division of
CanWest Global Communications Corp.
All Rights Reserved
The Gazette (Montreal, Quebec)

June 3, 2000, Saturday, FINAL

SECTION: Books and the Visual Arts; J2

LENGTH: 897 words

HEADLINE: What's in a name? Maybe a lawsuit

BYLINE: HOWARD RICHLER

BODY:

Etymology aside, Melissa Lazore of the Assembly of First Nations says that "throughout the centuries, the way in which the word was used also helped to build negative and derogatory meanings which many native Americans have come to associate with the word." The Encarta World English Dictionary entry for " squaw" states: "a highly **offensive** term for a Native North American woman or wife."

Similarly, there have been protests in the United States over the use of the term Redskins as the name of the football franchise in Washington. In 1992, a suit was filed in U.S. federal court to have the name changed. Lead petitioner, Cheyenne poet Suzan Shown Harjo, wrote that "in the annals of European American historical, journalistic ... writing about Native peoples, 'Redskins' was and is the worst racial epithet hurled at us in English." Harjo says that it was the definitive term used by soldiers and writers who were espousing the ethnic cleansing, if not the outright ...

Copyright 2000 The Miami Herald
All Rights Reserved
The Miami Herald

April 4, 2000 Tuesday FINAL EDITION

SECTION: FRONT; Pg. 19A

LENGTH: 366 words

HEADLINE: MAINE NEW LAW DROPS 'SQUAW' IN STATE'S PLACE NAMES

BYLINE: From Herald Wire Services

BODY:

AUGUSTA - All Maine communities and natural landmarks containing the word " **squaw** " - a term considered **offensive** to women and Indians - will be renamed under a bill signed Monday by Gov. Angus King. A special commission will recommend new names.

"It's not just an issue of being politically correct," said Tony Sprague, a spokesman for the governor. "This is a term that is offensive to them and it shouldn't be used in public places."

Copyright 2000 The Oregonian
The Oregonian

February 24, 2000 Thursday SUNRISE EDITION

SECTION: NORTH ZONER; Pg. D02

LENGTH: 410 words

HEADLINE: SQUAW BUTTE COULD BECOME CHINOOK RIDGE

SOURCE: FOSTER CHURCH - The Oregonian

DATELINE: BATTLE GROUND

BODY:

... overall responsibility for naming -- and sometimes renaming -- geographic spots in the state.

Its guidelines include a preference for names significant to the early history of the state, names that are strongly supported by local residents and that conform to existing names in the area.

Names that carry derogatory or defamatory implications are rejected. It appears that the butte's current name will not last long, nor will the names of 28 other features in Washington that carry the same derogatory name. Among them are two canyons, 10 creeks, four lakes, a saddle, a spring and a valley.

... overall responsibility for naming -- and sometimes renaming -- geographic spots in the state.

Its guidelines include a preference for names significant to the early history of the state, names that are strongly supported by local residents and that conform to existing names in the area.

Names that carry derogatory or defamatory implications are rejected. It appears that the butte's current name will not last long, nor will the names of 28 other features in Washington that carry the same derogatory name. Among them are two canyons, 10 creeks, four lakes, a saddle, a spring and a valley.

"In this case, the name is so universally **offensive** that all ' squaw' names will eventually be replaced, I believe," said Tim Gregg, executive secretary of the names board. "Our policy is that we will rename the features as people come forward with new names that are appropriate or honor the community members."

Copyright 1999 The Atlanta Constitution
The Atlanta Journal and Constitution

March 2, 1999, Tuesday, CONSTITUTION EDITION

SECTION: NEWS; Pg. 05A

LENGTH: 760 words

SERIES: Home

HEADLINE: Federal probe targets school mascots;
Team nicknames at North Carolina school are attacked as offensive to;
American Indians.

BYLINE: Lyn Riddle

DATELINE: Asheville, N.C.

BODY:

... Pastors have encouraged the board to drop the mascot, while Lions Club President Houston Henderson said during the public hearing last week, "They say we're stepping on their foot. Well cut off their foot."

The International Lions Club quickly issued a statement decrying Henderson's remarks.

Tovah Welsh, a student at nearby North Buncombe High School and a Cherokee Indian, told board members the Erwin mascots don't just affect Erwin students, they have hurt her as well.

During a game at Erwin, she said, someone pointed to her and said, "Hey, they have a squaw of their own."

The word **squaw** is especially **offensive,** because to some Indians it means prostitute or refers to a woman's genitalia. Minnesota has dropped the word from place names.

Hundreds of schools around the country have dropped Indian mascots in recent years, but hundreds more still use them, as do professional sports teams such as the Braves and the Washington Redskins.

School Superintendent Bob Bowers said even though he supports dropping the mascots, he considers it unfair for the Justice Department to single out Erwin to make a point about mascots.

"This is our most inclusive school," he said. "I am confident the school can withstand any scrutiny."

He said the issue is much broader than ...

Copyright 1998 The Times Mirror Company; Los Angeles Times
All Rights Reserved
Los Angeles Times


August 26, 1998, Wednesday, Home Edition


SECTION: Food; Part H; Page 2; Food Desk

LENGTH: 111 words

HEADLINE: SHE FINDS BREAD NAME INSULTING


BODY:

The word " **squaw** " is a highly **offensive** Algonquin word.

When Europeans first had contact with the Algonquin Nation on the East Coast and learned the meaning of the word squaw, they immediately began to use the word to refer to all native women.

To use the word squaw today is not only a grave insult to Native American women, it is an insult to the dignity of every woman. I wonder if the bakeries that continue to use the word  squaw  in their labeling would be willing to sell a bread as **offensive** to men .

HASHI-HANTA

American Indian Movement

Sells, Ariz.


Copyright 1997 Saint Paul Pioneer Press
All Rights Reserved
Saint Paul Pioneer Press (Minnesota)


April 6, 1997 Sunday


SECTION: MAIN; Pg. 15A

LENGTH: 697 words

HEADLINE: AIM TAKES ANTI-SQUAW CAMPAIGN TO CALIFORNIA;
INDIAN GROUP WANTS TO CHANGE PLACE NAMES

BYLINE: Tracy Seipel, Knight-Ridder News Service

DATELINE: SAN JOSE, CALIF.


BODY:


The word " **squaw,** " long the stuff of TV westerns and American vernacular, is **offensive** to some American Indians, and a national activist group is launching a campaign to remove it from more than 100 places throughout California - including the most famous of all: **Squaw** Valley.

These activists, leaders of the American Indian Movement, say the word is the white man's pejorative slang for "vagina," and they consider it among "the worst of the worst."

The group's crusade has met with success in Minnesota, where it persuaded the Legislature to pass a law decreeing that 19 place names containing the word squaw be changed.

And while linguists disagree with AIM's etymology, this isn't the first time changing sensibilities have prompted changes in

Copyright 1997 The Charlotte Observer
All Rights Reserved
Charlotte Observer (North Carolina)

March 24, 1997 Monday ONE-3 EDITION


SECTION: MAIN NEWS; Pg. 5A

LENGTH: 442 words

HEADLINE: GROUP WANTS SQUAW' STAMPED OUT IN CALIF.

BYLINE: TRACY SEIPEL, Knight-Ridder Newspapers

DATELINE: SAN JOSE, Calif.


BODY:


The word " **squaw** " is so **offensive** to many American Indians that a national activist group is launching a campaign to remove it from more than 100 places throughout California, including **Squaw** Valley.

These activists, leaders of the American Indian Movement, say the word is the white man's pejorative slang for "vagina."

The group's crusade has already met with success in Minnesota, where they persuaded the state Legislature in 1995 to pass a law decreeing that 19 places containing the word squaw be changed.

Copyright 1997 Chicago Tribune Company
Chicago Tribune

January 17, 1997 Friday, LAKE EDITION

SECTION: METRO LAKE; Pg. 1; ZONE: L

LENGTH: 551 words

HEADLINE: NO OFFENSE, BUT 'SQUAW' TAKEN OUT OF PARK NAME;
CRYSTAL LAKE BOARD OKS ACTIVIST'S REQUEST

BYLINE: By Marles Humphrey. Special to the Tribune.

BODY:
 In the lexicon of TV Westerns going back to the 1950s, there typically would be a cowboy hero, a cowgirl pal and often, for exotic effect, an Indian "squaw"--a beautiful, bronze-skinned woman with braided black tresses and a beaded dress.

 Though the woman might be portrayed as a sympathetic figure, few TV viewers outside the Native American community would have known the word describing her, " squaw, " is considered derogatory and sexually **offensive.**

 It's so **offensive,** Cindy Bloom, a resident of Prairie Grove, demanded that the Crystal Lake Park District change the name of its **Squaw** Creek Open Area.

 Park District officials Thursday night, with little discussion and finding no opposition to Bloom's request, renamed the site the Prairie Ridge Conservation Area.

 "Prairie Ridge Conservation Area is a good choice. It is our hope it can ultimately hook up with the conservation area planned at Prairie Ridge High School," said Park Board President Dave Phelps, referring to the new high school being built north of Crystal Lake.

 Also, Phelps said, "We don't want to offend anyone."

 The name change was a non-issue, parks officials said, noting they hadn't named the ...

 ... for the board meeting, and neither of them did so because of the name issue.

 The land was given to the Park District by the developer of the Squaw Creek subdivision, and was given the subdivision's name.

 Bloom, a member of the Cherokee nation, said the word "squaw" is not just "politically incorrect," it is inflammatory.

 That was the same reasoning used when Bloom and other Native American activists persuaded the Prairie Grove Village Board in August to rename Squaw Creek Road over the objections of some residents living on the road. The street is now Half Mile Trail.

 In a December letter to the Crystal Lake Park District, Bloom said the word, " **squaw," is "offensive** to Indian nations across America."

 Although there is considerable debate about the origins and the meaning of the word, Bloom said it is derived from the Algonquin Indian language. It does not mean woman, but is rather a crude sexual reference.

 Bloom says the word is so obscene that it is not spoken in the homes of Native Americans, including hers.

Bloom is active in an organization called Midwest Soaring. One of their goals is to make certain every public area with the designation "squaw" will undergo a name change.

There are an estimated 1,000 geographical features in the U.S. with the name "squaw," most in the West and ...

Copyright 1996 Gannett Company, Inc.
USA TODAY

December 5, 1996, Thursday, FINAL EDITION

SECTION: NEWS; Pg. 11A

LENGTH: 2589 words

HEADLINE: ACROSS THE USA: NEWS FROM EVERY STATE

BODY:
... in
local school districts, advocating instead to close colleges and universities to save money. Although James said his office wouldn't decide which schools to close, he said Auburn University and the University of Alabama may need to cut programs.

Alaska

Kenai -- The federal Minerals Management Service expects to award a contract this month for a two-year study on whether oil industry pollutants accumulate in the sediments of lower Cook Inlet and Shelikof Strait. The study will cost between $1.2 and $1.5 million.

Arizona

Phoenix -- A newly formed local chapter of the American Indian Movement wants the word " squaw " removed from public places here, saying it's offensive. Indians claim the word "squaw" means female genitalia and demeans women. Protest signs will be put up Friday, the group said. Copyright 1996 Star Tribune
Star Tribune (Minneapolis, MN)

March 22, 1996, Metro Edition

SECTION: News; Pg. 1B

LENGTH: 873 words

HEADLINE: Citizens debate what's in a name;
Law requiring Squaw Lake's renaming divides town

BYLINE: Robert Franklin; Staff Writer

DATELINE: Squaw Lake, Minn.

BODY:
   Two women, one Indian and one white, stood face-to-face at the front of the small meeting room. They were debating whether the word " squaw " is so  offensive  that it should be abolished as the name of the lake adjoining this tiny town on the Leech Lake Indian Reservation.

   "It is a putdown to me as a woman," said Muriel Charwood-Litzau, who is Indian. "How can you put a price tag on that?"

Copyright 1995 Star Tribune
Star Tribune (Minneapolis, MN)

February 9, 1995, Metro Edition

SECTION: News; Pg. 1B

LENGTH: 384 words

HEADLINE: Teens win a battle;
' Squaw  Point' is  offensive,  they say; town's name changed to 'Oak Point'

BYLINE: Kevin Duchschere; Staff Writer

Copyright 1993 The Washington Post
The Washington Post

September 20, 1993, Monday, Final Edition

NAME: BEN NIGHTHORSE CAMPBELL

SECTION: FIRST SECTION; PAGE A17; THE FEDERAL PAGE

LENGTH: 1059 words

HEADLINE: For Campbell, Heritage Comes Before Tradition

SERIES: Occasional

BYLINE: Kevin Merida, Washington Post Staff Writer

BODY:

... stadiums, where some Native Americans have protested the team's games, but he does hope to get a meeting with team management to discuss the issue.

Nonetheless, he knows what he is up against. A recent nationwide poll conducted by Voter/Consumer Research, a Bethesda-based GOP polling firm, indicated that 76 percent of those surveyed thought the Redskins should keep their name. Team owner Jack Kent Cooke has said in the past that "nothing in the world" is wrong with the name, and other officials have said the name is a tribute to the strength and courage of American Indians.

But Campbell said the word Redskins is one of four terms most **offensive** to Native Americans, the others being buck, squaw and savage. "It denotes a time when there was a bounty put on the hair and skins of Indians," he said.

As for the poll and other expressions of popular opposition to Campbell's stand, he said: "If you took a poll 150 years ago asking if slavery was okay, it would come back 85 percent yes. But that doesn't make it right."

Campbell, a member of the Northern Cheyenne tribe, is proud of his heritage. His great grandfather, Blackhorse, fought against Lt. Col. George Armstrong Custer in the famed battle at Little Bighorn. On display in Campbell's office is a knife his great grandfather ...

 LexisNexis™

Copyright 2004 The Arizona Republic
All Rights Reserved
The Arizona Republic

March 31, 2004 Wednesday Final chaser Edition

**SECTION:** LOCAL; Pg. 6B

**LENGTH:** 492 words

**HEADLINE:** NAMES BOARD BILLS FAIL IN COMMITTEE; PIESTEWA FANS FEARED LOSS OF DESIGNATION

**BYLINE:** By Robbie Sherwood, The Arizona Republic

**BODY:**
A legislative effort to penalize Gov. Janet Napolitano for her aggressive role in naming Piestewa Peak failed Tuesday.

American Indian leaders and family members of fallen Army Spc. Lori Piestewa believe they stopped a back-door effort to change the name of a Phoenix mountain back to Squaw Peak.

"The man upstairs was with us today," said Lori Piestewa's mother, Priscilla "Percy" Piestewa, as she hugged and kissed relatives and supporters outside a Senate hearing room.

"I just hope they will let this rest and let my daughter rest."

House Concurrent Resolution 2036 would have asked voters in November to give control of the State Board on Geographic and Historic Names to the Legislature and take it away from the governor. The measure failed 6-3 in the Senate Government Committee, and a companion bill failed 5-4.

Backers of the bills said they did not intend to rename the peak or dishonor Piestewa, a Hopi from Tuba City and the nation's first female American Indian service member killed in combat.

Rep. Phil Hanson, who sponsored the measures, said he stood behind them because "the board has lost all integrity and trust." Hanson added that he took "great umbrage" at the bills' opponents who suggested he was being a racist by pushing the bills.

"If it had been one legislator saying that to another, they would have been soundly ostracized," said Hanson, R-Peoria, before the votes. "I assure you that, if this does not pass, it's going to come up again next year and the year after that, and I don't think any of us want that."

Tim Norton, a longtime board member, said the issue wasn't about derogatory geographic names but about "removing the threats, intimidation and the politics" from the process. Norton made headlines when Napolitano's former aide Mario Diaz unsuccessfully pressured him to resign as chairman of the board because he would not consider the Piestewa Peak change.

But Jacob Moore, a representative of the Salt River Pima-Maricopa Indian Community, said Hanson's

Case 1:06-cv-01300-DB    Document 1-21    Filed 07/21/2006    Page 25 of 31

bills are divisive and disrespectful. Several American Indians testified that they believed a newly created board would attempt to rename Piestewa Peak.

"This would create a division between tribes and the state Legislature that would take us back to territorial days when members of Indian tribes were considered second-class citizens," Moore said.

The failure of the bills won't stop Tug Ross from continuing to call the mountain near his Phoenix home by the **Squaw** Peak name. Ross, a 63-year-old motorcycle apparel salesman, couldn't make it to the Senate to testify but said the old name is not **offensive.**

"The public is tired of these people sniveling about this," Ross said.

"I don't have anything against these people. I've got a lot of Indian friends, and many of them feel the same way I do. This whole thing was underhanded to start with."

/

Reach the reporter at robbie.sherwood@arizonarepublic.com or (602) 444-8146.

**LOAD-DATE:** April 23, 2004



Copyright 2004 Bangor Daily News
Bangor Daily News (Maine)

March 27, 2004 Saturday
All Editions

**SECTION:** Pg. C1

**LENGTH:** 577 words

**HEADLINE:** Tribal leader eyes Senate seat;
Richmond woman in nonvoting slot would gain visibility

**BYLINE:** JEFF TUTTLE OF THE NEWS STAFF

**DATELINE:** AUGUSTA

**BODY:**

Recovering from a case of laryngitis, Donna Loring doesn't have much of a voice at the moment.

But for the Penobscot Nation's longtime representative to the Maine Legislature, her current state, brought about by a persistent head cold, is a mere inconvenience compared to the more figurative silencing she has experienced in her nearly eight-year tenure in the House.

"I'm tired of being invisible," Loring said Thursday, explaining her desire to give up her nonvoting seat representing the Penobscot tribe and run for Maine Senate District 19, most of which lies in Sagadahoc County.

If elected to the Senate, Loring, a Democrat who lives in Richmond, would do more than cast her first vote. It is believed she would become the first Maine tribal member to do so in either chamber.

Because the state's Indian reservations are included within existing legislative districts, the state's two tribal representatives cannot vote in committee or on the House floor. If they did, courts have suggested tribal members would be inordinately represented, running afoul of the constitutional principle of "one person, one vote."

But under an arrangement - unique in the nation - Maine's tribal representatives do wield some influence, namely the ability to sponsor legislation, speak in committee and address the House.

During a break in the session Thursday, Loring said she has had to make the most of those limited powers - and hone her own power of persuasion - to effectively advance the tribe's agenda in Augusta.

"Without a vote, I really haven't had the ability to say I'll support your bill if you support mine," said Loring, noting her Republican opponent, Sen. Art Mayo of Bath, has enjoyed that luxury throughout his tenure - four terms in the House and one in the Senate. "I've had to be a bit more creative and

imaginative than he's had to be."

"I don't know what that has to do with creativity or getting legislation passed," countered Mayo, a moderate Republican well-known in the district, which this year added Loring's hometown. "Perhaps contrary to public perception, that kind of vote trading hardly ever happens."

Because of its historical significance, Loring's candidacy has attracted a fair share of media attention. In contrast, Mayo's expected re-election bid, has been delegated, he said, to the inside pages.

"I can't even get a notice in the local paper saying that I'm running," he said, laughing. "And I'm serious about that."

Loring counts among her accomplishments drafting a law that mandates the teaching of Maine Indian history in public schools and removing the word "**squaw,**" which many American Indians find **offensive,** from names of public places.

Her tenure in Augusta has been well documented, as she has found herself in the center of several contentious issues, including casino gambling and tribal sovereignty - both of which found the state and tribes at odds.

Like Loring, Penobscot Nation Chief Barry Dana is quick to reject the suggestion she would use her senate seat as a forum to advance the tribal issues she has championed in the past.

"She is an honorable person ... and our loss is your gain," said Dana, rattling off Loring's accomplishments, including her service in the Vietnam War.

"Would she abuse her tribal connection to change things in Augusta to the benefit of the tribes?" he asked rhetorically. "As you know, one person in Augusta can't make that much of a change, and I don't think there's much need for discussion there."

**LOAD-DATE:** March 29, 2004



Copyright 2004 Saint Paul Pioneer Press
All Rights Reserved
Saint Paul Pioneer Press (Minnesota)

February 1, 2004 Sunday

**SECTION:** LOCAL; BRIEF; Pg. 1C

**LENGTH:** 1692 words

**HEADLINE:** A serious name game;
It's possible to name a geographic feature, but it isn't easy. The process, often initiated by families, takes a year or more and requires local, state and federal approval.

**BYLINE:** BY MARY DIVINE; Pioneer Press

**BODY:**
About 70 years ago, Homer Holmbo acquired a small island in Lake Vermillion in northern Minnesota.

It was during the Depression, and the couple he was working for couldn't afford to pay him in cash.

Instead, Riley and Dorothy Creigh, who started what is now the Life of Riley Resort outside Cook, Minn., let Holmbo choose between two islands in the northeast end of the lake in 1934. The island he picked has been in the Holmbo family ever since, but it has never had a name.

Last month, however, the island was officially designated Holmbo Island. The naming was a result of efforts by Holmbo's nephew Gary, one of a growing number of Minnesotans who want their family's legacy to include a favorite lake, island, creek or other landmark that will carry on their name.

But naming a geographic feature isn't easy. The process often takes a year or more and requires local, state and federal approval. "It's a deliberative process because we want to make sure people have given proper thought to such a lasting decision," said Glen Yakel, who oversees the naming of geographic features in the state as supervisor of hydrographics for the Minnesota Department of Natural Resources. "What we do today, we want to stand the test of time."

Names such as Holmbo Island are accepted because they convey a slice of the state's history. "The idea is to capture some early history -- that's probably the most honorable reason to pursue a name change," Yakel said. "Are there early settlers who had a lasting and ongoing impact on the area-vicinity lasting to today?"

The DNR received about 12 formal proposals for name changes last year -- twice as many as in years past. "I used to get an inquiry about once every three months. Now, it's once a week," Yakel said.

WASHINGTON COUNTY

In Washington County, Tom Armstrong and Don Raleigh are petitioning to name a lake and creek in the Oakdale and Lake Elmo area after their pioneer great-grandmother and in honor of their family's Irish heritage. A public hearing on the new names -- Margaret Lake and Farney Creek -- was held Tuesday.

"I don't want someday for somebody to come in with some worthless, meaningless, foolish name ... which has nothing to do with the history of the county," said Armstrong, 57, a local historian and Washington County District Court judge.

"There are so many worthwhile people and names in this county that should have been kept, but they just let these people go through and give names that are meaningless," he said. "They should name it a historical name that means something. We just don't give enough appreciation to the people who broke the land here, especially these early pioneer families."

Armstrong said the hardships experienced by Margaret Mahoney Rawleigh, an Irish immigrant who helped settle Oakdale Township, were shared by many of Washington County's women pioneers.

Rawleigh bore 12 children. Six lived to adulthood. When the family's only cow fell in the ice on a lake near the family's home and drowned, the family went without milk. "Margaret had a tough life. It's a sad, sad story," said Armstrong.

The hoping-to-be Margaret Lake is in Lake Elmo Regional Park Reserve and is where the family cow drowned.

He also wants an unnamed creek to be named Farney Creek to honor his Irish forebears. The Armstrong family came from the lands of Farney Castle, which began as a single tower built in the 1500s to protect the Farney Bridge, an ancient stone structure in Ireland.

In 1987, Armstrong successfully petitioned to have a lake in Lake Elmo and Oakdale named Armstrong Lake after his great-great-uncle William Armstrong, the first clerk of Oakdale Township.

MINNESOTA

Not surprisingly given the state's 11,842 lakes, most of the name-change proposals in Minnesota involve bodies of water, Yakel said.

"They are frequently, but not always, named after relatives. But there are not thousands of lake basins begging to be named. There are more people than there are features."

Sites in federally designated wilderness areas, such as the Boundary Waters Canoe Area, are not named unless it is necessary for reasons of safety or education, Yakel said. "Naming features in a wilderness area is contrary to the purpose of a wilderness area," he said.

In 1995, Minnesota became the first state to require counties to rename geographic features -- 21 lakes, streams and points in all -- that contained the word **squaw,** which was deemed **offensive.**

Some Minnesota names were changed in the 1960s after the U.S. Geological Survey's Board on Geographic Names outlawed two racial epithets. The board recently changed the name of Jap Lake near Grand Marais. The lake was named after the initials of John and Addie Paulson, who developed an iron-ore mine near the lake in the 1880s. The lake is now Paulson Lake.

UNITED STATES

Nationally, about 400 applications for name changes are received annually. About 90 percent are approved, said Roger Payne, executive secretary of the U.S. Board on Geographic Names with the U.S.

Geological Survey in Reston, Va. Half of the applications seek to name a feature. Half are requests to change an existing name.

Names in place for 40 years generally are not subject to change, and anyone who is commemorated must have been dead at least five years.

Board members routinely deny requests to name geographic features after family pets or characters in books and movies, Payne said. Long names are discouraged because they take up so much room on maps.

The board works to standardize names, not regulate them, Payne said. "The federal government doesn't care what the name is -- what we care about is everybody using the same name for the same feature," he said. "All variables being equal, what's most important to us is local use and acceptance."

Interestingly, since its inception in 1890, the board has discouraged the use of possessives that include an apostrophe, stripping Harpers Ferry and Jamestown, among others, of apostrophes.

Legend has it apostrophes were discouraged because they look like rocks in the water on maps, but Payne says the reason is that the board has developed a philosophy that "geographic names in the United States should not show ownership of a feature." There are five exceptions, including Martha's Vineyard, a name conferred in 1933.

Payne also oversees the naming of underwater and international places on U.S. maps. "We can't tell any other country what names to use, but we establish policies and procedures about how we use those names on our products," he said. "You can imagine how important that is today."

There are any number of places in the United States left to name, according to Payne.

"Anything you can see on a landscape could be named," he said. "They can be as small as you can imagine. There's no such thing as an insignificant feature. People name just about anything. If you can see it on the ground, people have named it."

Back in Minnesota, Tom Armstrong said he is finished naming bodies of water. "This is everything that was connected with the family farm," he said. "There isn't any more." He does plan to ask the Washington County board to name roadways and trails in the Lake Elmo Park Reserve after three Civil War veterans who were from the Oakdale area.

Gary Holmbo, who lives in New Brighton, is looking forward to the day when Holmbo Island appears on a map of the Lake Vermillion area. When geographical names change, there is no mandate to print new maps. It simply means that information is updated the next time maps are printed.

"We'll probably have a celebration this summer," said Holmbo, lab services coordinator in the chemistry department of the University of Minnesota. "It was really a great experience to know that this was happening."

HOW TO NAME A GEOGRAPHIC FEATURE

1.Provide a petition to the county auditor where the geographic feature is located. The petition must contain: a description of the feature, a statement on why the name change or naming is requested, a map of the geographic feature and the proposed name, which cannot duplicate an existing name.

2. The petition must include the signatures of at least 15 legal voters residing in the county.

3. The petitioner is required to reimburse the county for all costs related to the naming process. This is $200 in Washington County.

4. The county sets a time for a public hearing and publishes a hearing notice in the legal newspaper for at least three consecutive weeks before the hearing.

5. The county notifies the Minnesota Department of Natural Resources and cities or townships of the name proposal and the date of the hearing. The DNR provides written findings and recommendations to the county board prior to the hearing.

6. The county holds a public hearing and petitioner presents arguments in favor of the name. Also, legal voters of the county may present arguments for or against the proposed name.

7. The county board makes findings and decisions related to the petition and notifies the DNR.

8. All naming actions taken by county boards require the written approval of the commissioner of natural resources.

9. Names are then forwarded to the U.S. Board on Geographic Names for approval.

FYI

The Minnesota Historical Society has published several books on names of places in Minnesota and maintains a Minnesota place names Web site. For information on the books and the site, visit the following links:

Minnesota Place Names, 3rd edition ($49.95 hardcover):
www.mnhs.org/market/mhspress/products/0873513967.html

The Pocket Guide to Minnesota Place Names ($11.95 paperback):
www.mnhs.org/market/mhspress/products/0873514246.html

Minnesota place names Web site: http://mnplaces.mnhs.org/upham

ALSO ONLINE

Ever wonder what is the most frequently occurring community name in the United States? (Fairview, 288 occurrences). Or the longest community name without a hyphen? (Mooselookmeguntic, Maine). For these facts and others, click on Geonames.usgs.gov.

Mary Divine covers Washington County. She can be reached at mdivine@pioneerpress.com

**LOAD-DATE:** February 1, 2004