# EXHIBIT 14 - PART A

THIS DISPOSITION
IS NOT CITABLE AS
PRECEDENT OF THE
TTAB

Mailed:
September 26, 2005

## UNITED STATES PATENT AND TRADEMARK OFFICE

## Trademark Trial and Appeal Board

In re Squaw Valley Development Company

Serial Nos. 76511144 and 76511145

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater
of Winston & Strawn LLP for Squaw Valley Development
Company.

Kathleen de Jonge, Trademark Examining Attorney, Law Office
116 (M. L. Hershkowitz, Managing Attorney).

Before Quinn, Chapman and Zervas, Administrative Trademark
Judges.

Opinion by Zervas, Administrative Trademark Judge:

Squaw Valley Development Company has filed

applications to register the marks "SQUAW" and "SQUAW ONE,"

both for "men's, women's and children's clothing and

accessories, namely, jackets, sweatshirts, sweaters,

shirts, pants, bathrobes, t-shirts, gloves, head bands,

vests, hats" in International Class 25; "skis, ski poles,

ski bindings, ski tuning kits comprised of waxes and

adjustment tools, ski equipment, namely, power cords" in

Ser Nos. 76511144 and 76511145

International Class 28; and "retail store services in the field of sporting goods and equipment, apparel for men, women and children, footwear, headgear and related goods and services" in International Class 35.[1]  Applicant maintains that it is the "world famous resort, the home of the 1960 Winter Olympic Games" located in California; owner of the www.squaw.com Internet domain name; and owner of the following registrations (which are of record herein):

> Registration No. 670261 for the mark SQUAW VALLEY for "women's, men's, girls', and boys' jackets, pants, and sweaters"; and

> Registration No. 1628589 for SQUAW VALLEY USA for, inter alia, "hotel, restaurant and lounge services; providing recreational facilities for and instructions in skiing, golf, tennis, swimming, operating a ski lift, aerobics and other forms of exercise; real estate management; and bus and transportation services."

(Response filed May 20, 2004 to Office Action at 2; and Applicant's Brief at 6 - 7.)[2]

Registration of the marks which are the subject of both applications has been finally refused under Section

---

[1] Application Serial Nos. 76511144 and 76511145, were both filed May 2, 2003.  In both applications, applicant claims first use and first use in commerce in 1949 for the goods in International Class 25 and the services in International Class 35, and first use and first use in commerce in 1968 for the goods in International Class 28.

[2] Applicant also maintains that it is the owner of two additional registrations for SQUAW VALLEY USA, but applicant has not submitted copies of the registrations.  As the Board does not take judicial notice of registrations, we do not further consider these two additional registrations.

2(a) of the Trademark Act, 15 U.S.C. 1052(a), on the
grounds that applicant's marks "consists of or comprises
matter which may disparage American Indians or bring them
into contempt or disrepute."   (Examining attorney's Briefs
at 2).[3]

    Applicant has appealed.  Both applicant and the
examining attorney have filed briefs, but applicant did not
request an oral hearing.

    In view of the common questions of law and fact that
are involved in these two applications, and in the
interests of judicial economy, we have consolidated the
applications for purposes of final decision.  Thus, we have
issued this single opinion.

### Examining Attorney's Arguments

    The examining attorney maintains that the "ordinary
and common meaning of the term 'SQUAW' is that of an
offensive or disparaging term for an American Indian woman
or wife"; and "[t]he additional term 'ONE' in the mark does
not change the meaning of 'SQUAW.'"  As support, she cites
to dictionary definitions of "squaw" provided in the first
Office actions in both cases and excerpts from the

---

[3] In application Serial No. 76511144 for the mark SQUAW, the
examining attorney had also finally refused registration under
Section 2(d) of the Trademark Act, 15 U.S.C. Section 1052(d).
She withdrew the Section 2(d) refusal in her brief (pp. 3-4).
Thus, that issue is not before us.

Nexis/Lexis computerized database made of record during the
prosecution of these cases.  The examining attorney adds
that "numerous examples of a variety of geographic place
names and features [identified in the excerpts] that
include the term 'SQUAW' makes [sic] clear that the term
'SQUAW' does not point to just one geographic feature or
commercial enterprise"; and concludes that "the applicant's
mark[s] … for the identified goods and services, do[es] not
primarily denote the name of the applicant's Squaw Valley
resort, but rather, retains its meaning as an offensive or
disparaging term for an American Indian woman."  Further,
she maintains:

> The manner in which the applicant uses its SQUAW
> mark on the identified goods and services does
> not alter the fact that American Indians are
> referred to, identified or implicated in some
> recognizable manner by the term "SQUAW."  As in
> *Harjo*, where the term "Redskins" was found to
> refer to Native Americans and to retain its
> meaning when considered in connection with the
> registrant's services, … the term "SQUAW" refers
> to an identifiable group - American Indians -
> and retains its meaning when considered in
> connection with the applicant's goods and
> services.  (Emphasis in original.)

### *Applicant's Arguments*

Applicant contends that "[t]hrough long, substantial
and widespread use, advertising and promotion, as well as
media coverage, Applicant's mark SQUAW … acquired a strong
secondary meaning identifying Applicant's world famous

Ser Nos. 76511144 and 76511145

resort, SQUAW VALLEY, the home of the 1960 Winter Olympic
games, and the skiing-related goods and services identified
in the Application";[4] and, with respect to SQUAW ONE, that
the mark has acquired strong secondary meaning identifying
a chair lift at applicant's resort.  Additionally,
applicant maintains that the examining attorney has not
considered that "Applicant's goods and services or the
manner in which Applicant's mark is used in the marketplace
in connection with those goods and services in determining
the likely meaning of the term 'Squaw' in Applicant's
mark"; and that if she would have done so, it would have
been clear that "Applicant's mark does not refer to
identifiable persons but is a shorthand reference to
Applicant's ski resort, SQUAW VALLEY, just as 'Whistler' is
a shorthand reference to the ski resort at Whistler
Mountain …."

In support of its arguments, applicant relies on
numerous stories from the Lexis/Nexis database from the
past two years (made of record through its requests for

---

[4] The Board will refer to applicant's resort or ski resort
throughout this decision.  We are aware that applicant refers to
its "world famous resort," and presumably applicant features
skiing and other winter sports only in the winter, but it offers
other activities in the other seasons.  See Registration No.
1628589 which includes, inter alia, "providing recreational
facilities for and instructions in … golf, tennis, [and]
swimming" in the identification of services.

Ser Nos. 76511144 and 76511145

reconsideration) "in which SQUAW is used to refer to
Applicant's resort and in which SQUAW ONE is used to refer
to Applicant's retail store or the SQUAW ONE chair lift at
Applicant's resort."  The following are excerpts of
representative samples of such stories:

> *Reno Gazette-Journal, November 2, 2004*
> "… Squaw job fair this Sunday
> Find a job working at Squaw Valley USA during the
> upcoming ski season at the fair …."
>
> *Reno Gazette-Journal, October 21, 2004*
> Films at Squaw
> Snowboarders excited by the recent snowfall can
> satisfy their jones with three free films
> Saturday at the Village at Squaw Valley."
>
> *The Seattle Times, November 23, 2003*
> Squaw Valley:  The most noticeable change at
> Squaw is the opening of Phase II of the new base
> village ….
>
> *St Louis Post-Dispatch, November 9, 2003*
> Squaw Valley will be opening phase II of its
> expanded base village … For those chained to
> their laptops, Squaw now provides wireless
> Internet access from nearly anywhere on the
> mountain.
>
> *The San Francisco Chronicle, October 26, 2003*
> -- Squaw Valley:  Phase II of the Village at
> Squaw Valley is finished.  "You can finally come
> here and not see a construction zone," said
> Squaw's Katja Dahl.
>
> *The Miami Herald, October 12, 2003*
> Squaw Valley boasts 33 lifts, including North
> America's only Funitel and a huge cable car, that
> access six peaks, 4,000 acres and 2,850 vertical
> feet of terrain.  Take a twirl on Squaw's on-
> mountain skating rink located at High Camp (8,200
> feet).

*Rocky Mountain News (Denver, CO), March 27, 2003*
Pearson stays with friends in South Lake, a 3 ½-
hour drive from San Francisco, nearly every
weekend in the winter.  He snowboards at Heavenly
and other Tahoe resorts like Squaw and Kirkwood.

*The New York Times, February 23, 2003*
TAHOE PACKAGE - Seventy-one motels, hotels and
vacation-home resorts in the North Lake Tahoe
area have nightly rates from $79 a person Sunday
to Thursday, $99 weekends for the rest of ski
season.  This includes lift tickets at ski
resorts like Squaw and Alpine Meadows.  There is
a two-night minimum; holidays are excluded.

*Charlotte Observer, February 16, 2003*
The first thing to know about Squaw Valley USA,
the California ski resort five miles west of Lake
Tahoe, is that nearly 20 years ago a movie was
filmed here that has become a cult classic. …
Thing is, a lot of the people who came to Squaw
to make that movie never left.

Applicant also cites to the following in support of
its contention that "the mark SQUAW in the context of ski
resorts and related goods and services identifies
Applicant's world famous resort" and SQUAW ONE identifies
applicant's chair lift: (a) printouts from its
www.squaw.com website demonstrating use of SQUAW and SQUAW
ONE in connection with "Applicant's world famous resort";
(b) search results for the term "Squaw" on the Yahoo and
Google search engines "in which the majority of the results
returned refer to Applicant's SQUAW VALLEY resort"; and (c)
a printout from "the online Encyclopedia Britannica website

Ser Nos. 76511144 and 76511145

in which a search for the term 'Squaw' retrieved a listing
for Applicant's SQUAW VALLEY resort," i.e.:

> Squaw Valley
> World-famous winter sports area in Placer County,
> eastern California, U.S., just northwest of Lake
> Tahoe.  The focus of a state recreation area, it
> was the site of the 1960 Winter Olympics ….

Applicant also notes that the "specimens of use submitted

with the application demonstrate that Applicant's mark is

not used in connection with any other term or design

element that would create an association with American

Indian women"; and that "[i]n fact, the specimen submitted

in support of the goods in Class 28 [for the SQUAW ONE

application] consists of a picture of a ski bearing the

applied-for mark and the wording "Squaw Valley USA."

### *Disparagement*

Pursuant to Trademark Act §2(a), 15 U.S.C. § 1052(a),

a mark may be barred from registration when it consists of

matter which may disparage, inter alia, persons.  In *Harjo*

*v. Pro-Football Inc.*, 50 USPQ2d 1705 (TTAB 1999), *rev'd on*

*other grounds*, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D. D.C.

2003), *remanded,* 415 F.3d 44, 75 U.S.P.Q.2d 1525 (D.C. Cir.

2005) ("*Harjo I*"), and followed in *Order Sons of Italy in*

*America v. The Memphis Mafia, Inc.*, 52 USPQ2d 1364 (TTAB

1999), the Board applied a two-step test for determining

whether matter may be disparaging under Section 2(a).

Ser Nos. 76511144 and 76511145

Under this test, the following is considered in determining whether a term is disparaging:

> (1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

> (2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

Accord *Pro-Football, Inc. v. Harjo*, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D. D.C. 2003) ("*Harjo II*"), 68 USPQ2d at 1247 ("The court finds no error in this approach.") Thus, we apply the test set forth in connection with both of the marks which are the subject of this appeal.

### Likely Meaning of the Matter in Question

Our initial source of information as to the meaning of the term "squaw" is the dictionary definitions made of record in this case during the prosecution of the applications. The examining attorney has cited the following dictionary definitions for "squaw:"

Ser Nos. 76511144 and 76511145

*The American Heritage Dictionary of the English Language*
(Online):

> Offensive.
>
> 1. A Native American woman, especially a wife.
> 2. A woman or wife.

*Merriam-Webster Dictionary* (Online):

> 1.  *often offensive*:  an American Indian woman
> 2.  *usually disparaging*:  <u>WOMAN</u>, <u>WIFE</u>

Further, applicant, with its responses to the examining

attorney's first Office actions, submitted the following

definition of "squaw" taken from *Webster's Third New*

*International* Dictionary (1993): "1a:  an American Indian

woman – compare SANNUP  b: FEMALE, WOMAN, WIFE – usu. used

disparagingly."  (Capitalization in the original.)

The examining attorney has also made the following

entry for "squaw" of record in an Office action, taken from

the *Encyclopedia of North American Indians,* Houghton

Mifflin (College Division) (Online):

> The literal meaning of the word *squaw* is obscure,
> and its connotations have changed over time.  Its
> origins are found among the northeastern tribes.
> In Massachusetts, *squd* referred to a younger
> woman.  In Narragansett, *sunksquaw* meant "queen"
> or "lady."  Despite these Algonquian-language
> origins, however, nonnatives applied the term to
> native women throughout North America.  Over time
> it took on derogatory connotations as travelers
> referred to native women as *squaw drudges* and
> often used the term in opposition to Indian
> princess.  Nonnatives often referred to women
> leaders as *squaw sachems* and nonnative men who
> married native women as *squaw men.*  By the

Ser Nos. 76511144 and 76511145

twentieth century the word *squaw* had developed
multiple derogatory associations that had no
connection with the word's original meaning.

Additionally, the following three Lexis/Nexis excerpts

located by the examining attorney provide a definition of

"squaw":

> *The Oregonian, June 11, 2002*
> . . . Clackamas County [Oregon] will change the
> name of Squaw Mountain Road this year to comply
> with a new state law.  Last year, the Legislature
> voted to expunge from maps the word that now is
> considered a vulgar term for Native American
> women. . . .
>
> *The Chicago Tribune, March 24, 2002*
> . . . South Dakota is the latest front in a
> national effort to eliminate the word "squaw," a
> term many Native Americans find offensive, from
> geographic names.  Five other states, from Oregon
> to Maine, have banned the word in official place
> names since 1995.  Similar efforts are under way
> in California, Idaho and Nebraska . . .  Native
> Americans do not agree on a universal substitute
> for squaw, which they consider an obscene
> reference to women. . .  As for "squaw," experts
> generally agree that the word is derived from a
> non-offensive Algonquin word for woman.  When
> "squaw" passed into English, "it took on very
> negative connotations in the 19th Century,
> meaning Indian woman available for sexual
> purposes," said Thomas Gasque, president of the
> American Name Society, which studies the use and
> origins of names . . .
>
> *The Omaha World Herald, March 13, 2001*
> . . . Bellevue City [Nebraska] Council members
> agreed Monday to remove "squaw" from the name of
> a creek that runs through northwest Bellevue.
> "To reflect the proud Indian heritage, I would
> like to ask the council to change the offensive
> name of Squaw Creek to Big Elk Creek," Council
> President Larry Cascio said Monday . . .  Cascio
> said several American Indians have since

Ser Nos. 76511144 and 76511145

explained the word's negative connotations . . .
Although Webster defines "squaw" as "a North
American Indian woman or wife," many feel the
word also has negative and vulgar meanings . . .

We find that all of the dictionary definitions
and the encyclopedia entry for "squaw" of record
consistently refer to "squaw" as a disparaging term
and as meaning, inter alia, "an American Indian woman"
and that the above-quoted excerpts of stories from the
Nexis/Lexis database are consistent with the
dictionary definition of "squaw."[5]

We must determine, however, the meanings of SQUAW and
SQUAW ONE in relation to the goods and services as
identified by the mark in the context of the marketplace.
*In re McGinley,* 660 F.2d 481, 211 USPQ 668 (CCPA 1981); and
*Harjo I,* 50 USPQ2d at 1738.  Thus, we consider the meaning
of the marks in the context of the goods and services in
applicant's two applications in turn below.

---

[5] Applicant maintains that "a search for the term 'Squaw'
retrieved a listing for Applicant's SQUAW VALLEY resort," relying
on a printout from the online *Encyclopedia Britannica* website
submitted in a response to an Office action.  Applicant's
reliance on the *Encyclopedia Britannica* entry is accorded limited
weight in determining the meaning of "squaw" because the entry is
for "Squaw Valley" and not for "squaw."

*International Class 25 Goods*, i.e., "Men's, women's and
children's clothing and accessories, namely, jackets,
sweatshirts, sweaters, shirts, pants, bathrobes, t-shirts,
gloves, head bands, vests, hats"; and *International Class
35 Services*, i.e., "Retail store services in the field of
sporting goods and equipment, apparel for men, women and
children, footwear, headgear and related goods and
services."

Applicant maintains that the mark SQUAW "is a
shorthand reference to Applicant's ski resort"; and that
"the mark SQUAW in the context of ski resorts and related
goods and services identifies Applicant's world famous
resort." The evidence offered by applicant (e.g., the
excerpts from the Lexis/Nexis database and the *Encyclopedia
Britannica* entry for "Squaw Valley"), indicates that
applicant is known as a resort for skiing.[6]

However, the International Class 25 and International
Class 35 identifications of goods and services do not
include any restrictions which limit the goods and services
recited therein to skiing or goods related to skiing. As
written, the identifications are broad enough to include
items unrelated to skiing, and even unrelated to winter

---

[6] Because of the proximity of skiing to snowboarding, by inference we
find that applicant is known as a resort for snowboarding too. See
discussion, *infra*, regarding applicant's specimen of use for its
International Class 28 goods in the application for SQUAW, which is a
photograph of a snowboard.

Ser Nos. 76511144 and 76511145

sports.[7]  It also has not escaped our attention that SQUAW

is defined as "woman," and that the identification of goods

in International Class 25 specifically states that the

identified clothing and accessories include those for

women.

Further, we note that there are no geographic

restrictions or restrictions as to trade channels or

classes of consumers in the identifications.  Thus, we

assume that applicant's clothing and retail store services

are offered for sale not just in the Squaw Valley,

California vicinity, but also throughout the United States,

even distant from the Squaw Valley resort, to both skiers

and non-skiers.  Additionally, we assume that the

International Class 25 identification encompasses all goods

of the nature and type described, and that the identified

goods move in all channels of trade that would be normal

for such goods and would include sales of such goods in

departments stores, clothing stores and mass merchandisers.

See *In re Elbaum*, 211 USPQ 639 (TTAB 1981).  Similarly,

because there are no restrictions in the identification of

services, we assume that the sporting goods and apparel

---

[7] "[B]athrobes" for men, women and children, which appears in the
International Class 25 identification of goods, certainly are not
related to skiing or to winter sports.

14

Ser Nos. 76511144 and 76511145

that applicant offers for sale in its stores are not
limited to such goods for skiing or even for winter sports
or to winter apparel, but includes goods and apparel for
sports which are not featured during winter and/or at
applicant's Squaw Valley resort.

We next consider the manner in which applicant uses
its marks. Applicant relies on the specimens of use in
arguing that the manner of use supports its contention that
the mark "as used by Applicant, does not refer to American
Indian women," noting that "Applicant's mark is not used in
connection with any other term or design element that would
create an association with American Indian women."

As its International Class 25 specimens of use,
applicant submitted a photograph of (i) a knitted headband
with SQUAW written in large letters between two stylized
snowflakes, and (ii) a plain long-sleeved collarless shirt
with SQUAW ONE written in large letters on the front of the
shirt. The terms are prominently displayed on the front of
the goods themselves, in large lettering.

We find that the specimens for applicant's
International Class 25 goods do not exhibit use such that
those perceiving the marks would associate SQUAW and SQUAW
ONE with applicant's ski resort. Neither headbands nor
shirts of the type depicted in the specimens are unique to

skiing or even to winter sports.  Further, although the
headband appears to be knitted and includes a snowflake
design, suggesting winter, there is no evidence in the
record that headbands are uniquely worn for skiing or even
for winter sports.  Further, neither the headband nor the
shirt depicted in the specimens includes other elements
such as additional wording, or skiing imagery or designs,
which would cause one viewing the goods to associate the
references to SQUAW and SQUAW ONE with applicant's ski
resort.

Turning next to applicant's International Class 35
specimens of use, such specimens show that applicant uses
its marks on storefronts.  The following is a reproduction
of the International Class 35 specimen of use for the mark
SQUAW:



Ser Nos. 76511144 and 76511145

It is clear that SQUAW appears on an exterior store wall,
and a ski rack (with a pair of skis in the rack) stands in
the foreground of the photograph.  SQUAW is superimposed on
a circular background and on a stylized "S" or a "double
S," with one "S" adjacent to the other.

The following is a reproduction of the International
Class 35 specimen of use for the mark SQUAW ONE:



Here, SQUAW ONE is depicted in a sign over the front door
of the store, with "accessories" also written on the sign.
Various items of clothing are shown on racks both inside
and outside the store, but none of the items in the
specimen can be positively identified as clothing or goods
unique to skiing or even to winter sports.

Ser Nos. 76511144 and 76511145

As with applicant's International Class 25 specimens,
we likewise find that the specimens for applicant's
International Class 35 services do not exhibit use such
that those perceiving the marks would associate SQUAW and
SQUAW ONE with the Squaw Valley ski resort.  Although SQUAW
appears on a stylized "S" and may be construed as an "S"
formed by a pair of skis passing through the snow, there is
no skiing, or even winter or sporting imagery proximate to
the "S" or to the word SQUAW in that specimen of use.
Further, the skis and the ski rack in front of the SQUAW
sign are not part of the building on which the SQUAW sign
is attached.  As for the specimen for SQUAW ONE, none of
the clothing that can be discerned in the photograph can be
identified as associated with the sport of skiing.
Accordingly, there is nothing in the specimens of use that
would suggest to consumers perceiving the marks that the
reference to SQUAW and to SQUAW ONE is to applicant.

Applicant has argued that "Applicant's mark is not
used in connection with any other term or design element
that would create an association with American Indians or
any other identifiable person(s)."  While that is true with
respect to the specimens in the record, it is also true
that applicant's marks on the record before us are not used
with any other term or design element that would create an

Ser Nos. 76511144 and 76511145

association with applicant, or even with skiing and ski
resorts, for which applicant maintains it is well-known.

We deem it more likely that consumers perceiving the
term SQUAW on or in connection with applicant's
International Class 25 and 35 goods and services would give
the dictionary definition to the term rather than associate
the term with applicant's ski resort. This is the case
particularly in the absence of any terms or design elements
which would suggest applicant in the areas for which
applicant maintains it is well-known, especially, because
applicant uses its marks on goods and services directed to,
inter alia, women, and the dictionaries of record define
"squaw" as "an American Indian woman."[8]

In view of the foregoing, we find that on the record
before us, including the few examples of the manner of use
of the marks, that the meaning of SQUAW and SQUAW ONE to
those perceiving applicant's marks in connection with its
International Class 25 and 35 goods and services is not

---

[8] We add that while the record shows an encyclopedia entry for
SQUAW VALLEY, the record does not contain an encyclopedia entry
or a definition for SQUAW ONE. Thus, we do not accept that a
reference to "squaw" in SQUAW ONE, outside the context of skiing,
would be construed in the marketplace as a reference to
applicant's chair lift. Only those who had the occasion to
become familiar with applicant's chair lift (and not just
applicant) would ascribe the meaning applicant advocates in its
brief to SQUAW ONE in the context of applicant's International
Class 25 and 35 goods and services.

applicant or its ski resort, but rather is the dictionary

definition of SQUAW, i.e., an American woman or wife.

Simply put, one would not associate the term "squaw" with

applicant outside the context of its resort, featuring

skiing or even other winter sports,[9] but would instead

ascribe the dictionary definition to the term.

**International Class 28 Goods**, *i.e.*, *"Skis, ski poles, ski
bindings, ski tuning kits comprised of waxes and adjustment
tools, ski equipment, namely, power cords."*

In contrast to the foregoing, we find that the meaning

of the term SQUAW in relation to the International Class 28

goods in the context of the marketplace is applicant's

Squaw Valley ski resort in California.

The International Class 28 goods are certainly goods

that are part of the sport of skiing and would be used by

skiers at applicant's resort.  Further, as noted above,

applicant has submitted an entry for "Squaw Valley" from

*Encyclopedia Britannica* stating that Squaw Valley in

California was the site of the 1960 Winter Olympics and is

"world famous."  Additionally, applicant has submitted

stories with its requests for reconsideration of the

examining attorney's decisions from the Lexis/Nexis

---

[9] A printout of applicant's website, made of record by applicant
during the prosecution of this case, reveals that, in addition to
skiing, snowboarding and possibly ice skating - see photo of ice
skaters under "Activities/Events" on p. 1 of "Squaw Mail" web
page - are offered at applicant's resort.

Ser Nos. 76511144 and 76511145

database, which show "shorthand" references to applicant's
Squaw Valley ski resort as "Squaw."

Further, applicant has submitted as a specimen of use
a photograph of a pair of skis with SQUAW ONE written on
the ski, in close approximation to the wording "Squaw
Valley USA," also written on the ski.  Because the skis
actually do have SQUAW VALLEY written on them, it is
apparent that those perceiving the mark on the goods will
associate SQUAW ONE with applicant.  Further, in the
application for SQUAW, applicant has submitted a photograph
of a snowboard with SQUAW appearing prominently on the
snowboard.  Because snowboarding occurs at ski resorts, we
find that those persons in the marketplace perceiving
applicant's snowboards depicted in the specimen of use will
associate SQUAW with applicant's "world famous" resort and
site of the 1960 Winter Olympics.  Thus, on this ex parte
record, we find that consumers, upon encountering
applicant's SQUAW and SQUAW ONE marks on applicant's
International Class 28 goods, will associate these marks
with applicant and applicant's ski resort, and not with an
offensive or disparaging term for an American Indian woman.

21

Ser Nos. 76511144 and 76511145

***Whether the Matter in Question May Be Disparaging to a
Substantial Composite of Native Americans.***

As to the goods in International Class 28, we found
(above) that the purchasing public will associate the terms
with applicant and not as a disparaging term.  However,
because we found (earlier herein) that the word "squaw"
retains its meaning as a reference to Native American women
when used in connection with applicant's International
Class 25 goods and International Class 35 services – and
hence identifies identifiable persons – we now turn to the
second part of the test set forth in *Harjo I*, i.e., whether
the matter in question may disparage Native Americans by
reference to the perceptions of Native Americans.  *Harjo*,
50 USPQ2d at 1472 – 1473.  As in *Harjo*, our standard is
whether a substantial composite of Native Americans in the
United States so perceive the subject matter in question.
*Id*. at 1743.  We do not take into consideration the
perceptions of the general public.  *Harjo II* ("… the TTAB
erred … [in] focusing on the general public and inferring
that the Native Americans would simply agree with those
views ….")  Also, in view of our findings above, we only
consider whether the marks may disparage Native Americans
with respect to the International Class 25 and
International Class 35 goods and services.

Ser Nos. 76511144 and 76511145

The examining attorney has submitted with her Office
actions the following excerpts of stories from the
Nexis/Lexis database from non-Native American sources which
report that Native Americans find the term "squaw"
disparaging:

> *The Rocky Mountain News, June 1, 2004*
> . . . Army Spc. Lori Piestewa, a Hopi from
> Arizona, was the first U.S. servicewoman killed
> in the Iraq war. . . An Arizona mountain, Squaw
> Peak - a name offensive to Indian people - was
> renamed in her honor . . . .
>
> *The Tampa Tribune, May 19, 2004*
> . . . The word "squaw" is as offensive to Indians
> as the "n-word" is to blacks.  It is so offensive
> and repugnant that it's been banned from
> geographical names in Minnesota and Arizona, and
> a bill passed in Florida aims to ban it as
> well . . . .
>
> *The Chicago Tribune, April 18, 2003*
> . . . In renaming Squaw Peak, Napolitano also
> sought to remove a name Indians find
> offensive . . . .
>
> *The Los Angeles Times, April 13, 2003*
> . . . The mountain is known as Squaw Peak, a name
> that many American Indians find offensive and
> have been trying to change . . . .
>
> *The Los Angeles Times, August 26, 1998*
> . . . The word "squaw" is a highly offensive
> Algonquin word . . . To use the word squaw today
> is not only a grave insult to Native American
> women, it is an insult to the dignity of every
> woman. . . [Letter from HASHI-HANTA, American
> Indian Movement, Sells, Ariz.]
>
> *The Fresno Bee, June 30, 2003*
> . . . Squaw Leap, a name that has long grated on
> American Indians, has passed into Central
> California history - at least, as far as the U.S.

> Bureau of Land Management is concerned. The
> agency this month renamed 6,700-acre Squaw Leap
> Management Area . . . It is now the San Joachin
> River Gorge. . . . American Indians . . . for
> decades have considered the name an insult. . . .
> Land Management officials said the word "squaw"
> has come under increasing fire across the
> country. The word . . . carries disparaging and
> vulgar meanings . . .

The examining attorney also submitted with her Office

actions the following statements from American Indian

groups and individual American Indians taken from the

Lexis/Nexis database, in support of her contention that the

term "squaw" "may be perceived as disparaging by American

Indians:"

> *The San Diego Union-Tribune, May 2, 2003*
> BYLINE: Tim Giago; Giago, an Oglala Lakota
> [Indian, writes] . . . [I]t doesn't matter what
> the word "squaw" means. It is how the word
> transformed its meaning from the early settler
> days. Any white man married to or living with an
> Indian woman was known as a "Squawman." When
> white men went looking for sex they went "squaw
> hunting." If any white person living in Phoenix
> or any other part of the United States wants to
> know if the word "squaw" is offensive to Indian
> women there is one sure way to find out. The
> next time you see several Indian women gathered
> together just walk up to them and call them
> squaws. If you get away with out having one hair
> on your head mussed up, you may consider yourself
> fortunate. It does not matter whether all of the
> white people in Phoenix believe "Squaw Peak" is
> an OK name. If just one Indian woman finds it
> offensive then that alone is reason enough to
> change the name . . . .
>
> *The Houston Chronicle, November 5, 2001*
> . . . Most offensive to Indians is the use of the
> term "squaw" in mascot or place names, Hook said.

Most modern American Indian groups now consider
"squaw" an obscene reference to a woman's body
part, Hook said.  "It has always been a term of
derision for Indian women," he said.  In the past
few years there has been a national movement
among Indian leaders to have "squaw" purged from
place names.  The National Congress of American
Indians asked the U.S. Board on Geographical
Names to have that term forbidden in use for
place names across the country. . . .[10]

*The Omaha World Herald, January 28, 2001*
. . . That position [that the name "Squaw" is not
offensive] ignores Indians' feelings about the
word, said Leonard Bruguier, a Yankton Sioux
[Indian] and the director of the Institute of
American Indian Studies at the University of
South Dakota in Vermillion.  As he grew up in
Yankton, S.D., "the people I knew were seasonal
workers, hard workers," Bruguier said.  "They'd
get drunk and you'd hear this, and it has a very
negative connotation."  Linguists dispute the
origin of "squaw," although it clearly is
offensive today, said Bruguier . . .  Some of
those urging the abolition of "squaw" link it to

---

[10] Applicant, in its reply brief, argues:

[P]olitical groups [e.g., The American Indian Movement
and the National Congress of American Indians] have
attempted to cast the term 'squaw' in the worst
possible light by claiming that it refers to female
genitalia.  This inflammatory definition has been
rejected by linguists in the very articles relied upon
[by] the Examining Attorney.  (See *The San Diego
Union-Tribune* (May 2, 2003); *The New York Times* (March
4, 2001); *The Saint Paul Pioneer Press* (April 6,
1997)).  For example, The New York Times reported in
2001 that the link of the term 'squaw' to female
genitalia 'was promulgated, with no evidence, in a
1973 polemic, and circulated broadly after being
mentioned in a 1992 episode of 'Oprah.'

Applicant's reply brief at 5 - 6.
  Thus, there is conflicting evidence as to whether the term
"squaw" also applies to female genitalia.  Because in this
record, the dictionary definitions of "squaw" do not include a
reference to female genitalia, we have not attributed this
meaning to the term.

Ser Nos. 76511144 and 76511145

a Mohawk word for a woman's private parts,
retired UCLA linguistics professor William Bright
wrote last fall in [the journal] Names. . . .

*The Saint Paul Pioneer Press, April 6, 1997*
The word "squaw," long the stuff of TV westerns
and American vernacular, is offensive to some
American Indians, and a national activist group
is launching a campaign to remove it from more
than 100 places throughout California - including
the most famous of all: Squaw Valley.  These
activists, leaders of the American Indian
Movement, say the word is the white man's
pejorative slang for "vagina," and they consider
it among "the worst of the worst."  The group's
crusade has met with success in Minnesota, where
it persuaded the Legislature to pass a law
decreeing that 19 place names containing the word
squaw be changed. . . .

*The Washington Post, September 20, 1993*
. . . [Senator Ben Nighthorse] Campbell said the
word Redskins is one of four terms most offensive
to Native Americans, the others being buck, squaw
and savage . . .  Campbell, a member of the
Northern Cheyenne tribe . . . .

*Indian Country Today, January 28, 2004*
. . . "The term [squaw] is degrading and racist,"
said Fort Mojave Chairperson Nora McDowell, among
Arizona Indian leaders speaking on Indian Nations
and Tribes Legislative Day.  McDowell refused
even to say the word in her address to the state
legislature.  "I'm not going to say it because it
is offensive to us as Native American women,"
said McDowell, president of the Intertribal
Council of Arizona . . .  "Damaging and
offensive," is how [Hopi Indian Chairman Wayne
Taylor, Jr.] described the word "squaw" . . .
Rep. Jack Jackson Jr., D-Window Rock, described
the bill he has presented, H.B. 2500, which
prohibits places in Arizona from being named
"Squaw" . . . .

*The Lewiston Morning Tribune, February 11, 2003*
. . . Four [of the] 93 Idaho place names with the
word "squaw" in their names were officially