# EXHIBIT 14 - PART B

Ser Nos. 76511144 and 76511145

> changed last December by the U.S. Board of
> Geographic Names . . . Proponents of the name
> change have tried for the last two years to
> remove squaw, which many Indians consider
> offensive, from the names of geographic features
> around the state. "It is never appropriate to
> use the word "squaw," said Julian Matthews, 44, a
> Nez Perce tribal member . . . Squaw should be
> dropped from names for no other reason than that
> it is offensive to Indian women, he said . . . .

Additionally, the examining attorney has pointed out

that "legislation banning the term 'SQUAW' from place names

and landmarks has been enacted in at least five states –

Minnesota, Montana, Maine, Wisconsin, Oregon and South

Dakota – and concurrent resolutions calling for the

renaming of geographic place names containing the term

'SQUAW' have been enacted by the Oklahoma and Idaho

legislatures, and proposed in other localities."  In

support, the examining attorney refers to excerpts from the

Nexis/Lexis database made of record during the prosecution

of the involved applications, including the following:

> *South Dakota Codified Laws §1-19C-4 (2003)*
> Offensive place names in South Dakota by county
> are replaced as follows: . . . Squaw Lake[changed
> to] Serenity Lake . . . Squaw Flat [changed to]
> Hat Creek Flat. . . Squaw Creek [in Jones County
> changed to] Pitan Creek . . . Squaw Creek [in
> Lawrence County changed to] Cleopatra Creek . . .
> Squaw Hill [changed to] Six Mile Hill . . . Squaw
> Lake [in Marshall County changed to] Six Mile
> Lake . . . Squaw Creek [in Moody County changed
> to] Jack Moore Creek. . . .

*Montana Code Annotated §2-15-149 (2003)*
Naming of sites and geographic features
replacement of word "squaw" -- advisory group.
(1) The coordinator of Indian Affairs shall
appoint an advisory group [to develop] names to
replace present site or geographic names that
contain the word "squaw".  (2) Each agency of
state government that own or manages public land
in the state shall identify any features or
places under its jurisdiction that contain the
word "squaw" and inform the advisory group . . .
[and shall ensure that] whenever the agency
updates a map or replaces a sign, interpretive
marker, or any other marker because of wear or
vandalism, the word "squaw" is removed and
replaced with the name chosen by the advisory
group. . . .

*Oregon Revised Statutes §271.600 (2003)*
271.600 Prohibition on use of term "squaw."
. . . (2) Except as required by federal law, a
public body may not use the term "squaw" in the
name of a public property.

*Maine Revised Statutes 1 M.R.S. §1101 (2003)*
§1101.   Definitions
1. OFFENSIVE NAME. "Offensive name" means a name
of a place that includes:
A. The designation "nigger" or "squaw" as a
separate word or as part of a word; or
B. The designation "squa" as a separate word.

*Minnesota Session Laws Chapter 53-S.F. No. 574
(1995)*
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF
MINNESOTA:
Section 1. . .  On or before July 31, 1996, the
commissioner of natural resources shall change
each name of a geographic feature in the state
that contains the word "squaw" to another name
that does not contain this word. . . .  Signed by
the governor April 18, 1995 . . .

*Concurrent Resolution No. 94 (Oklahoma
Legislature, May 2000)*
. . . WHEREAS, the word "squaw" is offensive to
Native Americans, and a national movement exists

to remove this offensive word from all geographic
names . . .   NOW, THEREFORE, BE IT RESOLVED . . .
THAT the word "squaw" be removed from all
geographic names used in Oklahoma. . .

Applicant, however, discounts this evidence, arguing

that "the Examining Attorney has failed to offer any

evidence whatsoever concerning the view of the referenced

group with respect to use of the mark SQUAW in connection

with the skiing-related goods and services identified in

the Application."

Applicant is correct -- there is no evidence in the

record that a substantial composite of Native Americans

find applicant's use of its marks on its identified goods

and services disparaging.[11]   The statements attributed to

---

[11] The Lexis/Nexis story (noted above) from the April 6, 1997
edition of *The Saint Paul Pioneer Press* stated:

> The word "squaw," long the stuff of TV westerns and
> American vernacular, is offensive to some American
> Indians, and a national activist group is launching a
> campaign to remove it from more than 100 places
> throughout California - including the most famous of
> all: Squaw Valley.  These activists, leaders of the
> American Indian Movement, say the word is the white
> man's pejorative slang for "vagina," and they consider
> it among "the worst of the worst."  The group's
> crusade has met with success in Minnesota, where it
> persuaded the Legislature to pass a law decreeing that
> 19 place names containing the word squaw be
> changed. . . .

While this story indicates that a certain group objects to
"Squaw Valley" as a place name and is "offensive to some
American Indians," it is silent on use of the marks SQUAW
and SQUAW ONE on the identified goods and services and
indicates the objection is by Native American activists.

Native Americans and Native American groups do not address
applicant's mark as used on its goods and services.
Further, the fact that several states have taken the
drastic step of renaming geographic sites to names which do
not include the term "squaw" does not compel the conclusion
that applicant's marks as used on applicant's goods and
services are disparaging to a substantial composite of
Native Americans.  Both *Harjo I* and *Harjo II* require
evidence that a substantial composite of the referenced
group considers the use of the mark in connection with the
relevant goods or services to be disparaging.  *Harjo I* at
1747; and *Harjo II* at 1252 ("However, the ultimate legal
inquiry is whether the six trademarks at issue may
disparage Native Americans when used in connection with
Pro-Football's services ….  The ultimate legal inquiry is
not whether the term 'redskin(s)' is a pejorative term for
Native Americans.")

The evidence submitted by the examining attorney does
not establish whether a substantial composite of Native
Americans find applicant's use of SQUAW in its *marks* on
applicant's identified *goods and services* to be
disparaging.  The ultimate legal inquiry here is not
whether Native Americans find "squaw" a pejorative term for
Native American women.

30

**Ser Nos. 76511144 and 76511145**

**DECISION:** The refusal to register under Section 2(a) is reversed for each class of goods and services in both applications.

Mailed:
May 23, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

----------

**Trademark Trial and Appeal Board**

----------

In re Squaw Valley Development Company

----------

Serial Nos. 76511144 and 76511145

----------

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater of Winston & Strawn LLP for Squaw Valley Development Company.

Michael Baird, Senior Examining Attorney, Law Office 116 (M. L. Hershkowitz, Managing Attorney).

**NOTICE OF CORRECTION**

**By the Board:**

On May 18, 2006, the Board mailed a final decision in connection with this appeal.

Page 52 of the decision incorrectly states that the request for reconsideration is granted to the extent that the refusal to register under Section 2(a) is affirmed for both applications in International Classes _24_ and 35, rather than in International Classes _25_ and 35.  In view thereof, page 52 of the decision is hereby corrected to indicate that the request for reconsideration is granted to the extent

**Ser. Nos. 76511144 and 76511145**

that the refusal to register under Section 2(a) is affirmed for both applications in International Classes 25 and 35.

A corrected copy of the Board's final decision is attached.

Applicant's time for filing an appeal or commencing a civil action regarding the Board's decision will run from the mailing date of this notice of correction. See Trademark Rule 2.145(d)(1), 37 C.F.R. §2.145(d)(1).

-o0o-

```
THIS OPINION IS
   CITABLE AS
PRECEDENT OF THE
     TTAB
```
Mailed:
May 23, 2006

### UNITED STATES PATENT AND TRADEMARK OFFICE

_____

**Trademark Trial and Appeal Board**

_____

In re Squaw Valley Development Company

_____

Serial Nos. 76511144 and 76511145

_____

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater of Winston & Strawn LLP for Squaw Valley Development Company.

Michael Baird, Senior Examining Attorney, Law Office 116 (M. L. Hershkowitz, Managing Attorney).

_____

Before Seeherman,[1] Quinn and Zervas, Administrative Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:

### _Request for Reconsideration_

#### A. _Background_

On October 25, 2005, the examining attorney, citing _In re Ferrero S.p.A._, 24 USPQ2d 1061 (TTAB 1992), requested reconsideration of the Board's September 26, 2005 decision

_____

[1] Judge Seeherman has been substituted for Judge Chapman, who participated in the Board's September 26, 2005 decision and who has since retired from government service.

Ser. Nos. 76511144 and 76511145

in connection with this appeal.  Squaw Valley Development

Company ("applicant") filed a response on

November 14, 2005.

Our September 26, 2005 decision reversed the trademark

examining attorney's refusal to register the marks SQUAW

and SQUAW ONE[2] (both in standard character form) on the

Principal Register, both for the following goods and

services:

> "men's, women's and children's clothing and
> accessories, namely, jackets, sweatshirts,
> sweaters, shirts, pants, bathrobes, t-shirts,
> gloves, head bands, vests, hats" in International
> Class 25;
>
> "skis, ski poles, ski bindings, ski tuning kits
> comprised of waxes and adjustment tools, ski
> equipment, namely, power cords" in International
> Class 28; and
>
> "retail store services in the field of sporting
> goods and equipment, apparel for men, women and
> children, footwear, headgear and related goods
> and services" in International Class 35.

The examining attorney had refused registration of the

marks which are the subject of both applications under

Section 2(a) of the Trademark Act, 15 U.S.C. 1052(a), on

the grounds that each mark "consists of or comprises matter

---

[2] Application Serial Nos. 76511144 for SQUAW and 76511145 for
SQUAW ONE were both filed May 2, 2003.  In both applications,
applicant claims first use and first use in commerce in 1949 for
the goods in International Class 25 and the services in
International Class 35, and first use and first use in commerce
in 1968 for the goods in International Class 28.

Ser. Nos. 76511144 and 76511145

which may disparage American Indians or bring them into

contempt or disrepute." Brief at p. 2.[3]

*The Applicant*

    As stated in our September 26, 2005 decision,

applicant maintains that it is the "world famous resort,

the home of the 1960 Winter Olympic Games" located in

California; owner of the www.squaw.com Internet domain

name; and owner of the following registrations (which are

of record herein):

> Registration No. 670261 for the mark SQUAW VALLEY
> for "women's, men's, girls', and boys' jackets,
> pants, and sweaters"; and

> Registration No. 1628589 for SQUAW VALLEY USA
> for, inter alia, "hotel, restaurant and lounge
> services; providing recreational facilities for
> and instructions in skiing, golf, tennis,
> swimming, operating a ski lift, aerobics and
> other forms of exercise; real estate management;
> and bus and transportation services."

Applicant also maintains that "the primary significance of

Applicant's mark SQUAW, as used in connection with

Applicant's goods and services, is a shorthand reference to

Applicant's world famous resort, SQUAW VALLEY," and the

primary significance of SQUAW ONE is the name of one of

---

[3] Because applicant filed appeal briefs in both the SQUAW and
SQUAW ONE applications, unless otherwise indicated, citations to
applicant's brief are to applicant's brief filed in the SQUAW
application.

applicant's ski lifts.  Brief at p. 6; SQUAW ONE brief at

p. 6.

*The Board's September 26, 2005 Decision*

        The Board, in its September 26, 2005 decision,

reversed the examining attorney's refusal to register each

mark for each International Class of goods and services.

The Board applied the two-part test set forth in *Harjo v.*

*Pro-Football, Inc.*, 50 USPQ2d 1705, 1740 - 1741 (TTAB 1999)

("*Harjo I*"), *rev'd on other grounds*, 284 F. Supp.2d 96, 68

USPQ2d 1225 (D.D.C. 2003), *remanded,* 415 F.3d 44, 75 USPQ2d

1525 (D.C. Cir. 2005), and later followed in *Order Sons of*

*Italy in America v. The Memphis Mafia, Inc.*, 52 USPQ2d 1364

(TTAB 1999), to determine whether the marks which are the

subject of this appeal are disparaging under Section 2(a):

> (1) what is the likely meaning of the matter in
> question, taking into account not only dictionary
> definitions, but also the relationship of the
> matter to the other elements in the mark, the
> nature of the goods or services, and the manner
> in which the mark is used in the marketplace in
> connection with the goods or services; and
>
> (2) if that meaning is found to refer to
> identifiable persons, institutions, beliefs or
> national symbols, whether that meaning may be
> disparaging to a substantial composite of the
> referenced group.

The District Court in *Pro Football, Inc. v. Harjo*, 284 F.

Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003) ("*Harjo II*"),

*remanded,* 415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005)

found "no error" in this test for disparagement.

Under the first part of the test, the Board found that

the meaning of SQUAW and SQUAW ONE, when used in connection

with applicant's International Class 28 skiing-related

goods, is applicant's Squaw Valley ski resort, and, when

used in connection with the International Class 25 goods

and the International Class 35 services, is "not applicant

or its ski resort, but rather … the dictionary definition

of SQUAW, i.e., an American Indian woman or wife."

Decision at pp. 19 - 20.  In view of the Board's finding

regarding the International Class 25 goods and

International Class 35 services, the Board went on to

consider whether this meaning may be disparaging to a

substantial composite of Native Americans under the second

part of the two-part *Harjo I* test.  The Board found as

follows:

> [T]here is no evidence in the record that a
> substantial composite of Native Americans find
> applicant's use of its marks on its identified
> goods and services disparaging.  The statements
> attributed to Native Americans and Native
> American groups do not address applicant's mark
> as used on its goods and services.  Further, the
> fact that several states have taken the drastic
> step of renaming geographic sites to names which
> do not include the term "squaw" does not compel
> the conclusion that applicant's marks as used on
> applicant's goods and services are disparaging to
> a substantial composite of Native Americans.

Ser. Nos. 76511144 and 76511145

> Both *Harjo I* and *Harjo II* require evidence that a substantial composite of the referenced group considers the use of the mark in connection with the relevant goods or services to be disparaging. *Harjo I* at 1747; and *Harjo II* at 1252 ("However, the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services …. The ultimate legal inquiry is not whether the term 'redskin(s)' is a pejorative term for Native Americans.")

> The evidence submitted by the examining attorney does not establish whether a substantial composite of Native Americans finds applicant's use of SQUAW in its *marks* on applicant's identified *goods and services* to be disparaging. The ultimate legal inquiry here is not whether Native Americans find "squaw" a pejorative term for Native American women.  Decision at pp. 29-30.  (Emphasis in the original decision.)

Thus, the Board reversed the refusal to register SQUAW and SQUAW ONE under Section 2(a) in each of the three International Classes.

### B.  *Request for Reconsideration*

The purpose of a request for reconsideration is to point out errors made by the Board in reaching its decision, based on the evidence of record and the prevailing authorities.  It is not merely to allow either the applicant or the examining attorney to reargue the case.  See TBMP §1219.01 (2d ed. rev. 2004), citing TBMP §§ 543 and 544.

In the request for reconsideration, the examining attorney maintains that the Board erred in arriving at its

September 26, 2005 decision.  The examining attorney makes

the following three points in the request:

1. With respect to the goods and services in
   International Classes 25 and 35, the examining
   attorney asserts that the Board misapplied the
   second part of the *Harjo I* test in requiring
   evidence that the goods and services be considered
   in finding the term is disparaging;

2. The examining attorney asserts that the Board
   incorrectly applied an inter partes standard of
   evidence to this ex parte appeal; and

3. With respect to the goods in International Class 28,
   the examining attorney asserts that the Board did
   not correctly analyze the evidence relating to the
   first part of the *Harjo I* test.

Because these arguments are directed to errors of law and

are not entirely re-argument, we consider the substance of

the request for reconsideration.

**1.   With respect to the goods and services in
International Classes 25 and 35, the examining
attorney asserts that the Board misapplied the second
part of the *Harjo I* test in requiring evidence that
the goods and services be considered in finding the
term is disparaging.**

The examining attorney maintains that the Board

"misapplied" the second prong of the *Harjo I* test in

finding that the examining attorney had not established

that a substantial composite of Native Americans find

disparaging applicant's use of SQUAW in its marks on the

identified International Class 25 goods and International

Class 35 services.  The examining attorney states:

7

Nowhere in the second part of the test are goods
and services mentioned.  The relationship of the
meaning of the term to the goods and services and
the context of the marketplace is only referred
to in the first part of the test.  Because, as
the Board found, the matter at issue had no other
meaning for the relevant goods and services than
as a reference to Native American women and a
substantial composite of the targeted group finds
the term to be disparaging, the test for
determining disparagement was met.  The Board
should have so decided.  Instead, the Board
appears to have required a three prong test,
i.e., requiring that the examining attorney show
that the term has no other meaning in the context
of the goods and services and in the market place
but that of a term that targets a particular
group (part one of the *Harjo I* test); that the
examining attorney prove that the targeted group
finds the term disparaging (part two of the *Harjo
I* test) and then, as a third requirement, that
the examining attorney must establish that the
targeted group finds the use on Applicant's
specific goods and services to be disparaging.
(Request for reconsideration at unnumbered p. 5.)

The examining attorney characterizes the Board's

decision as requiring evidence of "actual disparaging use"

and maintains that requiring "actual disparaging use" on

applicant's goods and services is "misplaced";[4] that "a

substantial composite of Native Americans believe the term

to [be] disparaging in any context"; that the "very

---

[4] We did not state in our opinion that there must be evidence of
"actual disparaging use."  We stated, "[b]oth *Harjo I* and *Harjo
II* require evidence that a substantial composite of the reference
group considers the use of the mark in connection with the
relevant goods or services to be disparaging"; and that "there is
no evidence in the record that a substantial composite of Native
Americans finds applicant's use of its marks on its identified
goods and services disparaging."  Decision at pp. 29 - 30.

8

existence of the term is disparaging"; and that

disparagement "may be inferred … from evidence regarding

the acceptability of the language or imagery used."

Request for reconsideration at unnumbered pp. 10 - 12.

The examining attorney also argues that if examining

attorneys are required to show that the "targeted group"

finds the use on applicant's specific goods and services to

be disparaging, this requirement would eviscerate Section

2(a) as a basis for refusal of registration:

> Clearly, a decision that requires the examining
> attorney to prove that a substantial composite of
> the … targeted group is disparaged when a
> derogatory term is used on specific goods or
> services would mean that the examining operation
> would be unable to apply Section 2(a), a result
> that Congress could not have contemplated.  Given
> the resources of the Office, an examining
> attorney is highly unlikely to prove that a
> targeted group is offended by use of a mark on
> *particular* goods and services which may or may
> not be in use, or if in use, may not be in use
> for a substantial period of time or be in use in
> an area where the targeted group may reside.  As
> written, the decision of the Board would seem to
> indicate that if there is no proof that the
> targeted group knows about the use of the
> purported mark so as to be offended, any mark may
> be registered.  (Request for reconsideration at
> unmarked p. 7.  Emphasis in original.)

Applicant maintains that the examining attorney is

"wrong" in contending that the *Harjo I* test does not

require a showing that the marks at issue are disparaging

to a substantial composite of the referenced group if used

**Ser. Nos. 76511144 and 76511145**

in connection with the goods and services set forth in the
applications.  As support, applicant cites various passages
from the Board's decision in *Harjo I* and from the District
Court's opinion in *Harjo II*, maintaining that the District
Court "repeatedly faulted the Board for finding
disparagement in the absence of evidence that a substantial
composite of the referenced group found the mark
disparaging *in connection with the identified goods and
services*."  Response to request for reconsideration at p.
3.  (Emphasis in original.)  Further, applicant
characterizes the examining attorney's arguments as asking
that the Board "adopt a 'new' test pursuant to which
disparagement would be determined in a vacuum without
reference to the goods or services involved or the
perceptions of the referenced group with respect to those
goods or services."  *Id*. at p. 4.

It has been long established that in the context of a
Section 2(a) ex parte refusal regarding scandalousness,
consideration must be given to the identified goods or
services.  See *In re Riverbank Canning Co.*, 95 F.2d 327, 37
USPQ 268, 269 (CCPA 1938) ("Of course, the word 'Madonna'
is not per se scandalous.  We do not understand that
appellant contends that a mark must be scandalous per se to
come within the prohibition of the statute.  …  It is

therefore obvious that, in determining whether a mark 'consists of or comprises … scandalous matter,' consideration ordinarily must be given to the goods upon which the mark is used."); and *In re McGinley*, 660 F.2d 481, 211 USPQ 668, 673 (CCPA 1981) ("In determining whether appellant's mark may be refused registration as scandalous, the mark must be considered in the context of the marketplace as applied to only the goods or services described in the application for registration.").

The Board, too, has stated that the relevant goods or services must be considered under Section 2(a). In *Harjo I*, the Board cited *In re Riverbank Canning Co.*, *supra*, and stated, "[a]s with most trademark issues, including scandalousness, the question of disparagement must be considered in relation to the goods or services identified by the mark in the context of the marketplace." *Harjo I*, 50 USPQ2d at 1738. *Harjo I* involved claims by several Native American plaintiffs that certain registrations of the Washington Redskins professional football team for, inter alia, marks containing or consisting of the term REDSKINS were scandalous and disparaging to Native Americans. The Board agreed with the plaintiffs that several of the marks were disparaging, stating that "petitioners have clearly established, by at least a

preponderance of the evidence, that, as of the dates the challenged registrations issued, the word 'redskin(s),' as it appears in respondent's marks in those registrations and as used in connection with the identified services, may disparage Native Americans, as perceived by a substantial composite of Native Americans." *Id.* at 1743.

Thereafter, Pro-Football, Inc. - the defendant in the Board proceeding - commenced an action in the District Court for the District of Columbia, seeking review of the Board's decision. The District Court in *Harjo II* concluded "that the TTAB correctly stated the test for disparagement and neither of the parties specifically dispute[d] this approach." *Harjo II,* 68 USPQ2d at 1247-1248. Additionally, the District Court emphasized that, under the second part of the *Harjo I* test, the question of disparagement had to be considered in the context of the involved goods or services. The District Court went on to state:

> To reach its conclusion that the trademarks may disparage Native Americans, the TTAB essentially determined that because the *word* "redskin(s)" may be viewed by Native Americans as derogatory when used as a reference for Native Americans, the trademarks are disparaging because they use that word. The result of this analysis is that there is very little discussion of the use of the mark in connection with Pro-Football's product or services. ... [I]n this case the TTAB did very little analysis of *how* the use of the trademarks

Ser. Nos. 76511144 and 76511145

> in connection with Pro-Football's services
> disparages Native Americans.  The Board was
> content with stating that because it found the
> name to be pejorative, the marks must be
> disparaging.  *Id.* at 1254.  (Emphasis in
> original).

In commenting on the evidence considered by the Board in connection with its evaluation of the second part of the *Harjo I* test, the Court made clear that the goods and services must be taken into account in making a determination of whether a mark is disparaging, noting, in connection with survey evidence, that "the survey is not directly dispositive of the legal question before the TTAB because it … did not test the participants' view of the term 'redskin(s)' in the context of Pro-Football's services …." *Harjo II*, 68 USPQ2d at 1249.  Similarly, with respect to the historical evidence before the Board, the Court said that "the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services and during the relevant time frame.  The ultimate legal inquiry is not whether the term 'redskin(s)' is a pejorative term for Native Americans." *Id.* at 1252.[5]  The District Court also

---

[5] The Board quoted this statement in arriving at its September 26, 2005 decision.  According to the examining attorney, "the Board utilized this quote to support its conclusion out of context and in an inapposite manner," because the Board omitted the wording "during the relevant time frame" in its quotation.  The examining attorney argues:

Ser. Nos. 76511144 and 76511145

commented generally on the factual findings made by the Board, stating, "[n]one of the findings of fact made by the TTAB tend to prove or disprove that the marks at issue 'may disparage' Native Americans, during the relevant time frame, especially when used in the context of Pro-Football's entertainment services." *Id.* at 1249.

It is clear from the foregoing that the second part of the test for disparagement requires consideration of whether the term would be considered disparaging as the term is used in connection with the identified goods or services. Hence, we reject the examining attorney's contention that the Board did not apply the proper test in our September 26, 2005 decision and/or has applied "a three prong test."

---

The missing terminology … is especially important because the *Harjo* case involved a cancellation proceeding and the issue before the Board and the Court was whether there was substantial evidence to show that the mark in question had a meaning in relation to Pro-Football services that was disparaging to Native Americans as of 1967 and not at the time of the cancellation proceeding. Request for reconsideration at unnumbered p. 6.

This argument has no bearing on, and does not dictate a different result in, this appeal. Of course, the relevant time frame here is the present, since this proceeding is an ex parte appeal, not a cancellation proceeding, when the issue date of the registration would be the relevant time period.

>       2.    **The examining attorney asserts that the Board should apply different standards of proof in ex parte and inter partes proceedings.**

As a second argument in favor of reconsideration, the examining attorney submits that there is a different standard of proof in an ex parte proceeding such as this one and an inter partes cancellation proceeding such as *Harjo I*.  The examining attorney maintains that "[t]he Board has consistently found that, in order to support a refusal to register, the examining attorney need only make a prima facie case"; that "the evidentiary burden then shifts to Applicant to rebut the examining attorney's finding"; and that "[i]n this case, the examining attorney has ... made a substantial prima facie case."  Request for reconsideration at unnumbered pp. 8 – 9.

Applicant, in response, maintains that "[t]he Examining Attorney failed to offer any evidence whatsoever concerning the views of the referenced group with respect to use of the applied-for marks in connection with the goods and services identified in the Application." Response at p. 4.

Of course, the examining attorney has the burden of proving that a trademark falls within a prohibition of Section 2(a).  *See In re Standard Elektrik Lorenz Aktiengesellschaft*, 371 F.2d 870, 152 USPQ 563, 566 (CCPA

15

Ser. Nos. 76511144 and 76511145

1967).  See also *In re Wilcher Corp.*, 40 USPQ2d 1929, 1934 (TTAB 1996) (evidence of record established prima facie that the mark would be offensive under Section 2(a) to the conscience or moral feelings of a substantial composite of the general public).

Once the USPTO sets forth a prima facie case, the burden shifts to the applicant to come forward with evidence to rebut the prima facie case with "competent evidence."  *See In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1010 (Fed. Cir. 1987); *In re R. M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984); *In re Teledyne Indus., Inc.*, 696 F.2d 986, 217 USPQ 9, 11 (Fed. Cir. 1982).

The Federal Circuit, our primary reviewing court, has commented on the evidentiary burden of the examining attorney and the limited ability of the examining attorney to gather evidence in support of a refusal.  In *In re Budge Mfg., Inc.*, 857 F.2d 773, 8 USPQ2d 1259 (Fed. Cir. 1988), the Federal Circuit considered whether LOVEE LAMB is deceptive when used for "automobile seat covers."  The Federal Circuit stated:

> In *ex parte* prosecution, the burden is initially
> on the Patent and Trademark Office (PTO) to put
> forth sufficient evidence that the mark for which
> registration is sought meets the … criteria of
> unregistrability.  Mindful that the PTO has

16

Ser. Nos. 76511144 and 76511145

limited facilities for acquiring evidence--it cannot, for example, be expected to conduct a survey of the marketplace or obtain consumer affidavits -- we conclude that the evidence of record here is sufficient to establish a *prima facie* case of deceptiveness. *Id.* at 1260-1261.

Similarly, in *In re Loew's Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865 (Fed. Cir. 1985), the Federal Circuit considered whether the use of "Durango" for tobacco was primarily geographically deceptively misdescriptive under Section 2(e)(2) [currently, Section 2(e)(3)]. The applicant argued that the USPTO failed to make a prima facie case that there was a goods/place association between tobacco and the geographic name "Durango" because the USPTO produced no evidence that the public would actually make the asserted association. The Federal Circuit disagreed that the USPTO, as part of its prima facie case, must establish an actual goods/place association, reasoning that the examining attorney "does not have means" to undertake the research, such as a marketing survey, necessary to prove that the public would actually make the goods/place association asserted. The Federal Circuit consequently required the USPTO only to establish "a reasonable predicate for its conclusion that the public would be *likely* to make the particular goods/place association on

which it relies," and not that the public would actually

make the asserted association.  *Id.* at 868.

Also, in *In re Pacer Technology*, 338 F.3d 1348, 67

USPQ2d 1629 (Fed. Cir. 2003), a case involving the

configuration of a container cap for adhesives and bonding

agents, the Federal Circuit found that to establish a prima

facie case of no inherent distinctiveness (which rested on

whether the public in the relevant market would view the

applicant's cap as a source-identifier), the USPTO was not

required to show that other caps were actually being

advertised, sold or used in the relevant market, but that

evidence of the existence of other design patents for

container caps was sufficient.  The Federal Circuit

acknowledged that it was "mindful of the reality that the

PTO is an agency of limited resources" and stated that "we

look only for substantial evidence, or more than a

scintilla of evidence, in support of the PTO's prima facie

case."  *Id.* at 1632.  See also *In re The Boulevard*

*Entertainment, Inc.*, 334 F.3d 1336, 67 USPQ2d 1475, 1478

(Fed. Cir. 2003), where the Federal Circuit, in the context

of an ex parte Section 2(a) case, stated that "although

other evidence, such as consumer surveys, would no doubt be

instructive," the USPTO's finding that a mark comprises or

consists of scandalous matter pursuant to Section 2(a) "is

not legally insufficient because of the absence of such evidence."

In our September 26, 2005 decision, we found that "there is no evidence in the record that a substantial composite of Native Americans find applicant's use of its marks on its identified goods and services disparaging." Decision at p. 29. We did not consider whether the evidence that was of record was sufficient to satisfy the examining attorney's burden of showing that a substantial composite of Native Americans find applicant's use of SQUAW in its marks on applicant's identified goods and services to be disparaging under the standard of proof approved by the Federal Circuit in ex parte cases. In other words, even though there was no *direct* evidence that a substantial composite of Native Americans find applicant's use of SQUAW in its marks on the identified goods and services to be disparaging, we did not consider whether the examining attorney met the Office's burden under the second prong of the *Harjo I* test by extrapolating from the evidence of record that a substantial composite of Native Americans find applicant's use of SQUAW in its marks on the identified goods and services to be disparaging. Thus, we now reconsider - applying the appropriate standard of proof for an ex parte case - whether the evidence of record

submitted by the examining attorney is sufficient to establish prima facie that a substantial composite of Native Americans find applicant's use of its marks in connection with its goods and services disparaging and, if so, whether applicant has rebutted the examining attorney's prima facie case. Because the examining attorney's arguments regarding the standard of proof are only directed to the Board's conclusions regarding applicant's goods and services in International Classes 25 and 35, we reconsider our decision in this respect in connection with these classes of the application.

> a. Did the examining attorney establish a prima facie case of disparagement with respect to applicant's International Class 25 and 35 goods and services?

As stated above, our September 26, 2005 decision resolved the first prong of the *Harjo I* test regarding the meaning of SQUAW and SQUAW ONE in the Office's favor in connection with the International Class 25 goods and International Class 35 services, namely, that in these marks, SQUAW conveys the dictionary definition of SQUAW as an American Indian woman or wife. The Board arrived at its conclusion despite the higher evidentiary burden we placed on the Office when we rendered that decision. Because the examining attorney has met the Office's burden under the

Ser. Nos. 76511144 and 76511145

higher evidentiary standard, the examining attorney has a priori met the Office's burden under the standard we have now articulated.  We hence do not revisit our findings with respect to the first prong of the *Harjo I* test.

The evidence submitted by the examining attorney which is relevant to our consideration of the second prong of the *Harjo I* test, i.e., whether the meaning of SQUAW and SQUAW ONE is disparaging to a substantial composite of Native Americans, includes the following:[6]

1.  Excerpted stories retrieved from the Nexis database with statements from American Indian groups and individual American Indians regarding the offensiveness of the term "squaw," e.g.:

*Indian Country Today, January 28, 2004*
The term [squaw] is degrading and racist," said Fort Mojave Chairperson Nora McDowell, among Arizona Indian leaders speaking on Indian Nations and Tribes Legislative Day.  McDowell refused even to say the word in her address to the state legislature.  "I'm not going to say it because it is offensive to us as Native American women," said McDowell, president of the Intertribal Council of Arizona. … "Damaging and offensive," is how [Hopi Indian Chairman Wayne Taylor, Jr.] described the word "squaw" … Rep. Jack Jackson Jr., D-Window Rock, described the bill he has presented, H.B. 2500, which prohibits places in Arizona from being named "Squaw" ….

_____

[6] The examining attorney relied on this evidence in contending that the meaning of "squaw" is a Native American woman under the first part of the *Harjo I* test.  As further discussed below, the examining attorney considers the evidence of record as establishing that Native Americans consider "squaw" disparaging in any context and thus the Office need not provide specific evidence that Native Americans consider "squaw" disparaging with respect to applicant's mark as used in connection with the applied-for goods and services.

Ser. Nos. 76511144 and 76511145

*The San Diego Union-Tribune, May 2, 2003*
BYLINE:  Tim Giago; Giago, an Oglala Lakota
[Indian, writes] … [I]t doesn't matter what the
word "squaw" means.  It is how the word
transformed its meaning from the early settler
days.  Any white man married to or living with an
Indian woman was known as a "Squawman."  When
white men went looking for sex they went "squaw
hunting."  If any white person living in Phoenix
or any other part of the United States wants to
know if the word "squaw" is offensive to Indian
women there is one sure way to find out.  The
next time you see several Indian women gathered
together just walk up to them and call them
squaws.  If you get away without having one hair
on your head mussed up, you may consider yourself
fortunate.  It does not matter whether all of the
white people in Phoenix believe "Squaw Peak" is
an OK name.  If just one Indian woman finds it
offensive then that alone is reason enough to
change the name.

*The Lewiston Morning Tribune, February 11, 2003*
Four [of the] 93 Idaho place names with the word
"squaw" in their names were officially changed
last December by the U.S. Board of Geographic
Names … Proponents of the name change have tried
for the last two years to remove squaw, which
many Indians consider offensive, from the names
of geographic features around the state.  "It is
never appropriate to use the word 'squaw,' said
Julian Matthews, 44, a Nez Perce tribal member …
Squaw should be dropped from names for no other
reason than that it is offensive to Indian women,
he said ….

*The Houston Chronicle, November 5, 2001*
Most offensive to Indians is the use of the term
"squaw" in mascot or place names, Hook said.
Most modern American Indian groups now consider
"squaw" an obscene reference to a woman's body
part, Hook said.  "It has always been a term of
derision for Indian women," he said.  In the past
few years there has been a national movement
among Indian leaders to have "squaw" purged from
place names.  The National Congress of American