# EXHIBIT 14 - PART C

Ser. Nos. 76511144 and 76511145

Indians asked the U.S. Board on Geographical
Names to have that term forbidden in use for
place names across the country.

*The Omaha World Herald, January 28, 2001*
That position [that the name "Squaw" is not
offensive] ignores Indians' feelings about the
word, said Leonard Bruguier, a Yankton Sioux
[Indian] and the director of the Institute of
American Indian Studies at the University of
South Dakota in Vermillion.  As he grew up in
Yankton, S.D., "the people I knew were seasonal
workers, hard workers," Bruguier said.  "They'd
get drunk and you'd hear this, and it has a very
negative connotation."  Linguists dispute the
origin of "squaw," although it clearly is
offensive today, said Bruguier … Some of those
urging the abolition of "squaw" link it to a
Mohawk word for a woman's private parts, retired
UCLA linguistics professor William Bright wrote
last fall in [the journal] Names.

*The Los Angeles Times, August 26, 1998*
The word "squaw" is a highly offensive Algonquin
word. … To use the word squaw today is not only a
grave insult to Native American women, it is an
insult to the dignity of every woman.  [Letter
from HASHI-HANTA, American Indian Movement,
Sells, Ariz.]

*The Saint Paul Pioneer Press, April 6, 1997*
The word "squaw," long the stuff of TV westerns
and American vernacular, is offensive to some
American Indians, and a national activist group
is launching a campaign to remove it from more
than 100 places throughout California - including
the most famous of all: Squaw Valley.  These
activists, leaders of the American Indian
Movement, say the word is the white man's
pejorative slang for "vagina," and they consider
it among "the worst of the worst."  The group's
crusade has met with success in Minnesota, where
it persuaded the Legislature to pass a law
decreeing that 19 place names containing the word
squaw be changed ….

Ser. Nos. 76511144 and 76511145

*The Washington Post, September 20, 1993*
[Senator Ben Nighthorse] Campbell said the word
Redskins is one of four terms most offensive to
Native Americans, the others being buck, squaw
and savage. … Campbell, a member of the Northern
Cheyenne tribe ….

2. Excerpted stories retrieved from the Nexis
database which report that Native Americans find the term
"squaw" offensive, including:

*The Rocky Mountain News, June 1, 2004*
Army Spc. Lori Piestewa, a Hopi from Arizona, was
the first U.S. servicewoman killed in the Iraq
war. … An Arizona mountain, Squaw Peak - a name
offensive to Indian people - was renamed in her
honor ….

*The Tampa Tribune, May 19, 2004*
The word "squaw" is as offensive to Indians as
the "n-word" is to blacks.  It is so offensive
and repugnant that it's been banned from
geographical names in Minnesota and Arizona, and
a bill passed in Florida aims to ban it as
well ….

*The Chicago Tribune, April 18, 2003*
In renaming Squaw Peak, Napolitano also sought to
remove a name Indians find
offensive ….

*The Los Angeles Times, April 13, 2003*
The mountain is known as Squaw Peak, a name that
many American Indians find offensive and have
been trying to change ….

*The Fresno Bee, June 30, 2003*
Squaw Leap, a name that has long grated on
American Indians, has passed into Central
California history - at least, as far as the U.S.
Bureau of Land Management is concerned.  The
agency this month renamed 6,700-acre Squaw Leap
Management Area. … It is now the San Joachin
River Gorge. … American Indians … for decades
have considered the name an insult. … Land
Management officials said the word "squaw" has
come under increasing fire across the country.

Ser. Nos. 76511144 and 76511145

The word … carries disparaging and vulgar
meanings ….

3.   Portions of state statutes retrieved from
www.lexis.com, www.stateline.com, and
www.revisor.leg.state.mn.us.com showing legislation enacted
in five states that rename geographic sites having the term
"squaw" or ban the term "squaw" from place names in public
places:

*South Dakota Codified Laws §1-19C-4 (2003)*
Offensive place names in South Dakota by county
are replaced as follows: … Squaw Lake [changed to]
Serenity Lake … Squaw Flat [changed to] Hat Creek
Flat … Squaw Creek [in Jones County changed to]
Pitan Creek … Squaw Creek [in Lawrence County
changed to] Cleopatra Creek … Squaw Hill [changed
to] Six Mile Hill … Squaw Lake [in Marshall
County changed to] Six Mile Lake … Squaw Creek
[in Moody County changed to] Jack Moore Creek ….

*Montana Code Annotated §2-15-149 (2003)*
Naming of sites and geographic features
replacement of word "squaw" -- advisory group.
(1) The coordinator of Indian Affairs shall
appoint an advisory group [to develop] names to
replace present site or geographic names that
contain the word "squaw".  (2) Each agency of
state government that owns or manages public land
in the state shall identify any features or
places under its jurisdiction that contain the
word "squaw" and inform the advisory group . . .
[and shall ensure that] whenever the agency
updates a map or replaces a sign, interpretive
marker, or any other marker because of wear or
vandalism, the word "squaw" is removed and
replaced with the name chosen by the advisory
group.

*Oregon Revised Statutes §271.600 (2003)*
271.600 Prohibition on use of term "squaw."
… (2) Except as required by federal law, a public
body may not use the term "squaw" in the name of
a public property.

*Maine Revised Statutes 1 M.R.S. §1101 (2003)*
§1101.  Definitions

Ser. Nos. 76511144 and 76511145

1. OFFENSIVE NAME. "Offensive name" means a name
of a place that includes:
A. The designation "nigger" or "squaw" as a
separate word or as part of a word; or
B. The designation "squa" as a separate word.

*Minnesota Session Laws Chapter 53-S.F. No. 574
(1995)*
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF
MINNESOTA:
Section 1. … On or before July 31, 1996, the
commissioner of natural resources shall change
each name of a geographic feature in the state
that contains the word "squaw" to another name
that does not contain this word. …  Signed by the
governor April 18, 1995 ….

    4.  A concurrent resolution passed by the Oklahoma
legislature calling for the renaming of geographic place
names in Oklahoma containing the term "squaw":

*Concurrent Resolution No. 94 (Oklahoma
Legislature, May 2000)*
WHEREAS, the word "squaw" is offensive to Native
Americans, and a national movement exists to
remove this offensive word from all geographic
names. …  NOW, THEREFORE, BE IT RESOLVED …. THAT
the word "squaw" be removed from all geographic
names used in Oklahoma.
*www2.Isb.state.ok.us*

Also in evidence is a concurrent resolution considered by
the Idaho legislature which addresses the "goal of the
eventual renaming of all geographical place names in the
state to eliminate the use of the word 'squaw,'" stating
"Native Americans and many citizens of the state find the
term 'squaw' objectionable and offensive to Native
Americans."  House Concurrent Resolution No. 42, 2d Sess.
2002), located by the examining attorney at
*www3.state.id.us.*

    5.  Two dictionary definitions and one encyclopedia
entry for "squaw" submitted by the examining attorney with
Office actions issued in the involved applications.[7]

---

[7] Applicant, with its responses to the examining attorney's first
Office actions, submitted the following definition of "squaw"

Ser. Nos. 76511144 and 76511145

*The American Heritage Dictionary of the English
Language* (online version)
1. Offensive.  A Native American woman, especially a
   wife.
2. A woman or wife.

*Merriam-Webster Dictionary* (online version)
1. *often offensive*:  an American Indian woman
2. *usually disparaging*:  WOMAN, WIFE.

*Encyclopedia of North American Indians,* Houghton
Mifflin (College Division) (online version)
The literal meaning of the word *squaw* is obscure,
and its connotations have changed over time.  Its
origins are found among the northeastern tribes.
In Massachusetts, *squd* referred to a younger
woman.  In Narragansett, *sunksquaw* meant "queen"
or "lady."  Despite these Algonquian-language
origins, however, nonnatives applied the term to
native women throughout North America.  Over time
it took on derogatory connotations as travelers
referred to native women as *squaw drudges* and
often used the term in opposition to Indian
princess.  Nonnatives often referred to women
leaders as *squaw sachems* and nonnative men who
married native women as *squaw men*.  By the
twentieth century the word *squaw* had developed
multiple derogatory associations that had no
connection with the word's original meaning.

In light of this evidence, the examining attorney

argues as follows:

The manner in which the applicant uses its SQUAW
mark on the identified goods and services does
not alter the fact that American Indians are

---

taken from *Webster's Third New International Dictionary,* Merriam
Webster, Inc. (1993): "1a:  an American Indian woman – compare
SANNUP  b: FEMALE, WOMAN, WIFE – usu. used disparagingly."
(Capitalization in the original.)  Definition 1a does not include
a usage designation directly after the definition.  However, the
other dictionary definitions and other evidence of record
indicating the offensiveness of the term outweighs the lack of a
usage designation directly after definition 1a.

Ser. Nos. 76511144 and 76511145

> referred to, identified or implicated in some
> recognizable manner by the term "SQUAW." As in
> *Harjo*, where the term "Redskins" was found to
> refer to Native Americans <u>and to retain its</u>
> <u>meaning when considered in connection with the</u>
> <u>registrant's services</u>, … the term "SQUAW" refers
> to an identifiable group – American Indians –
> and retains its meaning when considered in
> connection with the applicant's goods and
> services. Brief at p. 14. (Emphasis in the
> original brief.)

Applicant has challenged the examining attorney's

evidence, maintaining that the evidence relied on by the

examining attorney comprises excerpts from newspaper

stories regarding legislation in a few states and

localities banning use of the term "squaw" in geographical

place names; and that this "limited evidence" does not

relate in any way to use of the term SQUAW in connection

with applicant's "skiing-related goods and services

identified in the Application." Reply at p. 13.

Specifically, applicant argues as follows:

> There are more than 1,000 geographical features
> in the United States in thirty-six (36) states
> which have "squaw" in their names.
> (*Stateline.org*, April 26, 2000). Only seven (7)
> states have enacted legislation concerning use of
> the term "squaw" in geographical names. This
> legislation, however, is limited to geographical
> feature names and does not apply to business
> names and in some instances names of towns or
> villages. (See e.g., press release issued by the
> Oregon Legislature's Democratic Leadership
> Office, May 31, 2001, noting that the bill does
> not infringe on an individual's right to name his
> property whatever he wants; *The New York Times*,
> February 21, 2002, article which states that

Ser. Nos. 76511144 and 76511145

> Maine law requiring name change for geographical
> places containing the term "squaw" does not apply
> to businesses; *Stateline.org* April 26, 2000,
> article which states that Minnesota law applies
> only to geographic features, not to town names).
> The Examining Attorney provides no evidence that
> there is any consensus among the 2.4 million
> Native Americans regarding the meaning of the
> term "squaw". Reply at p. 5.

Additionally, applicant argues that "[t]he Examining Attorney offers only personal opinions of groups with political agendas and the legislation created under pressure to those agendas to support [the] refusal." Reply at p. 13. Applicant states:

> The limited legislation referred to by the
> Examining Attorney appears to reflect the agenda
> of two activist groups, the American Indian
> Movement and the National Congress of American
> Indians. The majority of quotes cited by the
> Examining Attorney in support of her position
> that the term "squaw" is disparaging comes from
> either members of these political groups or
> legislators who have adopted the positions
> espoused by these groups. In order to promote
> their agenda, these political groups have
> attempted to cast the term "squaw" in the worst
> possible light by claiming that it refers to
> female genitalia. This inflammatory definition
> has been rejected by linguists in the very
> articles relied upon [by] the Examining Attorney.
> Reply at pp. 5 - 6.

We find that the evidence made of record by the examining attorney is sufficient to establish prima facie that applicant's marks disparage a substantial composite of Native Americans when used in the context of applicant's goods and services. The record includes statements from

Ser. Nos. 76511144 and 76511145

Native Americans that the term is "damaging and offensive,"
"the worst of the worst," an "insult" and "obscene."  The
record also demonstrates that the opinions of Native
Americans regarding the term are not limited to particular
contexts.  Certainly, as a term considered "damaging and
offensive," "the worst of the worst," an "insult" and
"obscene," the term "squaw" is encompassed within the
definition of "disparage."  (See definition of "disparage"
in *Webster's Third New International* Dictionary (unabridged
ed. 1993), of which we take judicial notice: "to speak
slighting of: run down: DEPRECIATE.")[8]  Additionally, the
record includes a statement from Senator Ben Campbell, a
Native American United States Senator, that the term is
"one of four terms most offensive to Native Americans."
*The Washington Post, September 1993*.  We add that even if,
as applicant maintains, the statements in the record
attributed to Native Americans are those of Native American
activists and of legislators who share the views of such
activists, we do not discount such statements.  Applicant
would have us assume that the views of Native American
activists and sympathetic legislators do not represent the

---

[8] The Board may take judicial notice of dictionary definitions.
*University of Notre Dame du Lac v. J. C. Gourmet Food Imports
Co., Inc.*, 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372,
217 USPQ 505 (Fed. Cir. 1983).

views of a substantial composite of Native Americans.
Applicant provides no basis for concluding that their views
would not be shared by a substantial composite of Native
Americans.  Further, in light of the ex parte nature of
this case and the Federal Circuit's recognition of the
limited resources of examining attorneys, we do not
discount the probative value of such evidence.

The record also shows that various states have taken
the drastic and symbolic step of renaming geographic places
containing the term "squaw" or banning the term "squaw"
from geographic place names within the state.  Of note is
*Maine Revised Statutes 1 M.R.S. §1101* (2003), which
characterizes "squaw" as "offensive," and includes the term
"nigger" in the same statutory section, deeming each as an
"offensive name."  Also, Concurrent Resolution No. 94 of
the Oklahoma Legislature (May 2000) describes the term
"squaw" as "offensive to Native Americans," without
limitation to a particular context.

Applicant's challenges to the legislative evidence on
the basis that there are only a limited number of statutes
that address "squaw" and that such statutes only address
geographical place names and not the names of towns or
villages, or the names of businesses, are not well taken.
Even if "there are more than 1,000 geographical features in

31

Ser. Nos. 76511144 and 76511145

the United States" which have "squaw" in their names, and
only seven out of thirty-six states have enacted
legislation that applies to "geographical feature names"
with "squaw," the fact that seven states have addressed the
issue of names with "squaw" in them is significant.  We
cannot conclude from the absence of similar legislation to
date in other states that those states consider the term to
be inoffensive.  Also, the statutory sections submitted by
the examining attorney indicate that these seven states
have enacted such statutes on the basis that the term is
"offensive."  As noted above, the Maine legislature has
addressed the names of places containing "squaw" in the
same statutory section as "nigger."  See *Maine Revised
Statutes 1 M.R.S. §1101* (2003).  Additionally, that the
legislation does not address the names of businesses and is
not applicable to towns and villages does not detract from
the fact that the term is viewed as offensive.

The record also contains evidence of Native American
opposition to the term "squaw" as used in "Squaw Valley,"
which is the geographic location of applicant, part of
applicant's trade name, and part of the trademark of
applicant's claimed Registration Nos. 670261 (SQUAW VALLEY)
and 1628589 (SQUAW VALLEY USA).  See excerpted story from
the April 6, 1997 edition of *The Saint Paul Pioneer Press*,

stating that "[t]he word 'squaw,' … is offensive to some
American Indians, and a national activist group is
launching a campaign to remove it from more than 100 places
throughout California - including the most famous of all:
Squaw Valley."

We conclude that the evidence offered by the examining
attorney reflects that a substantial composite of Native
Americans would consider the term SQUAW, when its meaning
is a Native American woman or wife, to be disparaging
*regardless of context*, including in connection with
applicant's identified goods and services in International
Classes 25 and 35.  The evidence shows that this term, when
it means a Native American woman or wife, is generally
offensive to Native Americans, no matter what the goods or
services with which the mark is used.  Given the lesser
evidentiary standard that is required of the USPTO in the
ex parte context, it would be ludicrous to require an
examining attorney to find statements from individuals in
the relevant group stating that the term is offensive with
respect to the specific goods and services in the
application.  Members of the affected group are not likely
to make public statements regarding their feelings about
the use of SQUAW with respect to specific goods or

Ser. Nos. 76511144 and 76511145

services.[9]  Rather, we can infer from the evidence about the generally offensive nature of the term when meaning a Native American woman or wife that the term is offensive no matter with what goods or services it is used.

Thus, after reconsidering applicant's and the examining attorney's arguments, as well as the evidence before us, in light of the standard of proof required in an ex parte proceeding, we are persuaded that the examining attorney has met the Office's burden of establishing prima facie that a substantial composite of Native Americans finds the use of "squaw" in connection with applicant's identified goods and services in International Classes 25 and 35 to be disparaging.

Because we have found both that the meaning of "squaw," as used in applicant's marks for its goods and services in International Classes 25 and 35, is a Native American woman or wife, and that there is sufficient evidence of record for us to conclude that a substantial composite of Native Americans would find applicant's marks for such goods and services disparaging, we find that the

---

[9]  For example, it is unlikely that a tribal governing body would issue a statement that it found the use of SQUAW for "paperclips" to be offensive; there would be no reason that such pronouncements with respect to the use of the term for individual goods or services would be made.

examining attorney has made out a prima facie case of

disparagement under Section 2(a).

> b.  *Did applicant rebut the examining attorney's*
> *evidence that, under the second prong of the*
> *Harjo I test, the mark is disparaging as used in*
> *connection with the goods and services in*
> *International Classes 25 and 35?*

In view of our decision on reconsideration that the

examining attorney has met the requirements of the second

prong of the *Harjo I* test for disparagement, and therefore

has established a prima facie case, we must consider

whether applicant has rebutted the examining attorney's

showing, and specifically whether applicant has rebutted

the showing on the second prong of the test.  In doing so,

we have considered applicant's arguments in both its appeal

brief and its response to the request for reconsideration.

Applicant contended, in its brief on appeal, that:

> The mark SQUAW as used by Applicant for goods and
> services closely associated with its famous
> resort does not refer to identifiable persons.
> Therefore, it is not necessary to consider the
> second prong of the test for determining whether
> the matter is disparaging.  Brief at p. 8.

We disagree.  As stated above, the examining attorney has

made out a prima facie case that applicant's marks are

associated with identifiable persons, i.e., Native

Americans, and, in our original decision we found in favor

of the Office with respect to the first prong of the *Harjo*

35

*I* test.  Applicant's unsupported statement that its marks
do not refer to identifiable persons is not sufficient to
rebut the evidence submitted by the examining attorney that
the word SQUAW in applicant's marks, used in connection
with the identified goods and services in International
Classes 25 and 35, would have the meaning of a Native
American woman or wife.

Applicant, in its reply brief, has again challenged
the contention in the examining attorney's appeal brief
that American Indians are "the relevant group of
identifiable persons referred to, identified or implicated
in some recognizable manner by the term 'SQUAW'…."  Brief
at p. 14.  Although this argument uses a phrase from the
second prong of the *Harjo I* test (identifiable persons),
the argument actually goes to the first prong, i.e., what
is the "likely meaning" of the mark as used in connection
with the relevant goods and services since, if the mark
does not have the "likely meaning" of a Native American
woman or wife, Native Americans would not be the
"identifiable persons" of the second prong.  As we have
noted, in our original opinion we found that the Office had
met its burden of establishing that the meaning of SQUAW
and SQUAW ONE for the goods and services identified in
International Classes 25 and 35 was a Native American woman

36

or wife and, as we have stated in this decision, applicant
has not rebutted this.

We note applicant's argument that its "mark is not
used in connection with any other term or design element
that would create an association with American Indians or
any other identifiable person(s)," which was advanced by
applicant to distinguish the present situation from those
in other cases which had previously been cited by the
examining attorney, namely, *Harjo I; In re Hines*, 31 USPQ2d
1685 (TTAB 1994), *vacated on other grounds*, 32 USPQ2d 1376
(TTAB 1994); *Doughboy Industries, Inc. v. The Reese
Chemical Company, 88 USPQ 227 (Pat. Off. 1951);* and *In re
Anti-Communist World Freedom Congress, Inc.*, 161 USPQ 304
(TTAB 1969). According to applicant, in these cases the
marks at issue, which the Board found to be disparaging,
"all included design or logo elements which reinforced the
connection with the referenced persons or symbol the
applied-for marks were found to disparage." In contrast,
applicant submits that its marks "do not use any design or
logo elements which alludes to Native Americans." Reply
brief at p. 14. It appears to us that this argument, too,
goes to the first prong of the *Harjo I* test, namely, the
"likely meaning" of the term in the mark. We agree that
applicant's marks do not contain any design or logo

37

elements, but are for word marks in standard character

form.  However, we are aware of no requirement in Section

2(a) or the case law interpreting Section 2(a) that to be

found disparaging a mark must include design or logo

elements which reinforce the connection with the referenced

persons or symbol.  In fact, in *In re Reemtsma*

*Cigarettenfabriken G.m.b.H.*, 122 USPQ 339 (TTAB 1959),

involving the mark SENUSSI for "cigarettes," the Board's

decision does not refer to a design component in the

applied-for mark, yet the Board found the mark to be

disparaging to a Moslem sect whose tenets forbid the use of

cigarettes.[10]

Applicant also maintains that the manner in which its

mark is used does not create an association with American

Indians, pointing to its specimens.  Again, it appears to

us that this argument goes to the "likely meaning" of the

mark, the first prong of the *Harjo I* test, rather than to

whether applicant has rebutted the examining attorney's

---

[10] Applicant discussed *Reemtsma* in its reply brief at p. 15, and
argued that it is inapposite because "Applicant's mark SQUAW is
not the name of a religious sect or order and this case is
plainly not applicable to the present facts."  We are not
persuaded that the case is inapposite to the present case simply
because "SQUAW is not the name of a religious sect or order."
There are various ways in which terms can be used so as to
disparage individuals or groups.  Precedential case law is not
inapposite merely because the nature of the disparagement in one
case is different from another case.

showing that Native Americans would find the mark
disparaging as used for the identified goods and services,
which is the second element of the test.  We agree with
applicant's contention that "Applicant's mark is not used
in connection with any other term or design element that
would create an association with American Indians or any
other identifiable person(s)."[11]

However, while use of Native American indicia in
applicant's specimens would strengthen the association
between the marks and the meaning of "squaw" as a Native
American woman or wife, the lack of such indicia does not
mean that there would be no such association.  Even without
other Native American indicia, consumers would understand
applicant's marks for its identified International Class 25
and 35 goods and services to refer to a Native American
woman or wife.

---

[11] Applicant's specimens for the goods in International Class 25
are a photograph of (i) a knitted headband with SQUAW written in
large letters between two stylized snowflakes on the headband
itself, and (ii) a plain long-sleeved collarless shirt with SQUAW
ONE written in large letters on the front of the shirt.  As for
the International Class 35 specimens, the specimen for the SQUAW
application depicts a store sign with SQUAW superimposed on a
circular background having a stylized "S" or a "double S," with
one "S" adjacent to the other; and the specimen for the SQUAW ONE
application depicts SQUAW ONE on a store sign over the front door
of the store, with "accessories" also written on the sign.

With respect to the second prong of the *Harjo I* test,
applicant, in its opposition to the request for
reconsideration, has attacked the examining attorney's
evidence.  Specifically, applicant asserts, "the Examining
Attorney has offered no evidence that a substantial
composite of the referenced group believes applicant's use
of that mark in connection with the identified goods and
services is disparaging."  Reply brief at p. 13.

Contrary to applicant's contention, the evidence of
record is sufficient for us to find (a) what a substantial
composite of Native Americans believes; and (b) that
applicant's use of the marks in connection with the
identified goods and services is disparaging.  As already
mentioned above, in this ex parte proceeding the amount of
evidence needed for the Office to make a prima facie case
does not necessarily rise to the level of what is required
in an inter partes proceeding because of the Federal
Circuit's recognition that the Office has limited
resources.  The numerous quotations from Native Americans
in the excerpted portions of Nexis articles set forth
herein, and the fact that several states have taken the
drastic step of changing the names of geographic sites
containing the word "squaw," is sufficient for us to
conclude that the sentiments regarding this term are not

Ser. Nos. 76511144 and 76511145

limited to a minor portion of the Native American

population, but rather reflect the views of a substantial

composite of Native Americans.[12]

Further, the evidence is sufficient for us to conclude

that applicant's use of the marks in connection with the

identified goods and services is disparaging.  The evidence

shows that "squaw" is a term that Native Americans consider

to be an offensive reference to Native American women and

this term maintains its offensive meaning in most contexts,

including when used in connection with applicant's

identified goods and services in International Classes 25

and 35.

Thus, applicant's arguments directed against the

examining attorney's evidence are not well taken.

Applicant has not submitted any evidence which suggests

that Native Americans do not view "squaw" as a non-

disparaging term for its Class 25 and 35 goods and

services.

Accordingly, we conclude that applicant has *not*

rebutted either prong of the *Harjo I* test, and therefore we

find that applicant has not rebutted the examining

---

[12]  A substantial composite is not necessarily a majority.  See *In re Mavety Media Group Ltd.*, 33 F.3d 1367, 31 USPQ2d 1923, 1925 (Fed. Cir. 1994), quoting from *McGinley*, 211 USPQ at 763.

attorney's prima facie case of disparagement under Section
2(a).

> **3. With respect to the goods in Class 28, the
> examining attorney asserts that the Board did not
> correctly analyze the evidence relating to the first
> part of the *Harjo I* test.**

In our September 26, 2005 decision, the Board found
that the meaning of SQUAW in applicant's marks, as used in
connection with its identified skis and ski equipment in
International Class 28, is applicant's Squaw Valley ski
resort in California. The Board therefore held that the
marks were not disparaging under the first part of the
*Harjo I* test, i.e., the "likely meaning" of the matter in
question was not a Native American woman or wife.

The examining attorney has argued in the request for
reconsideration that the Board's finding as to the meaning
of the marks with respect to the International Class 28
goods is erroneous; and that "[t]he Board based [its]
finding on evidence of the fame of the resort for winter
sports and use of the mark[s] on skis on which the word
SQUAW was closely accompanied by the wording 'Squaw Valley
USA.'" Request for reconsideration at unnumbered p. 12.
It is the examining attorney's position that this finding
was incorrect because applicant is not limited to using the
marks in close approximation to the wording "Squaw Valley

42

USA" and because applicant's skis and goods related to

skiing could be sold in a ski shop *not* associated with

applicant, where the consumer would not necessarily

perceive the meaning of the term as the resort.  *Id.* at pp.

12 - 13.

Applicant, in response to the examining attorney's

arguments for reconsideration, maintains at p. 5 that the

examining attorney has no basis for the requested

reconsideration "other than an unsupported assertion that

Applicant has not sustained its burden of proving that

consumers would perceive use of the applied-for marks on

the Class 28 goods as referring to Applicant as opposed to

the dictionary meaning of the term"; and that the examining

attorney "has presented no new evidence, no manifest error

of fact or manifest error of law" with respect to the

determination regarding the goods in International Class

28.

In the appeal, applicant argued that "Applicant uses

the mark SQUAW in connection with ski equipment, clothing

and retail sporting goods store services as a shorthand

reference to SQUAW VALLEY"; that the "specimens of use

submitted with the application demonstrate that Applicant's

mark is not used in connection with any other term or

design element that would create an association with

American Indians or any other identifiable person(s)"; and

that the evidence submitted by applicant shows (i) that

applicant's marks have "secondary meaning" identifying

applicant's "world famous resort, SQUAW VALLEY, the home of

the 1960 Winter Olympic Games, and the skiing-related goods

and services identified in the Application"; and (ii) that

the meaning of SQUAW ONE is "the world famous SQUAW VALLEY

resort and the world famous ski lift named SQUAW ONE at

that resort."   Brief at pp. 6 - 7; reply at pp. 3 and 12.

Applicant submitted numerous articles from the Nexis

database in which applicant is referred to as "Squaw" and

one of applicant's chair lifts is referred to as "Squaw

One."   The following are excerpts from representative

articles showing such use of the term "squaw":

> *Reno Gazette-Journal, November 2, 2004*
> "… Squaw job fair this Sunday
> Find a job working at Squaw Valley USA during the
> upcoming ski season at the fair …."
>
> *The Seattle Times, November 23, 2003*
> Squaw Valley:  The most noticeable change at
> Squaw is the opening of Phase II of the new base
> village ….
>
> *St Louis Post-Dispatch, November 9, 2003*
> Squaw Valley will be opening phase II of its
> expanded base village. … For those chained to
> their laptops, Squaw now provides wireless
> Internet access from nearly anywhere on the
> mountain.

Ser. Nos. 76511144 and 76511145

*The San Francisco Chronicle, October 26, 2003*
-- Squaw Valley:  Phase II of the Village at
Squaw Valley is finished.  "You can finally come
here and not see a construction zone," said
Squaw's Katja Dahl.

*The Miami Herald, October 12, 2003*
Squaw Valley boasts 33 lifts, including North
America's only Funitel and a huge cable car, that
access six peaks, 4,000 acres and 2,850 vertical
feet of terrain.  Take a twirl on Squaw's on-
mountain skating rink located at High Camp (8,200
feet).

*Rocky Mountain News (Denver, CO), March 27, 2003*
Pearson stays with friends in South Lake, a 3½-
hour drive from San Francisco, nearly every
weekend in the winter.  He snowboards at Heavenly
and other Tahoe resorts like Squaw and Kirkwood.

*The New York Times, February 23, 2003*
TAHOE PACKAGE - Seventy-one motels, hotels and
vacation-home resorts in the North Lake Tahoe
area have nightly rates from $79 a person Sunday
to Thursday, $99 weekends for the rest of ski
season.  This includes lift tickets at ski
resorts like Squaw and Alpine Meadows.  There is
a two-night minimum; holidays are excluded.

*Charlotte Observer, February 16, 2003*
The first thing to know about Squaw Valley USA,
the California ski resort five miles west of Lake
Tahoe, is that nearly 20 years ago a movie was
filmed here that has become a cult classic. …
Thing is, a lot of the people who came to Squaw
to make that movie never left.

A substantial number of the articles submitted by applicant

in which "Squaw" is mentioned also include the term "Squaw

Valley."  It is clear that "Squaw" per se as used in those

articles is a shorthand reference to "Squaw Valley."

Ser. Nos. 76511144 and 76511145

Additionally, applicant has submitted two articles
from United States newspapers in which the term "Squaw One"
appears in reference to applicant's "Squaw One" ski lift.[13]
The first article appeared in *The Washington Post* on
November 7, 1999 and states in relevant part:

> Squaw, which spread out in front of our home's
> hillside deck, owns the reputation of old-school
> macho.  Home of the 1960 Winter Olympics and
> known for its challenging slopes ….  And an hour
> after hitting the Squaw One Express lift, and
> winding up on something steep and icy, I knew
> why.

The second article appeared in *Deseret News* (Salt Lake
City) on January 20, 2002, stating in relevant part:

---

[13] Applicant submitted eleven articles in support of its
contention that "the likely meaning of the mark SQUAW ONE … is
that of the world famous SQUAW VALLEY resort and the world famous
ski lift named SQUAW ONE at that resort." SQUAW ONE brief at
p. 6.  Two of these articles refer to "Squaw One Accessories,"
which is a clothing outlet and not applicant's ski lift.  (One of
applicant's specimens of use in the SQUAW ONE application is a
photograph of a storefront with a sign having "Squaw One
Accessories" written on the sign.)  Also, another two of these
articles appeared in foreign publications, i.e., *The Toronto Sun*
and *The Toronto Star*.  Because there is no evidence that *The
Toronto Sun* or *The Toronto Star* were distributed in the United
States or that the stories therein had any exposure to
prospective consumers in the United States, these two articles
have limited evidentiary value.  See *In re Men's International
Professional Tennis Council*, 1 USPQ2d 1917, 1918 (TTAB 1986).
Additionally, five of the eleven articles are from wire service
reports.  Wire service articles generally have limited
evidentiary value because we cannot determine whether or to what
extent they have been broadcast or otherwise distributed so as to
reach appreciable members of the relevant public.  *In re Cell
Therapeutics Inc.*, 67 USPQ2d 1795, 1798 (TTAB 2003).  However,
one of the wire service articles appeared in *The Deseret News*
(listed above), and we have given it weight at least insofar as
this publication is concerned.

> Squaw One, then the world's largest double
> chairlift, was wiped out by an avalanche the
> first year it ran.  And the second.  And the
> third.

Applicant has also made the following of record:

(a) printouts from its www.squaw.com website referring to

SQUAW and SQUAW ONE in connection with "Applicant's world

famous resort"; (b) search results for "squaw" on the Yahoo

and Google Internet search engines "in which the majority

of the results returned refer to Applicant's SQUAW VALLEY

resort"; and (c) a printout from "the online *Encyclopedia*

*Britannica* website in which a search for the term 'Squaw'

retrieved the following listing for Applicant's SQUAW

VALLEY resort":

> Squaw Valley
> World-famous winter sports area in Placer County,
> eastern California, U.S., just northwest of Lake
> Tahoe.  The focus of a state recreation area, it
> was the site of the 1960 Winter Olympics ….

Applicant also references the specimens of use in both

applications as showing use by applicant of SQUAW and SQUAW

ONE.  Reply at p. 4; SQUAW ONE reply at p. 4.

As we stated in our September 26, 2005 opinion, the

record shows that SQUAW VALLEY is well known in connection

with the sport of skiing.  Squaw Valley was the site of the

1960 Winter Olympics; *Encyclopedia Britannica* has an entry

for "Squaw Valley" and identifies Squaw Valley as "world-

47

famous"; Squaw Valley is mentioned in numerous newspaper
articles in newspapers from all over the United States;
and, according to the November 7, 1999 *Washington Post*
article noted above, Squaw Valley is known for its
challenging ski slopes.  Further, the articles from the
Nexis database submitted by applicant indicate that "Squaw"
is used as a shortened form of "Squaw Valley."  In view
thereof, the examining attorney's contention that applicant
is not "legally limited to using the mark in close
approximation with the wording 'Squaw Valley USA,'" as
appears on one of the specimens of use for applicant's
International Class 28 goods, while true, is of no
consequence - the wording "Squaw Valley USA" on skiing
related goods is not necessary to create an association of
SQUAW with applicant; rather, the term SQUAW, when used
with skiing related goods, would be perceived as a
reference to the Squaw Valley ski resort.

The examining attorney also points out that there are
no trade channel limitations in the identifications of
goods and that "consumer[s] seeing those goods being sold
in a ski shop not associated with Applicant would not
necessarily perceive the meaning as the resort."  Request
for reconsideration at unnumbered p. 13.  However, in view
of the evidence of record, and particularly because many of

48

the articles referring to "Squaw" are from locations in the
United States distant from applicant's resort, we cannot
accept the implication in the examining attorney's argument
that an association with applicant would only be created if
the skis and skiing-related goods were sold in stores
associated with applicant.

The Board has, in analyzing refusals under Section
2(a), considered the meaning of a term as reflected by the
goods on which the mark is used.  In *In re In Over Our
Heads, Inc.*, 16 USQP2d 1653 (TTAB 1990), the Board reversed
a refusal to register the mark MOONIES (and design) for a
doll which dropped its pants when a collapsible bulb was
squeezed, thus exposing its buttocks.  The examining
attorney took the position that "the mark comprised
scandalous matter which disparaged The Unification Church
founded by the Reverend Sun Myung Moon."  *Id.* at 1653.
However, the Board found that the term MOONIES had more
than one meaning, and that the meaning of MOONIES, when
used on the subject goods – dolls – would most likely be
perceived as indicating that the doll "moons," and would
not be perceived as referencing members of The Unification
Church.

Accordingly, we reiterate our finding that, when SQUAW
is considered in connection with applicant's "skis, ski

49

poles, ski bindings, ski tuning kits comprised of waxes and adjustment tools, ski equipment, namely, power cords," i.e., items which are directly connected with skiing, it is the Squaw Valley ski resort meaning of SQUAW, rather than the meaning of a Native American woman or wife, that will come to the minds of consumers. The same meaning will attach to SQUAW ONE, used for such goods, not because applicant has established that SQUAW ONE is well known (in view of the limited evidence regarding SQUAW ONE), but because of the prominence of the term SQUAW in the mark.

Because applicant has rebutted the examining attorney's showing regarding the "likely meaning" of the marks for the International Class 28 goods, it is not necessary for us to consider whether applicant has rebutted the second part of the *Harjo I* test, and the refusal to register the marks in Class 28 must be reversed. The examining attorney's request for reconsideration of our decision regarding the International Class 28 goods is denied.

## *Publication of the Mark*

As a final point, we address applicant's contention that "[d]oubts on the issue of whether a mark is disparaging are resolved in favor of the applicant," citing to *In re Mavety Media Group Ltd.*, 33 F.3d 1367, 31 USPQ2d

1923, 1928 (Fed. Cir. 1994), and *In re In Over Our Heads,
Inc.*, 16 USQP2d at 1654-55, and its contention that "[b]oth
the Federal Circuit and Board have previously supported the
practice of passing a mark for publication and allowing any
person(s) that finds such mark scandalous or disparaging
the opportunity to oppose registration." Response at pp.
5-6. While it is true that the Board has on previous
occasions resolved doubt as to whether a term was
disparaging or scandalous in favor of publication, the key
point is that the Board has done so when there has been
doubt. In this case, upon reconsidering our previous
decision and the evidence of record in light of the degree
of evidence required for the Office to meet its burden to
make a prima facie showing, we have no doubt that under
Section 2(a), as interpreted by the Board and the courts,
the term is disparaging with respect to the identified
goods in International Class 25 and the identified services
in International Class 35.

Thus, the examining attorney's request for
reconsideration is granted to the extent that the Section
2(a) refusal is affirmed for the application in
International Classes 25 and 35.[14]

---

[14]   In his request for reconsideration, the examining attorney
included a footnote suggesting that applicant's marks might also

Ser. Nos. 76511144 and 76511145

**DECISION:** The examining attorney's request for reconsideration is granted in part and denied in part. It is granted to the extent that the refusal to register under Section 2(a) is affirmed for both applications in International Classes 25 and 35, and it is denied to the extent that the refusal to register under Section 2(a) remains reversed for both applications in International Class 28.

---

be considered scandalous under Section 2(a), and indicated that the Board had the authority to remand the application so that the examining attorney could consider whether a refusal might be made on this ground, also. If an application comes before the Board on appeal, and it appears to the Board that there may be a ground for refusal that was not previously considered by the examining attorney, the Board may, pursuant to Trademark Rule 2.142(f), remand the application to the examining attorney to consider whether such a refusal should be made. However, the Board will exercise its power to sua sponte remand an application only prior to the issuance of a final decision and not, as here, when a decision has been issued and the Board is considering a request for reconsideration. Indeed, once a final decision issues, the Board no longer has the authority to order such a remand. See Trademark Rule 2.142(g) ("An application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer under §6 of the Act of 1946 or upon order of the Director, but a petition to the Director to reopen an application will be considered only upon a showing of sufficient cause for consideration of any matter not already adjudicated.").