# EXHIBIT 15

| | | |
|---|---|---|
| **From:** | Baird, Michael | 76511/45 |
| **Sent:** | Tue 10/25/05 04:16 PM | |
| **Subject:** | Request for Reconsideration of Board's Decision: 76511144 and 76511145 | |

Enclosed please find

1) a formal request for reconsideration of the Board's decision in 76511144 and 76511145, pursuant to TBMP Section 543, and

2) a brief in support of the request, pursuant to TBMP Section 1219.01.

## UNITED STATES PATENT AND TRADEMARK OFFICE

SERIAL NO: 76/511144

APPLICANT: Squaw Valley Development Company

**\*7651114
4\***

CORRESPONDENT ADDRESS:
    VIRGINIA R. RICHARD
    WINSTON & STRAWN
    200 PARK AVENUE
    NEW YORK NEW YORK 10166

BEFORE THE
TRADEMARK TRIAL
AND APPEAL BOARD
ON APPEAL

MARK:    SQUAW

CORRESPONDENT'S REFERENCE/DOCKET NO: N/A

CORRESPONDENT EMAIL ADDRESS:

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and e-mail address.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant: | Squaw Valley Development Company | : | BEFORE THE |
| Trademarks: | SQUAW<br>SQUAW ONE | : | TRADEMARK TRIAL |
| Serial Nos: | 76511144<br>76511145 | : | AND |
| Attorney: | Virginia R. Richard | : | APPEAL BOARD |
| Address: | Winston & Strawn<br>200 Park Avenue<br>New York, NY 10166 | : | ON APPEAL |

**REQUEST FOR RECONSIDERATION OF DECISION ON EX PARTE APPEAL**

The trademark senior attorney[1] respectfully requests that the Board reconsider its final decision reversing the examining attorney's refusal to register the proposed marks SQUAW and SQUAW ONE. *In re Squaw Valley Development Company*, No. 76511144, slip op. (TTAB Sept. 26, 2005) ("Decision"). It is the contention of the senior attorney that the decision of the Board is erroneous and the refusal to register should be affirmed. The request for reconsideration is filed pursuant to TBMP §1219.01 and TMEP §1501.07. The request has been filed within thirty days of the final decision, which was issued on September 26, 2005. TBMP §543; 37 CFR §2.129(c).[2]

Respectfully submitted,

/Michael W. Baird/
Senior Attorney, Law Office 116

Meryl Hershkowitz
Managing Attorney, Law Office 116

---

[1] The undersigned senior attorney has been assigned this case for the purposes of this Request.
[2] The managing attorney has concurred with this Request and Brief and received approval from the Administrator for Trademark Policy and Procedure for filing these documents pursuant to the above cited TMEP section.

# UNITED STATES PATENT AND TRADEMARK OFFICE

SERIAL NO: 76/511144

APPLICANT: Squaw Valley Development Company

**\*76511144\***

CORRESPONDENT ADDRESS:
    VIRGINIA R. RICHARD
    WINSTON & STRAWN
    200 PARK AVENUE
    NEW YORK NEW YORK 10166

BEFORE THE
TRADEMARK TRIAL
AND APPEAL BOARD
ON APPEAL

MARK:    SQUAW

CORRESPONDENT'S REFERENCE/DOCKET NO: N/A

CORRESPONDENT EMAIL ADDRESS:

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and e-mail address.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant: | Squaw Valley Development Company | : | BEFORE THE |
| Trademarks: | SQUAW<br>SQUAW ONE | : | TRADEMARK TRIAL |
| Serial Nos: | 76511144<br>76511145 | : | AND |
| Attorney: | Virginia R. Richard | : | APPEAL BOARD |
| Address: | Winston & Strawn<br>200 Park Avenue<br>New York, NY 10166 | : | ON APPEAL |

## BRIEF IN SUPPORT OF REQUEST FOR RECONSIDERATION

## STATEMENT OF THE CASE

The examining attorney finally refused to register the marks, "SQUAW" and "SQUAW ONE," for a variety of goods and services in International Classes 25, 28 and 35, under Section 2(a) of the Trademark Act, 15 U.S.C. 1052(a), because Applicant's marks consist of or comprise matter which may disparage American Indians and bring them into contempt or disrepute. On appeal, brought by Applicant, Squaw Valley Development Company, the Trademark Trial and Appeal Board reversed the decision of the examining attorney. The Board is respectfully requested to reconsider its decision and affirm the refusal to register.

## FACTS

Squaw Valley Development Company ("Applicant") filed applications to register the marks "SQUAW" and "SQUAW ONE," in typed form, both for "men's, women's and children's clothing and accessories, namely, jackets, sweatshirts, sweaters, shirts, pants, bathrobes, t-shirts, gloves,

head bands, vests, hats" in International Class 25; "skis, ski poles, ski bindings, ski tuning kits comprised of waxes and adjustment tools, ski equipment, namely, power cords" in International Class 28; and "retail store services in the field of sporting goods and equipment, apparel for men, women and children, footwear, headgear and related goods and services" in International Class 35. Both applications are based on use in commerce.

Registration was refused by the trademark examining attorney on the grounds that the proposed marks consist of or comprise matter which may disparage American Indians or bring them into contempt or disrepute, pursuant to Section 2(a) of the Trademark Act, 15 U.S.C. §1052(a). The refusals to register were made final, and Applicant appealed the decisions to the Trademark Trial and Appeal Board.

On appeal, the Board reversed the refusals to register for each class of goods and services in both applications, applying the two-part test set forth in *Harjo v. Pro-Football Inc.*, 50 USPQ2d 1705 (TTAB 1999), ("*Harjo I*") rev'd on other grounds, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D. D.C. 2003) (*"Harjo II"*), remanded, 415 F.3d 44, 75 U.S.P.Q.2d 1525 (D.C. Cir. 2005), and followed in *Order Sons of Italy in America v. The Memphis Mafia, Inc.*, 52 USPQ2d 1364 (TTAB 1999) (*"Memphis Mafia"*).

The case is now before the Board on a Request for Reconsideration filed by the senior attorney.

## ARGUMENT

### I. The Board should grant the Request for Reconsideration

In *In re Ferrero S.p.A.*, 22 USPQ2d 1800 (TTAB 1992), *recon. denied*, 24 USPQ2d 1061 (TTAB 1992), the Trademark Trial and Appeal Board expressly overruled prior precedent and held that an examining attorney may request reconsideration of a Board decision reversing the examining attorney in an *ex parte* appeal. The Board found that there was no legal reason to deny

the Office flexibility to correct possibly erroneous decisions. It is under that authority that the senior attorney now requests that the Board reconsider its decision and affirm the refusals to register.

## II. The Lanham Act forbids registration of a mark that is disparaging to persons

The Lanham Act at 15 U.S.C. §1052, states that:

*No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it--*

 *(a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute . . ..*

In the present case, the examining attorney has shown by substantial evidence that the word SQUAW as used on the goods and services specified in the applications is disparaging to Native Americans and should be refused registration.

## III. The decision of the Board is erroneous as to International Classes 25 and 35

Contrary to the decision reached by the Board, the examining attorney established that the marks at issue are disparaging to Native Americans in connection with the goods and services of the applications. To determine disparagement, the case law references a two part test set forth in *Harjo v. Pro-Football Inc.*, 50 USPQ2d 1705 (TTAB 1999), (*"Harjo I"*) rev'd on other grounds, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D. D.C. 2003) (*"Harjo II"*), remanded, 415 F.3d 44, 75 U.S.P.Q.2d 1525 (D.C. Cir. 2005), and followed in *Order Sons of Italy in America v. The Memphis Mafia, Inc.*, 52 USPQ2d 1364 (TTAB 1999) (*"Memphis Mafia"*).

The Board in its decision claimed to be following that test. It correctly restated the test as follows:

 (1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other

> elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and
>
> (2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

*Citing at 9, Harjo I* at 1740-41; *accord, Harjo II* at 1247.

Referring to the first part of the test, the Board found that, as to the goods in International Class 25 and the services in International Class 35, "... consumers perceiving the term SQUAW on or in connection with applicant's [clothing and retail services] would give the dictionary definition to the term rather than associate the term with applicant's ski resort." Decision at 19. The Board found that the term SQUAW had no other meaning than the dictionary definition in relation to and as used on those goods and services. That conclusion answered the first question of the test. That is, the likely meaning of the word SQUAW, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services is, in sum, an offensive term for a Native American woman. *See* definitions cited by the Board at 10. The Board found that Applicant had not limited the identifications of goods and services in International Classes 25 and 35 in any way, as to use on specific types of clothing or stores, or as to geography or trade channels. Decision at 13 and 14. The actual use of the mark as shown on the specimens in these classes also supported the conclusion that the only meaning of SQUAW that would be understood by consumers of Applicant's goods and services would be the dictionary definition of the term.

Once it determined that the meaning of the term SQUAW under the first part of the test referred to Native American women, the Board went on to determine the second part of the test; to wit, because that meaning is found to refer to identifiable persons, institutions,

beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group. The Board reviewed the significant evidence before it concerning the disparaging nature of the term SQUAW, including many articles containing statements by Native Americans finding the term offensive to their people as well as state statutes banning use of the term on geographical features and defining the term as offensive.

Nevertheless, the Board went on to erroneously conclude that the examining attorney had not established that a substantial composite of Native Americans find Applicant's use of SQUAW in its marks on Applicant's identified goods and services to be disparaging. Decision at 30.

It is at that point that the Board misapplied the *Harjo I* test. Nowhere in the second part of the test are goods and services mentioned. The relationship of the meaning of the term to the goods and services and the context of the marketplace is only referred to in the first part of the test. Because, as the Board found, the matter at issue had no other meaning on the relevant goods and services than as a reference to Native American women and a substantial composite of the targeted group finds the term to be disparaging, the test for determining disparagement was met. The Board should have so decided. Instead, the Board appears to have required a three prong test, i.e., requiring that the examining attorney show that the term has no other meaning in the context of the goods and services and in the market place but that of a term that targets a particular group (part one of the *Harjo I* test); that the examining attorney prove that the targeted group finds the term disparaging (part two of the *Harjo I* test) and then, as a third requirement, that the examining attorney must establish that the targeted group finds the use on Applicant's *specific* goods and services to be disparaging.

The Board seems to justify this conclusion by quoting *Harjo II* at 1252: "However, the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services . . .The ultimate legal inquiry is not whether the term 'redskin(s)' is a pejorative term for Native Americans." Decision at 30. However, the Board utilized this quote to support its conclusion out of context and in an inapposite manner. The full quote reads as follows:

> The ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services and *during the relevant time frame*. The ultimate legal inquiry is not whether the term "redskin(s)" is a pejorative term for Native Americans.

*Harjo II* at 1252 (emphasis added). The missing terminology "during the relevant time frame" is especially important because the *Harjo* case involved a cancellation proceeding and the issue before the Board and the Court was whether there was substantial evidence to show that the mark in question had a meaning in relation to Pro-Football services that was disparaging to Native Americans as of 1967 and not at the time of the cancellation proceeding.

Of course the issue of disparagement must be decided in context of the goods and services at issue; but that is what the first part of the test references. Does the matter at issue refer to a targeted group in relationship to the goods or services at issue? Certain marks, although disparaging in certain contexts, may not be in others. One example of that premise is the word "mafia" in the *Order Sons of Italy in America v. Memphis Mafia Inc.*, 52 USPQ2d 1364 (TTAB 1999). In that case, the mark, THE MEMPHIS MAFIA, for entertainment services, was found not to be matter that disparages Italian-Americans or bring them into contempt or disrepute because the meaning of the words was not shown to refer to Italian-Americans in the context of the services at issue.

Here, however, the results of the decision of the Board illustrate how the Board erroneously applied the two prong test for determining disparagement. The conclusion that the word SQUAW

can be used emblazoned across a headband or a t-shirt and not be considered disparaging when substantial evidence has shown that the word itself refers to Native American women and Native American women are disparaged by the term would essentially eviscerate the plain meaning of Section 2(a). The statute clearly states that marks should not be registered which are disparaging to persons. As the evidence of record indicates, the word SQUAW to Native Americans is the equivalent of the word NIGGER to African Americans. *See* evidence cited by the Board Decision at 23 and 28.[1]

Clearly, a decision that requires the examining attorney to prove that a substantial composite of the a targeted group is disparaged when a derogatory term is used on specific goods or services would mean that the examining operation would be unable to apply Section 2(a), a result that Congress could not have contemplated. Given the resources of the Office, an examining attorney is highly unlikely to prove that a targeted group is offended by use of a mark on *particular* goods and services which may or may not be in use, or if in use, may not be in use for a substantial period of time or be in use in an area where the targeted group may reside. As written, the decision of the Board would seem to indicate that if there is no proof that the targeted group knows about the use of the purported mark so as to be offended, any mark may be registered.

It is unlikely that the examining operation would ever have more evidence of disparagement than exists in the present case, where legislative history from several states exists that shows a targeted group speaking on behalf of legislation to outlaw an offensive term as a geographical feature. Even the U.S. Bureau of Land Management has renamed a 6,700 acre area

---

[1] *The Tampa Tribune, May 19, 2004*
  . . .The word "squaw" is as offensive to Indians as the "n-word" is to blacks. It is so offensive and repugnant that it's been banned from geographical names in Minnesota and Arizona, and a bill pass in Florida aims to ban it as well.
  *Maine Revised Statutes 1 M.R.S. Sec. 1101 (2003)*
  1. OFFENSIVE NAME. "Offensive name" means a name of a place that includes:
  A. The designation "nigger" or "squaw" as a separate word or as part of a word . . .

from Squaw Leap Management Area to San Joachin River Gorge because American Indians for decades have considered the name an insult carrying disparaging and vulgar meanings.[2]

### IV. The standard of proof is different in an *ex parte* proceeding and the test for disparagement must be interpreted in that context

At this point it is important to once again distinguish the facts present in this case from the situation explored in the *Harjo I* and *Harjo II* decisions. In developing its test for disparagement, the Board attempted to create a test which viewed a mark retrospectively, in an *inter-partes* action, and in a nationally recognized context. That is, the Board attempted to create a test which took into account a multitude of factors, including the meaning of the term "redskin" as applied to professional football exhibitions, as of the 1967 registration date. In *Harjo I*, the Board found that the term "redskin" was disparaging based on evidence that a substantial portion of the overall population found that the term was derogatory, and concluded that since Native Americans are a part of the overall population, the Board could reasonably infer that Native Americans found the term to be disparaging in the context of football services. The District Court emphatically rejected this finding, holding that such an inference improperly shifted the burden of evidence to the registrant. This is absolutely correct; in an *inter partes* cancellation proceeding, the burden of proof sits squarely on the shoulders of the petitioning party.

However, the situation at hand is not an *inter partes* cancellation proceeding. The marks have not yet been registered; the Board is not in the position of revoking previously granted federal rights. The Board has consistently found that, in order to support a refusal to register, the examining attorney need only make a *prima facie* case.[3] The evidentiary burden then shifts to

---

[2] See Decision at 23 citing *The Fresno Bee, June 30, 2003*.

[3] This standard has been upheld by the Board in cases involving Section 2(e): *see, e.g., In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987); *In re Zanova, Inc.*, 59 USPQ2d 1300 (TTAB 2001); *In re Richard Joseph Couture*, 60 USPQ2d 1317 (TTAB 1999) (applicant failed to rebut the PTO's prima facie case of descriptiveness of GENERIC for telephone services); *In re Loew's Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865, 868 (Fed. Cir. 1985) ("We affirm that a *prima facie* case can be established by the type of evidence of record here where the question concerns the registration

Applicant to rebut the examining attorney's finding. In this case, the examining attorney has a made a substantial *prima facie* case. In addition to the dictionary definitions, the examining attorney has submitted vast quantities of evidence demonstrating that Native Americans find the term disparaging in a multitude of contexts. In contrast, Applicant's rebuttal efforts have been directed towards associating the term SQUAW with its arguably-famous Squaw Valley ski resort. The Board has taken notice of the evidence and has, in fact, found that the primary meaning of the proposed mark in the context of the ski-related goods is that of Applicant's ski resort. That is to say, Applicant successfully rebutted the examining attorney's arguments with regard to the goods in International Class 28.

The facts in *Harjo I* must be further distinguished from the case at hand. Applicant has presented evidence of long and widespread use of the term "Squaw Valley" in connection with ski resort services. In *Harjo I*, the respondent showed that it had been using the mark for a long period of time, and had done so in connection with the services identified in the registrations. At this point the fact patterns diverge drastically. Unlike the situation in *Harjo I*, Applicant does not claim fame as to the marks in question, but rather to a particular geographic location: Squaw Valley, California. Unlike Pro-Football's 30-odd years of use of the marks prior to registration, Applicant's use of the terms SQUAW and SQUAW ONE is relatively recent. Also unlike the situation in *Harjo I*, where the claimed services were the very core of the registrant's business, here the goods and services at hand are only tangentially related to Applicant's main activity of providing ski facilities.

The Board correctly found that, at least with regard to the goods in International Class 25 and the services in International Class 35, the primary significance of the term SQUAW is that

---

of a geographic name."); *In re Kahan & Weisz Jewelry Mfg. Corp.*, 508 F.2d 831, 184 USPQ 421 (CCPA 1975) (examiner must establish a *prima facie* case that a word is primarily merely a surname).

conveyed by dictionary definitions. Having made the determination that the term SQUAW refers to Native American women, the Board answered the first *Harjo* factor.

### V.    The Board's requirement of evidence of actual disparaging use on Applicant's goods and services is misplaced

Since the Board found that the primary significance of SQUAW is to refer to Native American women, the second *Harjo* factor steps to the fore. The Board had only to determine whether "that meaning may be disparaging to a substantial composite of the referenced group." Despite the wealth of evidence provided by the examining attorney demonstrating that a substantial composite of Native Americans believe the term to disparaging in *any* context, and despite the usage notes in all the dictionaries of record indicating that the terms is "offensive" and "usually disparaging," the Board concluded that the examining attorney failed to provide evidence " . . . that a substantial composite of Native Americans find *applicant's use of its marks* . . . disparaging." Decision at 29 [emphasis added]. In making this finding, the Board has confused the concepts of *use* with that of *trademark use*. "Use," as contemplated by Section 2(a) of the Trademark Act, is necessarily hypothetical; one must determine if the use *may* be perceived as disparaging by the identified class. In requiring evidence pertinent to Applicant's own use in commerce, the Board has improperly added another factor to the *Harjo* test – that of actual use in commerce by an applicant.

By referring to "Pro-Football's services," it is clear that the District Court in *Harjo II* intended this wording to be shorthand for "those services for which the registrations exist." In a cancellation proceeding, the use of such terms would almost always be interchangeable. By definition, a registered mark must be in use in commerce; it is natural to assume that evidence of disparagement in context with the identified goods or services would include use by the registrant. Especially, as in *Harjo*, where the particular services in question are limited to a few elite individuals (owners of professional football teams), have been used by this elite group over the

course of many years, and have been so heavily promoted so as to become part of our national consciousness.

The Board's interpretation of the District Court's opinion, on the other hand, results in the unusual and highly unlikely conclusion that a *prima facie* refusal on the basis of disparagement can only be made if 1) the mark is in actual use in commerce, and 2) the use is so widespread that substantial composite of the disparaged group is a) aware of the mark, b) believes the use to be disparaging, and c) communicates this belief to the examining attorney. Indeed, such a test is in essence an equitable defense, requiring a showing of actual harm to a party not involved in the prosecution of the application. The Board and its reviewing courts have long held that the equitable defenses of laches, acquiescence and estoppel are not applicable in *ex parte* examination. *Cf. Application of National Distillers & Chemical Corp.*, 49 C.C.P.A. 854, 297 F.2d 941, 947, 132 USPQ 271 (1962); *In re Thomas H. Wilson*, 57 USPQ2d 1863, n. 13 (TTAB 2001).

Too, the requirement for evidence of actual disparaging use by Applicant ignores the simple fact that the disparaged group consists of an entire *people*, and that the nature of the disparagement refers to an immutable element of the group - their very race. The disparaged party is not a corporate entity, a military designation, or a religious movement. The disparagement does not target a particular aspect of the people or perpetuate a known offensive stereotype. Instead, it amounts to a racial slur. The record is replete with evidence that Native Americans find the term offensive to the extreme, regardless of context. The very existence of the term is disparaging. Also, the Board is reminded that the goods and services in question are clothing and retail stores. These are everyday-type goods and services which everyone purchases, including Native American women. Contact with the goods and services may be presumed.

Unlike the fact pattern in *Harjo I*, there is no question that the term *at the time of registration* is considered disparaging. Indeed, in the instant case, the trademark examining

attorney made of record numerous newspaper articles and other publications showing that the term is *per se* disparaging. The trademark examining attorney even included relevant state statutes from South Dakota, Montana, Oregon, Minnesota, Oklahoma, and Maine outlawing use of the term on place names.[4]

The Board noted in *Harjo I* that disparagement " ... may be inferred ... from evidence regarding the acceptability of the language or imagery used." *Harjo I* at 1738. The Board further stated that "the use of the term 'may' is necessary in connection with 'disparage' in Section 2(a) to avoid an interpretation of this statutory provision that would require a showing of intent to disparage. Such a showing would be extremely difficult in all except the most egregious cases." *Id.* And yet, this is the very evidence that the Board seems to require of the trademark examining attorney in this case.

## VI. The decision of the Board is erroneous as to International Class 28

The Board's decision to reverse the refusal to register the marks as to the goods in International Class 28 is also erroneous. Applicant has requested registration of the marks at issue for a variety of goods involving skis and ski equipment. The Board found that as to these goods, the meaning of the term SQUAW in the context of the market place is Applicant's Squaw Valley ski resort in California. Decision at 20. The Board based this finding on evidence of the fame of the resort for winter sports and use of the mark on skis on which the word SQUAW was closely accompanied by the wording "Squaw Valley USA."

Nevertheless, the Board should reconsider that finding. First of all, Applicant is not legally limited to using the mark in close approximation with the wording, "Squaw Valley USA," and in fact, there is no such close approximation on the specimens of record showing Applicant's ski board. Moreover, there is no limitation on channels of trade for the sale of the goods. A consumer

---

[4] In fact, the evidence of record may show that registration of the word SQUAW may be so shocking to the conscience

seeing those goods being sold in a ski shop not associated with Applicant would not necessarily perceive the meaning as the resort. In fact every instance of evidence provided by Applicant showing shortened use of its resort's name to SQUAW includes a reference to the full name, Squaw Valley, or the word "resort;" consequently Applicant has not sustained its burden of proving the inference that one would perceive the words SQUAW or SQUAW ONE on skis and ski equipment as meaning the Squaw Valley resort as opposed to the common dictionary meaning of the terms.

---

as to rise to the level required for finding the marks to be unregistrable as scandalous; the Board may remand the case back to the examining attorney for consideration of such a new issue pursuant to 37 C.F.R. 2.142(f). TMBP 1209.01.

## CONCLUSION

The Board incorrectly applied an *inter partes* standard of evidence to this *ex parte* appeal, and required additional evidence not warranted by the test it set forth in *Harjo I*. The trademark examining attorney respectfully requests that the Board reevaluate its findings. The examining attorney has presented a strong *prima facie* showing that the proposed mark is disparaging to Native Americans.

Though Applicant has presented evidence that the proposed marks may not be disparaging in the context of skiing-related goods, the Board has already rejected this evidence with regard to the clothing identified in International Class 25 and the retail services identified in International Class 35.

Having found that with regard to these particular goods and services the meaning of SQUAW is the meaning found in dictionaries, and recognizing that those same dictionaries characterize the term as disparaging, and in light of the otherwise unrebutted evidence that the Native American community finds the term disparaging in all contexts, the Board is constrained to find that the proposed marks *may* be disparaging, pursuant to the statutory language of Section 2(a). Consequently, the refusal to register must be affirmed.

Respectfully submitted,

/Michael W. Baird/
Senior Attorney, Law Office 116

Phone: (571) 272-9487
Fax:   (571) 273-9487

Meryl Hershkowitz
Managing Attorney, Law Office 116