# EXHIBIT 17 - PART A

Mailed:
May 23, 2006

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

### Trademark Trial and Appeal Board

---

In re Squaw Valley Development Company

---

Serial Nos. 76511144 and 76511145

---

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater of Winston & Strawn LLP for Squaw Valley Development Company.

Michael Baird, Senior Examining Attorney, Law Office 116 (M. L. Hershkowitz, Managing Attorney).

### NOTICE OF CORRECTION

**By the Board:**

On May 18, 2006, the Board mailed a final decision in connection with this appeal.

Page 52 of the decision incorrectly states that the request for reconsideration is granted to the extent that the refusal to register under Section 2(a) is affirmed for both applications in International Classes _24_ and 35, rather than in International Classes _25_ and 35. In view thereof, page 52 of the decision is hereby corrected to indicate that the request for reconsideration is granted to the extent

**Ser. Nos. 76511144 and 76511145**

that the refusal to register under Section 2(a) is affirmed for both applications in International Classes 25 and 35.

A corrected copy of the Board's final decision is attached.

Applicant's time for filing an appeal or commencing a civil action regarding the Board's decision will run from the mailing date of this notice of correction. See Trademark Rule 2.145(d)(1), 37 C.F.R. §2.145(d)(1).

-o0o-

```
┌─────────────────────┐
│  THIS OPINION IS    │
│   CITABLE AS        │
│ PRECEDENT OF THE    │
│      TTAB           │
└─────────────────────┘
```

Mailed:
May 23, 2006

### UNITED STATES PATENT AND TRADEMARK OFFICE

_____

### Trademark Trial and Appeal Board

_____

In re Squaw Valley Development Company

_____

Serial Nos. 76511144 and 76511145

_____

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater
of Winston & Strawn LLP for Squaw Valley Development
Company.

Michael Baird, Senior Examining Attorney, Law Office 116
(M. L. Hershkowitz, Managing Attorney).

_____

Before Seeherman,[1] Quinn and Zervas, Administrative
Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:

### *Request for Reconsideration*

#### *A.    Background*

On October 25, 2005, the examining attorney, citing *In
re Ferrero S.p.A.*, 24 USPQ2d 1061 (TTAB 1992), requested
reconsideration of the Board's September 26, 2005 decision

_____

[1] Judge Seeherman has been substituted for Judge Chapman, who
participated in the Board's September 26, 2005 decision and who
has since retired from government service.

Ser. Nos. 76511144 and 76511145

in connection with this appeal.  Squaw Valley Development

Company ("applicant") filed a response on

November 14, 2005.

Our September 26, 2005 decision reversed the trademark

examining attorney's refusal to register the marks SQUAW

and SQUAW ONE[2] (both in standard character form) on the

Principal Register, both for the following goods and

services:

> "men's, women's and children's clothing and
> accessories, namely, jackets, sweatshirts,
> sweaters, shirts, pants, bathrobes, t-shirts,
> gloves, head bands, vests, hats" in International
> Class 25;
>
> "skis, ski poles, ski bindings, ski tuning kits
> comprised of waxes and adjustment tools, ski
> equipment, namely, power cords" in International
> Class 28; and
>
> "retail store services in the field of sporting
> goods and equipment, apparel for men, women and
> children, footwear, headgear and related goods
> and services" in International Class 35.

The examining attorney had refused registration of the

marks which are the subject of both applications under

Section 2(a) of the Trademark Act, 15 U.S.C. 1052(a), on

the grounds that each mark "consists of or comprises matter

---

[2] Application Serial Nos. 76511144 for SQUAW and 76511145 for
SQUAW ONE were both filed May 2, 2003.  In both applications,
applicant claims first use and first use in commerce in 1949 for
the goods in International Class 25 and the services in
International Class 35, and first use and first use in commerce
in 1968 for the goods in International Class 28.

Ser. Nos. 76511144 and 76511145

which may disparage American Indians or bring them into

contempt or disrepute." Brief at p. 2.[3]

*The Applicant*

As stated in our September 26, 2005 decision,

applicant maintains that it is the "world famous resort,

the home of the 1960 Winter Olympic Games" located in

California; owner of the www.squaw.com Internet domain

name; and owner of the following registrations (which are

of record herein):

> Registration No. 670261 for the mark SQUAW VALLEY
> for "women's, men's, girls', and boys' jackets,
> pants, and sweaters"; and

> Registration No. 1628589 for SQUAW VALLEY USA
> for, inter alia, "hotel, restaurant and lounge
> services; providing recreational facilities for
> and instructions in skiing, golf, tennis,
> swimming, operating a ski lift, aerobics and
> other forms of exercise; real estate management;
> and bus and transportation services."

Applicant also maintains that "the primary significance of

Applicant's mark SQUAW, as used in connection with

Applicant's goods and services, is a shorthand reference to

Applicant's world famous resort, SQUAW VALLEY," and the

primary significance of SQUAW ONE is the name of one of

---

[3] Because applicant filed appeal briefs in both the SQUAW and
SQUAW ONE applications, unless otherwise indicated, citations to
applicant's brief are to applicant's brief filed in the SQUAW
application.

Ser. Nos. 76511144 and 76511145

applicant's ski lifts.  Brief at p. 6; SQUAW ONE brief at
p. 6.

### The Board's September 26, 2005 Decision

The Board, in its September 26, 2005 decision,
reversed the examining attorney's refusal to register each
mark for each International Class of goods and services.
The Board applied the two-part test set forth in *Harjo v.
Pro-Football, Inc.*, 50 USPQ2d 1705, 1740 - 1741 (TTAB 1999)
("*Harjo I*"), *rev'd on other grounds*, 284 F. Supp.2d 96, 68
USPQ2d 1225 (D.D.C. 2003), *remanded,* 415 F.3d 44, 75 USPQ2d
1525 (D.C. Cir. 2005), and later followed in *Order Sons of
Italy in America v. The Memphis Mafia, Inc.*, 52 USPQ2d 1364
(TTAB 1999), to determine whether the marks which are the
subject of this appeal are disparaging under Section 2(a):

> (1) what is the likely meaning of the matter in
> question, taking into account not only dictionary
> definitions, but also the relationship of the
> matter to the other elements in the mark, the
> nature of the goods or services, and the manner
> in which the mark is used in the marketplace in
> connection with the goods or services; and
>
> (2) if that meaning is found to refer to
> identifiable persons, institutions, beliefs or
> national symbols, whether that meaning may be
> disparaging to a substantial composite of the
> referenced group.

The District Court in *Pro Football, Inc. v. Harjo*, 284 F.
Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003) ("*Harjo II*"),

Ser. Nos. 76511144 and 76511145

*remanded,* 415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005) found "no error" in this test for disparagement.

Under the first part of the test, the Board found that the meaning of SQUAW and SQUAW ONE, when used in connection with applicant's International Class 28 skiing-related goods, is applicant's Squaw Valley ski resort, and, when used in connection with the International Class 25 goods and the International Class 35 services, is "not applicant or its ski resort, but rather ... the dictionary definition of SQUAW, i.e., an American Indian woman or wife." Decision at pp. 19 - 20. In view of the Board's finding regarding the International Class 25 goods and International Class 35 services, the Board went on to consider whether this meaning may be disparaging to a substantial composite of Native Americans under the second part of the two-part *Harjo I* test. The Board found as follows:

> [T]here is no evidence in the record that a substantial composite of Native Americans find applicant's use of its marks on its identified goods and services disparaging. The statements attributed to Native Americans and Native American groups do not address applicant's mark as used on its goods and services. Further, the fact that several states have taken the drastic step of renaming geographic sites to names which do not include the term "squaw" does not compel the conclusion that applicant's marks as used on applicant's goods and services are disparaging to a substantial composite of Native Americans.

Ser. Nos. 76511144 and 76511145

> Both *Harjo I* and *Harjo II* require evidence that a
> substantial composite of the referenced group
> considers the use of the mark in connection with
> the relevant goods or services to be disparaging.
> *Harjo I* at 1747; and *Harjo II* at 1252 ("However,
> the ultimate legal inquiry is whether the six
> trademarks at issue may disparage Native
> Americans when used in connection with Pro-
> Football's services …. The ultimate legal
> inquiry is not whether the term 'redskin(s)' is a
> pejorative term for Native Americans.")

> The evidence submitted by the examining attorney
> does not establish whether a substantial
> composite of Native Americans finds applicant's
> use of SQUAW in its *marks* on applicant's
> identified *goods and services* to be disparaging.
> The ultimate legal inquiry here is not whether
> Native Americans find "squaw" a pejorative term
> for Native American women. Decision at pp. 29-
> 30. (Emphasis in the original decision.)

Thus, the Board reversed the refusal to register SQUAW and

SQUAW ONE under Section 2(a) in each of the three

International Classes.

### B.   *Request for Reconsideration*

The purpose of a request for reconsideration is to

point out errors made by the Board in reaching its

decision, based on the evidence of record and the

prevailing authorities. It is not merely to allow either

the applicant or the examining attorney to reargue the

case. See TBMP §1219.01 (2d ed. rev. 2004), citing TBMP §§

543 and 544.

In the request for reconsideration, the examining

attorney maintains that the Board erred in arriving at its

Nowhere in the second part of the test are goods
and services mentioned.  The relationship of the
meaning of the term to the goods and services and
the context of the marketplace is only referred
to in the first part of the test.  Because, as
the Board found, the matter at issue had no other
meaning for the relevant goods and services than
as a reference to Native American women and a
substantial composite of the targeted group finds
the term to be disparaging, the test for
determining disparagement was met.  The Board
should have so decided.  Instead, the Board
appears to have required a three prong test,
i.e., requiring that the examining attorney show
that the term has no other meaning in the context
of the goods and services and in the market place
but that of a term that targets a particular
group (part one of the *Harjo I* test); that the
examining attorney prove that the targeted group
finds the term disparaging (part two of the *Harjo
I* test) and then, as a third requirement, that
the examining attorney must establish that the
targeted group finds the use on Applicant's
specific goods and services to be disparaging.
(Request for reconsideration at unnumbered p. 5.)

The examining attorney characterizes the Board's

decision as requiring evidence of "actual disparaging use"

and maintains that requiring "actual disparaging use" on

applicant's goods and services is "misplaced";[4] that "a

substantial composite of Native Americans believe the term

to [be] disparaging in any context"; that the "very

_____

[4] We did not state in our opinion that there must be evidence of
"actual disparaging use."  We stated, "[b]oth *Harjo I* and *Harjo
II* require evidence that a substantial composite of the reference
group considers the use of the mark in connection with the
relevant goods or services to be disparaging"; and that "there is
no evidence in the record that a substantial composite of Native
Americans finds applicant's use of its marks on its identified
goods and services disparaging."  Decision at pp. 29 - 30.

Ser. Nos. 76511144 and 76511145

September 26, 2005 decision.  The examining attorney makes
the following three points in the request:

> 1. With respect to the goods and services in
>    International Classes 25 and 35, the examining
>    attorney asserts that the Board misapplied the
>    second part of the *Harjo I* test in requiring
>    evidence that the goods and services be considered
>    in finding the term is disparaging;
>
> 2. The examining attorney asserts that the Board
>    incorrectly applied an inter partes standard of
>    evidence to this ex parte appeal; and
>
> 3. With respect to the goods in International Class 28,
>    the examining attorney asserts that the Board did
>    not correctly analyze the evidence relating to the
>    first part of the *Harjo I* test.

Because these arguments are directed to errors of law and
are not entirely re-argument, we consider the substance of
the request for reconsideration.

> **1.   With respect to the goods and services in
> International Classes 25 and 35, the examining
> attorney asserts that the Board misapplied the second
> part of the *Harjo I* test in requiring evidence that
> the goods and services be considered in finding the
> term is disparaging.**

The examining attorney maintains that the Board
"misapplied" the second prong of the *Harjo I* test in
finding that the examining attorney had not established
that a substantial composite of Native Americans find
disparaging applicant's use of SQUAW in its marks on the
identified International Class 25 goods and International
Class 35 services.  The examining attorney states:

7

existence of the term is disparaging"; and that

disparagement "may be inferred … from evidence regarding

the acceptability of the language or imagery used."

Request for reconsideration at unnumbered pp. 10 – 12.

The examining attorney also argues that if examining

attorneys are required to show that the "targeted group"

finds the use on applicant's specific goods and services to

be disparaging, this requirement would eviscerate Section

2(a) as a basis for refusal of registration:

> Clearly, a decision that requires the examining
> attorney to prove that a substantial composite of
> the … targeted group is disparaged when a
> derogatory term is used on specific goods or
> services would mean that the examining operation
> would be unable to apply Section 2(a), a result
> that Congress could not have contemplated.  Given
> the resources of the Office, an examining
> attorney is highly unlikely to prove that a
> targeted group is offended by use of a mark on
> *particular* goods and services which may or may
> not be in use, or if in use, may not be in use
> for a substantial period of time or be in use in
> an area where the targeted group may reside.  As
> written, the decision of the Board would seem to
> indicate that if there is no proof that the
> targeted group knows about the use of the
> purported mark so as to be offended, any mark may
> be registered.  (Request for reconsideration at
> unmarked p. 7.  Emphasis in original.)

Applicant maintains that the examining attorney is

"wrong" in contending that the *Harjo I* test does not

require a showing that the marks at issue are disparaging

to a substantial composite of the referenced group if used

Ser. Nos. 76511144 and 76511145

in connection with the goods and services set forth in the
applications.  As support, applicant cites various passages
from the Board's decision in *Harjo I* and from the District
Court's opinion in *Harjo II*, maintaining that the District
Court "repeatedly faulted the Board for finding
disparagement in the absence of evidence that a substantial
composite of the referenced group found the mark
disparaging *in connection with the identified goods and
services*."  Response to request for reconsideration at p.
3.  (Emphasis in original.)  Further, applicant
characterizes the examining attorney's arguments as asking
that the Board "adopt a 'new' test pursuant to which
disparagement would be determined in a vacuum without
reference to the goods or services involved or the
perceptions of the referenced group with respect to those
goods or services."  *Id.* at p. 4.

It has been long established that in the context of a
Section 2(a) ex parte refusal regarding scandalousness,
consideration must be given to the identified goods or
services.  See *In re Riverbank Canning Co.*, 95 F.2d 327, 37
USPQ 268, 269 (CCPA 1938) ("Of course, the word 'Madonna'
is not per se scandalous.  We do not understand that
appellant contends that a mark must be scandalous per se to
come within the prohibition of the statute.  …  It is

10

therefore obvious that, in determining whether a mark
'consists of or comprises … scandalous matter,'
consideration ordinarily must be given to the goods upon
which the mark is used."); and *In re McGinley*, 660 F.2d
481, 211 USPQ 668, 673 (CCPA 1981) ("In determining whether
appellant's mark may be refused registration as scandalous,
the mark must be considered in the context of the
marketplace as applied to only the goods or services
described in the application for registration.").

        The Board, too, has stated that the relevant goods or
services must be considered under Section 2(a). In *Harjo
I*, the Board cited *In re Riverbank Canning Co.*, *supra*, and
stated, "[a]s with most trademark issues, including
scandalousness, the question of disparagement must be
considered in relation to the goods or services identified
by the mark in the context of the marketplace." *Harjo I*,
50 USPQ2d at 1738. *Harjo I* involved claims by several
Native American plaintiffs that certain registrations of
the Washington Redskins professional football team for,
inter alia, marks containing or consisting of the term
REDSKINS were scandalous and disparaging to Native
Americans. The Board agreed with the plaintiffs that
several of the marks were disparaging, stating that
"petitioners have clearly established, by at least a

                                11

Ser. Nos. 76511144 and 76511145

preponderance of the evidence, that, as of the dates the

challenged registrations issued, the word 'redskin(s),' as

it appears in respondent's marks in those registrations and

as used in connection with the identified services, may

disparage Native Americans, as perceived by a substantial

composite of Native Americans."   *Id.* at 1743.

        Thereafter, Pro-Football, Inc. - the defendant in the

Board proceeding - commenced an action in the District

Court for the District of Columbia, seeking review of the

Board's decision.   The District Court in *Harjo II* concluded

"that the TTAB correctly stated the test for disparagement

and neither of the parties specifically dispute[d] this

approach."   *Harjo II,* 68 USPQ2d at 1247-1248.

Additionally, the District Court emphasized that, under the

second part of the *Harjo I* test, the question of

disparagement had to be considered in the context of the

involved goods or services.   The District Court went on to

state:

>       To reach its conclusion that the trademarks may
>       disparage Native Americans, the TTAB essentially
>       determined that because the *word* "redskin(s)" may
>       be viewed by Native Americans as derogatory when
>       used as a reference for Native Americans, the
>       trademarks are disparaging because they use that
>       word.   The result of this analysis is that there
>       is very little discussion of the use of the mark
>       in connection with Pro-Football's product or
>       services.  …  [I]n this case the TTAB did very
>       little analysis of *how* the use of the trademarks

in connection with Pro-Football's services
disparages Native Americans.  The Board was
content with stating that because it found the
name to be pejorative, the marks must be
disparaging.  *Id.* at 1254.  (Emphasis in
original).

In commenting on the evidence considered by the Board
in connection with its evaluation of the second part of the
*Harjo I* test, the Court made clear that the goods and
services must be taken into account in making a
determination of whether a mark is disparaging, noting, in
connection with survey evidence, that "the survey is not
directly dispositive of the legal question before the TTAB
because it … did not test the participants' view of the
term 'redskin(s)' in the context of Pro-Football's
services …."  *Harjo II*, 68 USPQ2d at 1249.  Similarly, with
respect to the historical evidence before the Board, the
Court said that "the ultimate legal inquiry is whether the
six trademarks at issue may disparage Native Americans when
used in connection with Pro-Football's services and during
the relevant time frame.  The ultimate legal inquiry is not
whether the term 'redskin(s)' is a pejorative term for
Native Americans."  *Id.* at 1252.[5]  The District Court also

---

[5] The Board quoted this statement in arriving at its
September 26, 2005 decision.  According to the examining
attorney, "the Board utilized this quote to support its
conclusion out of context and in an inapposite manner," because
the Board omitted the wording "during the relevant time frame" in
its quotation.  The examining attorney argues:

commented generally on the factual findings made by the Board, stating, "[n]one of the findings of fact made by the TTAB tend to prove or disprove that the marks at issue 'may disparage' Native Americans, during the relevant time frame, especially when used in the context of Pro-Football's entertainment services." *Id*. at 1249.

It is clear from the foregoing that the second part of the test for disparagement requires consideration of whether the term would be considered disparaging as the term is used in connection with the identified goods or services. Hence, we reject the examining attorney's contention that the Board did not apply the proper test in our September 26, 2005 decision and/or has applied "a three prong test."

---

> The missing terminology … is especially important because the *Harjo* case involved a cancellation proceeding and the issue before the Board and the Court was whether there was substantial evidence to show that the mark in question had a meaning in relation to Pro-Football services that was disparaging to Native Americans as of 1967 and not at the time of the cancellation proceeding. Request for reconsideration at unnumbered p. 6.

This argument has no bearing on, and does not dictate a different result in, this appeal. Of course, the relevant time frame here is the present, since this proceeding is an ex parte appeal, not a cancellation proceeding, when the issue date of the registration would be the relevant time period.

14

Ser. Nos. 76511144 and 76511145

> **2.  The examining attorney asserts that the Board should apply different standards of proof in ex parte and inter partes proceedings.**

As a second argument in favor of reconsideration, the examining attorney submits that there is a different standard of proof in an ex parte proceeding such as this one and an inter partes cancellation proceeding such as *Harjo I*.  The examining attorney maintains that "[t]he Board has consistently found that, in order to support a refusal to register, the examining attorney need only make a prima facie case"; that "the evidentiary burden then shifts to Applicant to rebut the examining attorney's finding"; and that "[i]n this case, the examining attorney has … made a substantial prima facie case."  Request for reconsideration at unnumbered pp. 8 - 9.

Applicant, in response, maintains that "[t]he Examining Attorney failed to offer any evidence whatsoever concerning the views of the referenced group with respect to use of the applied-for marks in connection with the goods and services identified in the Application."  Response at p. 4.

Of course, the examining attorney has the burden of proving that a trademark falls within a prohibition of Section 2(a).  *See In re Standard Elektrik Lorenz Aktiengesellschaft*, 371 F.2d 870, 152 USPQ 563, 566 (CCPA

Ser. Nos. 76511144 and 76511145

1967).  See also *In re Wilcher Corp.*, 40 USPQ2d 1929, 1934
(TTAB 1996) (evidence of record established prima facie
that the mark would be offensive under Section 2(a) to the
conscience or moral feelings of a substantial composite of
the general public).

Once the USPTO sets forth a prima facie case, the
burden shifts to the applicant to come forward with
evidence to rebut the prima facie case with "competent
evidence." *See In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009,
1010 (Fed. Cir. 1987); *In re R. M. Smith, Inc.*, 734 F.2d
1482, 222 USPQ 1, 3 (Fed. Cir. 1984); *In re Teledyne
Indus., Inc.*, 696 F.2d 986, 217 USPQ 9, 11 (Fed. Cir.
1982).

The Federal Circuit, our primary reviewing court, has
commented on the evidentiary burden of the examining
attorney and the limited ability of the examining attorney
to gather evidence in support of a refusal.  In *In re Budge
Mfg., Inc.*, 857 F.2d 773, 8 USPQ2d 1259 (Fed. Cir. 1988),
the Federal Circuit considered whether LOVEE LAMB is
deceptive when used for "automobile seat covers."  The
Federal Circuit stated:

> In *ex parte* prosecution, the burden is initially
> on the Patent and Trademark Office (PTO) to put
> forth sufficient evidence that the mark for which
> registration is sought meets the … criteria of
> unregistrability.  Mindful that the PTO has

16

limited facilities for acquiring evidence--it
cannot, for example, be expected to conduct a
survey of the marketplace or obtain consumer
affidavits -- we conclude that the evidence of
record here is sufficient to establish a *prima
facie* case of deceptiveness.  *Id.* at 1260-1261.

Similarly, in *In re Loew's Theatres, Inc.*, 769 F.2d

764, 226 USPQ 865 (Fed. Cir. 1985), the Federal Circuit

considered whether the use of "Durango" for tobacco was

primarily geographically deceptively misdescriptive under

Section 2(e)(2) [currently, Section 2(e)(3)].  The

applicant argued that the USPTO failed to make a prima

facie case that there was a goods/place association between

tobacco and the geographic name "Durango" because the USPTO

produced no evidence that the public would actually make

the asserted association.  The Federal Circuit disagreed

that the USPTO, as part of its prima facie case, must

establish an actual goods/place association, reasoning that

the examining attorney "does not have means" to undertake

the research, such as a marketing survey, necessary to

prove that the public would actually make the goods/place

association asserted.  The Federal Circuit consequently

required the USPTO only to establish "a reasonable

predicate for its conclusion that the public would be

*likely* to make the particular goods/place association on

which it relies," and not that the public would actually
make the asserted association.  *Id.* at 868.

   Also, in *In re Pacer Technology*, 338 F.3d 1348, 67
USPQ2d 1629 (Fed. Cir. 2003), a case involving the
configuration of a container cap for adhesives and bonding
agents, the Federal Circuit found that to establish a prima
facie case of no inherent distinctiveness (which rested on
whether the public in the relevant market would view the
applicant's cap as a source-identifier), the USPTO was not
required to show that other caps were actually being
advertised, sold or used in the relevant market, but that
evidence of the existence of other design patents for
container caps was sufficient.  The Federal Circuit
acknowledged that it was "mindful of the reality that the
PTO is an agency of limited resources" and stated that "we
look only for substantial evidence, or more than a
scintilla of evidence, in support of the PTO's prima facie
case."  *Id.* at 1632.  See also *In re The Boulevard
Entertainment, Inc.*, 334 F.3d 1336, 67 USPQ2d 1475, 1478
(Fed. Cir. 2003), where the Federal Circuit, in the context
of an ex parte Section 2(a) case, stated that "although
other evidence, such as consumer surveys, would no doubt be
instructive," the USPTO's finding that a mark comprises or
consists of scandalous matter pursuant to Section 2(a) "is

not legally insufficient because of the absence of such
evidence."

In our September 26, 2005 decision, we found that
"there is no evidence in the record that a substantial
composite of Native Americans find applicant's use of its
marks on its identified goods and services disparaging."
Decision at p. 29. We did not consider whether the
evidence that was of record was sufficient to satisfy the
examining attorney's burden of showing that a substantial
composite of Native Americans find applicant's use of SQUAW
in its marks on applicant's identified goods and services
to be disparaging under the standard of proof approved by
the Federal Circuit in ex parte cases. In other words,
even though there was no *direct* evidence that a substantial
composite of Native Americans find applicant's use of SQUAW
in its marks on the identified goods and services to be
disparaging, we did not consider whether the examining
attorney met the Office's burden under the second prong of
the *Harjo I* test by extrapolating from the evidence of
record that a substantial composite of Native Americans
find applicant's use of SQUAW in its marks on the
identified goods and services to be disparaging. Thus, we
now reconsider – applying the appropriate standard of proof
for an ex parte case – whether the evidence of record

submitted by the examining attorney is sufficient to

establish prima facie that a substantial composite of

Native Americans find applicant's use of its marks in

connection with its goods and services disparaging and, if

so, whether applicant has rebutted the examining attorney's

prima facie case.  Because the examining attorney's

arguments regarding the standard of proof are only directed

to the Board's conclusions regarding applicant's goods and

services in International Classes 25 and 35, we reconsider

our decision in this respect in connection with these

classes of the application.

> a.  Did the examining attorney establish a prima
> facie case of disparagement with respect to
> applicant's International Class 25 and 35 goods
> and services?

As stated above, our September 26, 2005 decision

resolved the first prong of the Harjo I test regarding the

meaning of SQUAW and SQUAW ONE in the Office's favor in

connection with the International Class 25 goods and

International Class 35 services, namely, that in these

marks, SQUAW conveys the dictionary definition of SQUAW as

an American Indian woman or wife.  The Board arrived at its

conclusion despite the higher evidentiary burden we placed

on the Office when we rendered that decision.  Because the

examining attorney has met the Office's burden under the

higher evidentiary standard, the examining attorney has a
priori met the Office's burden under the standard we have
now articulated.  We hence do not revisit our findings with
respect to the first prong of the *Harjo I* test.

The evidence submitted by the examining attorney which
is relevant to our consideration of the second prong of the
*Harjo I* test, i.e., whether the meaning of SQUAW and SQUAW
ONE is disparaging to a substantial composite of Native
Americans, includes the following:[6]

1.    Excerpted stories retrieved from the Nexis
database with statements from American Indian groups and
individual American Indians regarding the offensiveness of
the term "squaw," e.g.:

> *Indian Country Today, January 28, 2004*
> The term [squaw] is degrading and racist," said
> Fort Mojave Chairperson Nora McDowell, among
> Arizona Indian leaders speaking on Indian Nations
> and Tribes Legislative Day.  McDowell refused
> even to say the word in her address to the state
> legislature.  "I'm not going to say it because it
> is offensive to us as Native American women,"
> said McDowell, president of the Intertribal
> Council of Arizona. … "Damaging and offensive,"
> is how [Hopi Indian Chairman Wayne Taylor, Jr.]
> described the word "squaw" … Rep. Jack Jackson
> Jr., D-Window Rock, described the bill he has
> presented, H.B. 2500, which prohibits places in
> Arizona from being named "Squaw" ….

---

[6] The examining attorney relied on this evidence in contending
that the meaning of "squaw" is a Native American woman under the
first part of the *Harjo I* test.  As further discussed below, the
examining attorney considers the evidence of record as
establishing that Native Americans consider "squaw" disparaging
in any context and thus the Office need not provide specific
evidence that Native Americans consider "squaw" disparaging with
respect to applicant's mark as used in connection with the
applied-for goods and services.

Ser. Nos. 76511144 and 76511145

*The San Diego Union-Tribune, May 2, 2003*
BYLINE:  Tim Giago; Giago, an Oglala Lakota
[Indian, writes] … [I]t doesn't matter what the
word "squaw" means.  It is how the word
transformed its meaning from the early settler
days.  Any white man married to or living with an
Indian woman was known as a "Squawman."  When
white men went looking for sex they went "squaw
hunting."  If any white person living in Phoenix
or any other part of the United States wants to
know if the word "squaw" is offensive to Indian
women there is one sure way to find out.  The
next time you see several Indian women gathered
together just walk up to them and call them
squaws.  If you get away without having one hair
on your head mussed up, you may consider yourself
fortunate.  It does not matter whether all of the
white people in Phoenix believe "Squaw Peak" is
an OK name.  If just one Indian woman finds it
offensive then that alone is reason enough to
change the name.

*The Lewiston Morning Tribune, February 11, 2003*
Four [of the] 93 Idaho place names with the word
"squaw" in their names were officially changed
last December by the U.S. Board of Geographic
Names … Proponents of the name change have tried
for the last two years to remove squaw, which
many Indians consider offensive, from the names
of geographic features around the state.  "It is
never appropriate to use the word 'squaw,' said
Julian Matthews, 44, a Nez Perce tribal member …
Squaw should be dropped from names for no other
reason than that it is offensive to Indian women,
he said ….

*The Houston Chronicle, November 5, 2001*
Most offensive to Indians is the use of the term
"squaw" in mascot or place names, Hook said.
Most modern American Indian groups now consider
"squaw" an obscene reference to a woman's body
part, Hook said.  "It has always been a term of
derision for Indian women," he said.  In the past
few years there has been a national movement
among Indian leaders to have "squaw" purged from
place names.  The National Congress of American

Ser. Nos. 76511144 and 76511145

Indians asked the U.S. Board on Geographical
Names to have that term forbidden in use for
place names across the country.

*The Omaha World Herald, January 28, 2001*
That position [that the name "Squaw" is not
offensive] ignores Indians' feelings about the
word, said Leonard Bruguier, a Yankton Sioux
[Indian] and the director of the Institute of
American Indian Studies at the University of
South Dakota in Vermillion.  As he grew up in
Yankton, S.D., "the people I knew were seasonal
workers, hard workers," Bruguier said.  "They'd
get drunk and you'd hear this, and it has a very
negative connotation."  Linguists dispute the
origin of "squaw," although it clearly is
offensive today, said Bruguier … Some of those
urging the abolition of "squaw" link it to a
Mohawk word for a woman's private parts, retired
UCLA linguistics professor William Bright wrote
last fall in [the journal] Names.

*The Los Angeles Times, August 26, 1998*
The word "squaw" is a highly offensive Algonquin
word. … To use the word squaw today is not only a
grave insult to Native American women, it is an
insult to the dignity of every woman.  [Letter
from HASHI-HANTA, American Indian Movement,
Sells, Ariz.]

*The Saint Paul Pioneer Press, April 6, 1997*
The word "squaw," long the stuff of TV westerns
and American vernacular, is offensive to some
American Indians, and a national activist group
is launching a campaign to remove it from more
than 100 places throughout California - including
the most famous of all: Squaw Valley.  These
activists, leaders of the American Indian
Movement, say the word is the white man's
pejorative slang for "vagina," and they consider
it among "the worst of the worst."  The group's
crusade has met with success in Minnesota, where
it persuaded the Legislature to pass a law
decreeing that 19 place names containing the word
squaw be changed ….

Ser. Nos. 76511144 and 76511145

*The Washington Post, September 20, 1993*
[Senator Ben Nighthorse] Campbell said the word
Redskins is one of four terms most offensive to
Native Americans, the others being buck, squaw
and savage. … Campbell, a member of the Northern
Cheyenne tribe ….

2.  Excerpted stories retrieved from the Nexis
database which report that Native Americans find the term
"squaw" offensive, including:

*The Rocky Mountain News, June 1, 2004*
Army Spc. Lori Piestewa, a Hopi from Arizona, was
the first U.S. servicewoman killed in the Iraq
war. … An Arizona mountain, Squaw Peak - a name
offensive to Indian people - was renamed in her
honor ….

*The Tampa Tribune, May 19, 2004*
The word "squaw" is as offensive to Indians as
the "n-word" is to blacks.  It is so offensive
and repugnant that it's been banned from
geographical names in Minnesota and Arizona, and
a bill passed in Florida aims to ban it as
well ….

*The Chicago Tribune, April 18, 2003*
In renaming Squaw Peak, Napolitano also sought to
remove a name Indians find
offensive ….

*The Los Angeles Times, April 13, 2003*
The mountain is known as Squaw Peak, a name that
many American Indians find offensive and have
been trying to change ….

*The Fresno Bee, June 30, 2003*
Squaw Leap, a name that has long grated on
American Indians, has passed into Central
California history - at least, as far as the U.S.
Bureau of Land Management is concerned.  The
agency this month renamed 6,700-acre Squaw Leap
Management Area. … It is now the San Joachin
River Gorge. … American Indians … for decades
have considered the name an insult. … Land
Management officials said the word "squaw" has
come under increasing fire across the country.

Ser. Nos. 76511144 and 76511145

The word … carries disparaging and vulgar meanings ….

3.    Portions of state statutes retrieved from www.lexis.com, www.stateline.com, and www.revisor.leg.state.mn.us.com showing legislation enacted in five states that rename geographic sites having the term "squaw" or ban the term "squaw" from place names in public places:

*South Dakota Codified Laws §1-19C-4 (2003)*
Offensive place names in South Dakota by county are replaced as follows: … Squaw Lake [changed to] Serenity Lake … Squaw Flat [changed to] Hat Creek Flat … Squaw Creek [in Jones County changed to] Pitan Creek … Squaw Creek [in Lawrence County changed to] Cleopatra Creek … Squaw Hill [changed to] Six Mile Hill … Squaw Lake [in Marshall County changed to] Six Mile Lake … Squaw Creek [in Moody County changed to] Jack Moore Creek ….

*Montana Code Annotated §2-15-149 (2003)*
Naming of sites and geographic features replacement of word "squaw" -- advisory group. (1) The coordinator of Indian Affairs shall appoint an advisory group [to develop] names to replace present site or geographic names that contain the word "squaw".  (2) Each agency of state government that owns or manages public land in the state shall identify any features or places under its jurisdiction that contain the word "squaw" and inform the advisory group . . . [and shall ensure that] whenever the agency updates a map or replaces a sign, interpretive marker, or any other marker because of wear or vandalism, the word "squaw" is removed and replaced with the name chosen by the advisory group.

*Oregon Revised Statutes §271.600 (2003)*
271.600 Prohibition on use of term "squaw."
… (2) Except as required by federal law, a public body may not use the term "squaw" in the name of a public property.

*Maine Revised Statutes 1 M.R.S. §1101 (2003)*
§1101.  Definitions

Ser. Nos. 76511144 and 76511145

1. OFFENSIVE NAME. "Offensive name" means a name of a place that includes:
A. The designation "nigger" or "squaw" as a separate word or as part of a word; or
B. The designation "squa" as a separate word.

*Minnesota Session Laws Chapter 53-S.F. No. 574 (1995)*
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MINNESOTA:
Section 1. … On or before July 31, 1996, the commissioner of natural resources shall change each name of a geographic feature in the state that contains the word "squaw" to another name that does not contain this word. …  Signed by the governor April 18, 1995 ….

4.  A concurrent resolution passed by the Oklahoma legislature calling for the renaming of geographic place names in Oklahoma containing the term "squaw":

*Concurrent Resolution No. 94 (Oklahoma Legislature, May 2000)*
WHEREAS, the word "squaw" is offensive to Native Americans, and a national movement exists to remove this offensive word from all geographic names. …  NOW, THEREFORE, BE IT RESOLVED …. THAT the word "squaw" be removed from all geographic names used in Oklahoma.
*www2.lsb.state.ok.us*

Also in evidence is a concurrent resolution considered by the Idaho legislature which addresses the "goal of the eventual renaming of all geographical place names in the state to eliminate the use of the word 'squaw,'" stating "Native Americans and many citizens of the state find the term 'squaw' objectionable and offensive to Native Americans."  House Concurrent Resolution No. 42, 2d Sess. 2002), located by the examining attorney at *www3.state.id.us.*

5.  Two dictionary definitions and one encyclopedia entry for "squaw" submitted by the examining attorney with Office actions issued in the involved applications.[7]

---

[7] Applicant, with its responses to the examining attorney's first Office actions, submitted the following definition of "squaw"